**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CABLE NEWS NETWORK, INC.,

             Plaintiff,

v.

FEDERAL BUREAU OF INVESTIGATION,

             Defendant.

Case No. 1:17-cv-01167-JEB

**PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO DEFENDANT'S (1) MOTION FOR SUMMARY JUDGMENT
AND (2) MOTION TO SUBMIT AN IN CAMERA, EX PARTE DECLARATION**

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff Cable News Network, Inc.

("CNN"), by and through its undersigned counsel, hereby moves for summary judgment against

Defendant Federal Bureau of Investigation ("FBI"), opposes the FBI's motion for partial

summary judgment, and opposes the FBI's motion to submit an *in camera*, *ex parte* declaration.

For the reasons set forth more fully in the accompanying Memorandum, CNN's

Statement of Material Facts as to Which There is No Genuine Dispute and Response to the FBI's

Statement of Undisputed Material Facts, and the supporting Declaration and Exhibits thereto,

CNN states that there is no genuine dispute as to any material fact and that it is entitled to

judgment as a matter of law.

**REQUEST FOR HEARING**

CNN respectfully requests a hearing on its motion for summary judgment.

[SIGNATURE ON NEXT PAGE]

Dated:  November 3, 2017                Respectfully submitted,

                                        BALLARD SPAHR LLP

                                        /s/ *Charles D. Tobin*
                                        Charles D. Tobin (#455593)
                                        Adrianna C. Rodriguez (#1020616)
                                        Maxwell S. Mishkin (#1031356)
                                        1909 K Street, NW, 12th Floor
                                        Washington, DC 20006
                                        Telephone: (202) 661-2200
                                        Fax: (202) 661-2299
                                        tobinc@ballardspahr.com
                                        rodriguezac@ballardspahr.com
                                        mishkinm@ballardspahr.com

                                        *Counsel for Plaintiff Cable News Network, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that, on this date, I caused Plaintiff's Cross-Motion for Summary Judgment and Opposition to Defendant's (1) Motion for Summary Judgment and (2) Motion to Submit an *In Camera*, *Ex Parte* Declaration, supporting Memorandum, Statement of Material Facts as to Which There is No Genuine Dispute and Response to Defendant's Statement of Undisputed Material Facts, accompanying Declaration and Exhibits, and accompanying Proposed Orders to be filed and served electronically via the Court's ECF System upon counsel of record.

Dated:  November 3, 2017                         /s/ *Charles D. Tobin*
                                                 Charles D. Tobin

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CABLE NEWS NETWORK, INC., | |
| Plaintiff, | |
| v. | Case No. 1:17-cv-01167-JEB |
| FEDERAL BUREAU OF INVESTIGATION, | |
| Defendant. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S**
**CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO**
**DEFENDANT'S (1) MOTION FOR SUMMARY JUDGMENT AND (2) MOTION**
**TO SUBMIT AN IN CAMERA, EX PARTE DECLARATION**

BALLARD SPAHR LLP

Charles D. Tobin (#455593)
Adrianna C. Rodriguez (#1020616)
Maxwell S. Mishkin (#1031356)
1909 K Street, NW, 12th Floor
Washington, DC 20006
Telephone: (202) 661-2200
Fax: (202) 661-2299
tobinc@ballardspahr.com
rodriguezac@ballardspahr.com
mishkinm@ballardspahr.com

*Counsel for Plaintiff Cable News Network, Inc.*

Dated:  November 3, 2017

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND AND PROCEDURAL HISTORY.....................................................................3

    A.     The FBI and the 2016 Presidential Election ....................................................3

    B.     The Creation of the Comey Memos.................................................................3

          1.     The January 6, 2017 Meeting.................................................... 4

          2.     The January 27, 2017 White House Dinner............................... 5

          3.     The February 14, 2017 Oval Office Meeting............................. 6

          4.     The March 30, 2017 Telephone Call ........................................ 6

          5.     The April 11, 2017 Telephone Call .......................................... 7

    C.     Comey's Dismissal .......................................................................................7

    D.     Public Release of the Information Contained in the Comey Memos......................9

    E.     CNN's FOIA Request and this Litigation.........................................................10

ARGUMENT .............................................................................................................................12

I.      STANDARD OF REVIEW ..............................................................................................12

II.     THE FBI HAS IMPROPERLY WITHHELD THE COMEY MEMOS ...........................13

    A.     Some or All of the Comey Memos Must be Released Due to Prior
             Disclosure .....................................................................................................13

    B.     The Comey Memos May Not Be Withheld Under Exemption 7...........................15

    C.     The Comey Memos May Not Be Withheld Under Exemption 7(A)....................18

    D.     The Comey Memos May Not Be Withheld Under Exemption 7(E) ....................21

    E.     The Comey Memos May Not Be Withheld Under Exemptions 6 or 7(C) ............22

    F.     The Comey Memos May Not Be Withheld Under Exemption 1...........................25

    G.     The Comey Memos May Not Be Withheld Under Exemption 3...........................27

III.    THE FBI MUST PRODUCE ALL REASONABLY SEGREGABLE NON-
       EXEMPT PORTIONS OF THE COMEY MEMOS .........................................................28

IV.    THE FBI'S REQUEST TO FILE AN EX PARTE DECLARATION SHOULD
       BE DENIED BECAUSE THE COURT CAN REVIEW THE MEMOS IN
       CAMERA .......................................................................................................................29

CONCLUSION...........................................................................................................................31

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                    **Page(s)**

*100Reporters LLC v. Dep't of Justice*,
    248 F. Supp. 3d 115 (D.D.C. 2017) ...................................................................23

*Albuquerque Publishing Co. v. Dep't of Justice*,
    726 F. Supp. 851 (D.D.C. 1989) .......................................................................21

*Am. Immigration Council v. Dep't of Homeland Sec.*,
    950 F. Supp. 2d 221 (D.D.C. 2013) ..................................................................12

*Arieff v. Dep't of Navy*,
    712 F.2d 1462 (D.C. Cir. 1983) ........................................................................29

*Armstrong v. Exec. Office of the President*,
    97 F.3d 575 (D.C. Cir. 1996) .................................................................23, 24, 30

*Bartko v. Dep't of Justice*,
    62 F. Supp. 3d 134 (D.D.C. 2014) ....................................................................20

*Beck v. Dep't of Justice*,
    997 F.2d 1489 (D.C. Cir. 1993) ........................................................................23

*Blackwell v. FBI*,
    646 F.3d 37 (D.C. Cir. 2011) ...........................................................................22

*Campbell v. Dep't of Health & Human Servs.*,
    682 F.2d 256 (D.C. Cir. 1982) ........................................................................20

*Campbell v. Dep't of Justice*,
    164 F.3d 20 (D.C. Cir. 1998) ...........................................................................15

*\*Ctr. for Nat'l Sec. Studies v. Dep't of Justice*,
    331 F.3d 918 (D.C. Cir. 2003) ....................................................................15, 18

*CIA v. Sims*,
    471 U.S. 159 (1985) ..........................................................................................27

*\*Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice*,
    746 F.3d 1082 (D.C. Cir. 2014) ..............................................................18, 19, 30

*Demetracopoulos v. FBI*,
    510 F. Supp. 529 (D.D.C. 1981) .......................................................................16

*Dep't of Air Force v. Rose*,
    425 U.S. 352 (1976) ....................................................................................12, 17

*Dep't of Def. v. FLRA*,
510 U.S. 487 (1994) ............................................................................................24

*Dep't of Justice v. Reporters Comm. for Freedom of the Press*,
489 U.S. 749 (1989) ......................................................................................12, 24

*El Badrawi v. Dep't of Homeland Sec.*,
583 F. Supp. 2d 285 (D. Conn. 2008) ............................................................30, 31

*Elec. Frontier Found. v. CIA*,
2013 WL 5443048 (N.D. Cal. Sept. 30, 2013) ....................................................30

*Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec.*,
926 F. Supp. 2d 311 (D.D.C. 2013) ....................................................................29

*Fitzgibbon v. CIA*,
911 F.2d 755 (D.C. Cir. 1990) ............................................................................13

*Gardels v. CIA*,
689 F.2d 1100 (D.C. Cir. 1982) .....................................................................26, 27

*Goldstein v. Office of Indep. Counsel*,
1999 WL 570862 (D.D.C. July 29, 1999)............................................................21

*Gray v. U.S. Army Criminal Investigation Command*,
742 F. Supp. 2d 68 (D.D.C. 2010) ......................................................................20

*Halperin v. CIA*,
629 F.2d 144 (D.C. Cir. 1980) ............................................................................27

*Hayden v. NSA*,
608 F.2d 1381 (D.C. Cir. 1979) ..........................................................................29

*Hertzberg v. Veneman*,
273 F. Supp. 2d 67 (D.D.C. 2003) ......................................................................28

*Johnson v. FBI*,
118 F. Supp. 3d 784 (E.D. Pa. 2015) ..................................................................30

*Juarez v. Dep't of Justice*,
518 F.3d 54 (D.C. Cir. 2008) .........................................................................18, 19

*Judicial Watch, Inc. v. Dep't of Def.*,
715 F.3d 937 (D.C. Cir. 2013) .......................................................................25, 26

*Kimberlin v. Dep't of Justice*,
139 F.3d 944 (D.C. Cir. 1998) ............................................................................28

*King v. Dep't of Justice*,
  830 F.2d 210 (D.C. Cir. 1987) ...........................................................................18

*Larson v. Dep't of State*,
  565 F.3d 857 (D.C. Cir. 2009) ...........................................................................12

*Lesar v. Dep't of Justice*,
  636 F.2d 472 (D.C. Cir. 1980) ...........................................................................16

*Lykins v. Dep't of Justice*,
  725 F.2d 1455 (D.C. Cir. 1984) ....................................................................29, 30

*Mapother v. Dep't of Justice*,
  3 F.3d 1533 (D.C. Cir. 1993) ............................................................................19

*Mead Data Cent., Inc. v. Dep't of Air Force*,
  566 F.2d 242 (D.C. Cir. 1977) .....................................................................28, 29

*Murphy v. Exec. Office for U.S. Attorneys*,
  789 F.3d 204 (D.C. Cir. 2015) .....................................................................27, 28

*News-Press v. Dep't of Homeland Sec.*,
  489 F.3d 1173 (11th Cir. 2007) ...................................................................23, 25

*NLRB v. Robbins Tire & Rubber Co.*,
  437 U.S. 214 (1978)...........................................................................................18

*PHE, Inc. v. Dep't of Justice*,
  983 F.2d 248 (D.C. Cir. 1993) .....................................................................21, 22

*Pratt v. Webster*,
  673 F.2d 408 (D.C. Cir. 1982) ..............................................................15, 16, 18

*Pub. Citizen, Inc. v. OMB*,
  598 F.3d 865 (D.C. Cir. 2010) .....................................................................12, 17

*Pub. Citizen v. Dep't of State*,
  11 F.3d 198 (D.C. Cir. 1993) ............................................................................13

*Roth v. Dep't of Justice*,
  642 F.3d 1161 (D.C. Cir. 2011) .........................................................................30

*Sciacca v. FBI*,
  23 F. Supp. 3d 17 (D.D.C. 2014) .......................................................................30

*Shapiro v. Dep't of Justice*,
  153 F. Supp. 3d 253 (D.D.C. 2016) ...................................................................21

*Stern v. FBI*,
   737 F.2d 84 (D.C. Cir. 1984) ........................................................................................23, 24

*Wilderness Soc'y v. Dep't of Interior*,
   344 F. Supp. 2d 1 (D.D.C. 2004) ..............................................................................28

*\*Wolf v. CIA*,
   473 F.3d 370 (D.C. Cir. 2007) ..................................................................................13

## Statutes & Other Authorities

5 U.S.C. § 552 ................................................................................................. *passim*

Exec. Order No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009) ..............................................26

Fed. R. Civ. P. 56 ....................................................................................................12, 14, 22

## PRELIMINARY STATEMENT

This action seeks the release of memoranda prepared by former Federal Bureau of Investigation ("FBI") Director James B. Comey that he has publicly testified about, released to a Columbia Law School professor to disclose its contents to the news media, and which, as Comey explicitly told Congress, concern non-classified political issues.

As former Director Comey has testified, he prepared the memoranda immediately following his discussions with Donald J. Trump from January 2017 through April 2017. At the time of each discussion, Trump was either the President-elect or President of the United States. President Trump fired Comey in May 2017, just three years into Comey's 10-year term as FBI Director.

Comey explained to Congress in a public hearing that he created what are now known as the "Comey Memos" because he felt that President Trump's "nature" might lead him to lie about their conversations. Comey has testified that during a January 2017 dinner at the White House, President Trump demanded "loyalty" from him, stating, "I need loyalty, I expect loyalty," and that Comey believed that a contemporaneous record of those meetings could one day "defend the FBI" and its "integrity as an institution." The Comey Memos, by their author's own account, therefore contain detailed descriptions of the political relationship between the White House and the FBI, and can reasonably be expected to offer particularly illuminating insights such as the President's choice of words, tone of voice, posture, and gestures, and the FBI Director's contemporaneous impressions and concerns. These documents inarguably provide information of the highest interest to the American public.

Plaintiff Cable News Network, Inc. ("CNN"), under the Freedom of Information Act ("FOIA"), requested copies of the Comey Memos shortly after their existence came to light in May 2017. Despite Comey's public testimony and his providing a copy to the professor, the FBI

denied CNN's FOIA request in full under Exemption 7(A) – which allows an agency to withhold only those records compiled for law enforcement purposes, and only where disclosure could reasonably be expected to interfere with enforcement proceedings.  The FBI argues that the memos' release would harm an investigation into Russia's efforts to influence the 2016 presidential election.  The FBI also erroneously argues that portions of the Comey Memos may be withheld from the public on grounds that they contain classified information (Exemption 1), are exempt under statute (Exemption 3), would invade personal privacy (Exemptions 6 and 7(C)), and would reveal law enforcement techniques or procedures (Exemption 7(E)).

To permit the FBI to keep the memos secret under Exemption 7(A), the FBI must prove that they were compiled for purposes of the Russia investigation.  According to their author, they were not, and the FBI has not demonstrated otherwise.  The FBI must next prove that releasing the memos would likely interfere with the Russia probe.  The FBI has offered no explanation as to why their release would interfere with any investigation.

The FBI's contention that portions contain classified information also is at odds with Comey's own testimony that he specifically wrote several of the memos to be unclassified. Moreover, any minimal privacy interest of people mentioned in the Comey Memos is overwhelmed by the insight the memos would provide the public about what the government is up to.  Finally, much of the content of the Comey Memos already has been publicly disclosed, making their withholding unjustifiable under any FOIA exemption.

The Court should deny the FBI's motion for partial summary judgment, grant CNN's cross-motion for summary judgment, and order that the Comey Memos be released without delay.  The Court also should deny the FBI's motion to file the Declaration of an unnamed declarant *ex parte*, and should unseal that Declaration as well.

## BACKGROUND AND PROCEDURAL HISTORY

### A.      The FBI and the 2016 Presidential Election

Donald Trump's political battle against Comey and the FBI began even before his

election as President.  During his general election campaign against Hilary Clinton, unhappy

with the conclusion of the FBI investigation into her official use of a private email server,

candidate Trump released a video on Twitter asserting that "the Department of Justice, the State

Department, and the FBI colluded – got together – to make Hillary Clinton look less guilty and

look a lot better than she looks."  Pl.'s Statement of Undisputed Material Facts, dated Nov. 3,

2017 ("SUMF") ¶ 1.  He declared that such behavior "shows corruption at the highest level,"

adding, "this is collusion between the FBI, Department of Justice, and the State Department to

try and make Hillary Clinton look like an innocent person when she's guilty of very high

crimes."  *Id.*  After the FBI briefly re-opened the investigation of the Clinton emails, and

Director Comey then notified Congress that the bureau had not changed its conclusions,

candidate Trump responded to the audience at a campaign rally, "Hillary Clinton is guilty.  She

knows it, the FBI knows it, the people know it."  SUMF ¶ 2.  Two days later, on November 8,

2016, Mr. Trump was elected the 45th President of the United States.

Throughout his campaign, as the FBI's investigation of the Clinton emails changed

direction, candidate Trump alternately expressed admiration and dismay for the investigators,

and, specifically, at Comey.  The relationship among the would-be President, Comey, and the

FBI was a central feature of the Trump campaign.

### B.      The Creation of the Comey Memos

President-elect Trump's rocky relationship with Comey continued as a focus of public

interest – and Trump's – between the election and the Presidential Inauguration.  With that

backdrop, the President-elect conducted a series of in-person and telephone discussions about Comey's future as Director."[1]

### 1.     The January 6, 2017 Meeting

Comey and President-elect Trump met for the first time on January 6, 2017.  *See* SUMF ¶ 4.  As Comey testified before the Senate Select Committee on Intelligence, he attended the meeting with other leaders of the intelligence community to "brief [President-elect Trump] and his new national security team on the findings of an [intelligence] assessment concerning Russian efforts to interfere in the [2016] election."  SUMF ¶ 5.

Immediately following this meeting, Comey "felt compelled to document [his] first conversation with the President-Elect in a memo," which he "began to type . . . on a laptop in an FBI vehicle outside Trump Tower the moment [he] walked out of the meeting."  SUMF ¶ 6.  Comey testified that he felt the urgent need to memorialize the meeting based on "the nature of the person," explaining that he "was honestly concerned [President-elect Trump] might lie about the nature of our meeting so I thought it important to document."  SUMF ¶ 7.  Comey later elaborated, in an exchange with Senator Mark Warner, that he created the memos to be ready "to defend the FBI and our integrity as an institution and the independence of our investigative function."

> WARNER: I think that's a very important statement you just
> made. Then, unlike your dealings with presidents of either parties
> in your past experience, in every subsequent meeting or
> conversation with this president, you created a written record. Did

---

[1] Indeed, the tenuous nature of Comey's tenure was on the President-elect's mind as soon as the election was over.  When asked in an interview on November 13, 2016 whether he would retain the FBI Director, then just three years into his 10-year term, President-elect Trump stated, "I think that I would rather not comment on that yet.  I don't – I haven't made up my mind.  I respect him a lot.  I respect the FBI a lot . . . I would certainly like to talk to him.  And – see him. This is a tough time for him.  And I would like to talk to him before I'd answer a question like that."  *See* SUMF ¶ 3.

> you feel that you needed to create this written record of these
> memos, because they might need to be relied on at some future
> date?
>
> COMEY: Sure. I created records after conversations that I think I
> did it after each of our nine conversations.  If I didn't, I did it for
> nearly all of them especially the ones that were substantive.  I
> knew there might come a day when I would need a record of what
> had happened, not just to defend myself, but to defend the FBI and
> our integrity as an institution and the independence of our
> investigative function.  That's what made this so difficult is it was
> a combination of circumstances, subject matter and the particular
> person.

SUMF ¶ 8.

According to Comey, "[c]reating written records immediately after one-on-one

conversations with Mr. Trump was my practice from [the January 6, 2017 meeting] forward."

SUMF ¶ 9.

### 2.      The January 27, 2017 White House Dinner

One week after he took office, President Trump abruptly invited Comey to a one-on-one

dinner at the White House.  SUMF ¶ 10.  At dinner, Comey testified, President Trump asked if

he "wanted to stay on as FBI Director," noting that "lots of people wanted [the] job."  SUMF

¶ 11.  Comey interpreted this as "at least in part, an effort to have [him] ask for [his] job and

create some sort of patronage relationship."  *Id.*  When Comey expressed that he "was not on

anybody's side politically," President Trump responded, "I need loyalty, I expect loyalty."

SUMF ¶ 12.  Later that evening, President Trump repeated, "I need loyalty," to which Comey

responded, "You will always get honesty from me," leading President Trump to reply, "That's

what I want, honest loyalty."  *Id.*

Comey "wrote a detailed memo about the dinner immediately afterwards and shared it

with the senior leadership team of the FBI."  SUMF ¶ 13.  In his Senate testimony, Comey

observed that "common sense told [him]" that President Trump was "looking to get something in exchange for granting [his] request to stay in the job."  SUMF ¶ 14.

### 3.      The February 14, 2017 Oval Office Meeting

Following the resignation of President Trump's National Security Advisor Michael Flynn, on February 14, 2017, President Trump asked Comey to stay behind after a scheduled meeting in the Oval Office.  The President waited until Attorney General Jeff Sessions and Senior Advisor to the President Jared Kushner had left the room, and when the two were alone, President Trump stated to Comey, "I want to talk about Mike Flynn."  SUMF ¶ 15.  President Trump told Comey that Flynn "is a good guy and has been through a lot," adding, "I hope you can see your way clear to letting this go, to letting Flynn go.  He is a good guy.  I hope you can let this go." *Id.*

Comey told the Senate that he "immediately prepared an unclassified memo of the conversation about Flynn and discussed the matter with FBI senior leadership."  SUMF ¶ 16.  In subsequent testimony, Comey clarified that his intent in preparing an unclassified memo was to "make it easier for us to discuss within the FBI and the government, and to hold onto it in a way that makes it accessible to us."  SUMF ¶ 17.  Following the February 14 meeting, Comey "implore[d] the Attorney General to prevent any future direct communication between the President and [himself]."  SUMF ¶ 18.

### 4.      The March 30, 2017 Telephone Call

On the morning of March 30, 2017, President Trump called Comey and "asked why there had been a congressional hearing about Russia the previous week."  SUMF ¶ 19.  President Trump subsequently stated that he "hadn't brought up 'the McCabe thing'" – an apparent reference to FBI Deputy Director Andrew McCabe, whose wife Dr. Jill McCabe had received

political contributions during her Virginia State Senate campaign from entities linked to Virginia

Governor Terry McAuliffe – because Comey "had said McCabe was honorable."  SUMF ¶ 20.

Comey later testified that he "didn't understand why the President was bringing this up."  SUMF

¶ 21.

### 5.      The April 11, 2017 Telephone Call

On April 11, 2017, Comey spoke with President Trump for the last time.  President

Trump called Comey to ask what he had done to "get out" the message that President Trump was

not personally under investigation with respect to the Russia probe.  SUMF ¶ 22.  Before the call

ended, the President told Comey: "I have been very loyal to you, very loyal; we had that thing

you know."  *Id.*

## C.      Comey's Dismissal

On May 9, 2017, President Trump dismissed Comey from the position of FBI Director,

purportedly based on the recommendation of Attorney General Sessions and Deputy Attorney

General Rod Rosenstein.  SUMF ¶ 23.  A memorandum prepared by Rosenstein and attached to

the President's termination letter pointed to Comey's "handling of the conclusion of the

investigation of Secretary Clinton's emails" as the justification for the termination.  SUMF ¶ 24.

As recently as October 18, 2017, Attorney General Sessions testified to the Senate Judiciary

Committee that it was Comey's handling of the Clinton email investigation that led to his firing.

SUMF ¶ 25.

According to a *New York Times* report, however, on May 10, 2017, President Trump

"told Russian officials in the Oval Office . . . that firing [Comey] had relieved 'great pressure' on

him," and the President described Comey himself as "crazy, a real nut job."  SUMF ¶ 26.  Then-

deputy White House Press Secretary Sarah Huckabee Sanders further stated that Comey had committed "basic atrocities" that led to his firing.  SUMF ¶ 27.

President Trump discussed Comey's firing in more detail during an interview with NBC News on May 11, 2017, telling the network that Comey "wanted to have dinner because he wanted to stay on," adding, "I think he asked for the dinner.  And he wanted to stay on as the FBI head.  And I said I'll, you know, consider and we'll see what happens."  SUMF ¶ 28.  President Trump also conceded that he had decided to fire Comey "regardless of [the] recommendation" from Deputy Attorney General Rosenstein:

> [B]ut regardless of recommendation I was going to fire Comey knowing, there was no good time to do it.  And in fact when I decided to just do it, I said to myself, I said you know, this Russia thing with Trump and Russia is a made up story, it's an excuse by the Democrats for having lost an election that they should have won . . . . This was an excuse for having lost an election.

SUMF ¶ 29.

Also on May 11, 2017, *The New York Times* reported about the January 27 White House dinner.  SUMF ¶ 30.  According to that report, Comey and President Trump "made small talk about the election and the crowd sizes at Mr. Trump's rallies," until President Trump "turned the conversation to whether Mr. Comey would pledge his loyalty to him."  *Id.*  As the *Times* also noted, this account differed from "the dinner described by Mr. Trump in his interview with NBC," as President Trump "told NBC that Mr. Comey requested it to ask to keep his job."  SUMF ¶ 31.  According to the *Times*, Comey "described details of his refusal to pledge his loyalty to Mr. Trump to several people close to him on the condition that they not discuss it publicly while he was F.B.I. director."  *Id.*  The White House disputed this account, as according to his spokesperson, President Trump "would never even suggest the expectation of personal loyalty, only loyalty to our country and its great people."  SUMF ¶ 32.

**D.      Public Release of the Information Contained in the Comey Memos**

On May 12, 2017, the day after the *Times* reported on the January 27 dinner, President

Trump tweeted: "James Comey better hope that there are no 'tapes' of our conversations before

he starts leaking to the press!"  SUMF ¶ 33.  As he later testified, Comey reacted to President

Trump's statement by directing his friend – later identified as Columbia Law School Professor

Daniel Richman – to "share the content of the memo with a reporter."  SUMF ¶ 34.  On May 16,

2017, the *Times* published a report about the February 14, 2017 Oval Office meeting between

Comey and President Trump, directly referring to "a memo Mr. Comey wrote shortly after the

meeting."  SUMF ¶ 35.  According to the report, "Mr. Comey shared the existence of the memo

with senior F.B.I. officials and close associates," and "one of Mr. Comey's associates read parts

of [the memo] to a *Times* reporter."  *Id.*

On June 8, 2017, one month after he had been dismissed by President Trump, Comey

submitted a written statement and appeared in person before the Senate Select Committee on

Intelligence.  SUMF ¶ 36.  Comey testified under oath for nearly three hours and was asked

extensively about the Comey Memos.  Of particular note, the hearing included the following

exchange about the memos between Comey and Senator James Lankford:

> LANKFORD: The individual that you told about your memos, that
> then sent on to *The New York Times* – [did they] have a copy of the
> memos or [were they] told orally?
>
> COMEY: Had a copy at the time.
>
> LANKFORD: Do they still have a copy of those memos?
>
> COMEY: Good question.  I think so.  I guess I can't say for sure
> sitting here, but – I guess I don't know.  But I think so.

SUMF ¶ 37.  When asked if he would "encourage [Special Counsel Robert] Mueller to release

[the] memos," Comey replied, "Sure."  SUMF ¶ 38.

Shortly after Comey's testimony President Trump's counsel issued a statement asserting that Comey had disclosed details of their interactions beginning "no later than March 2017 when friends of Mr. Comey have stated he disclosed to them the conversations he had with the President during their January 27, 2017 dinner and February 14, 2017 White House meeting." SUMF ¶ 39.  The statement further declared that President Trump "never told Mr. Comey, 'I need loyalty, I expect loyalty' in form or substance."  *Id.*  The following day, the President, again through counsel, asserted that the previous day's statement "was accurate" and noted that "[i]t is obvious that whomever was the source for the May 11, 2017 New York Times story got that information from the memos or from someone reading or who had read the memos."  SUMF ¶ 40.

### E.       CNN's FOIA Request and this Litigation

On May 16, 2017, shortly after the Comey Memos came to light, CNN submitted a FOIA request ("the Request") to the FBI for "copies of all records of notes taken by or communications sent from FBI Director James Comey regarding or documenting interactions (including interviews and other conversations) with President Donald Trump."  *See* Compl. Ex. A, June 15, 2017, ECF 1-1.  CNN requested a fee waiver as a news organization and sought expedited processing.  *Id.*  On May 23, 2017, the FBI granted CNN's request for a fee waiver but denied its request for expedited processing.  *See* Compl. Exs. C & D, ECF 1-3 & 1-4.  CNN timely appealed the denial of its expedited processing request, *see* Compl. Ex. E, ECF 1-5, and on June 2, 2017, the Department of Justice's Office of Information Policy reversed the denial and remanded the Request to the FBI with directions to process it "as quickly as practicable."  *See* Compl. Ex. F, ECF 1-6.

On June 7, 2017, the Senate released Comey's prepared statement for the record in advance of his testimony the following day.  That same day, through counsel, CNN emailed FBI Section Chief David M. Hardy seeking a status update on the Request.  *See* Compl. Ex. G, ECF 1-7.  As that email observed, "Given that today Mr. Comey publicly confirmed that the memos exist, are not classified, and he divulged the details of those memos, it would now be appropriate for the FBI to comply with CNN's FOIA request immediately."  *See id.*  On June 8, 2017, the FBI responded to CNN's email, stating that the Request would be processed "as soon as practicable."  *See* Compl. Ex. H at 2, ECF 1-8.  On June 12, 2017, the FBI informed CNN that "[t]he FBI's FOIPA Program is searching the FBI's indices for potentially responsive documents."  *See id.* at 1.

On June 15, 2017, CNN filed this lawsuit against the FBI seeking the release of the Comey Memos.  *See* Compl., ECF 1.  The following day, the FBI notified CNN that it was withholding the Comey Memos in their entirety under Exemption 7(A), stating that "[t]he records responsive to [CNN's] request are law enforcement records," that "[t]here is a pending or prospective law enforcement proceeding relevant to these responsive records," and that "release of the information in these responsive records could reasonably be expected to interfere with enforcement proceedings."  SUMF ¶ 49.  The FBI filed its Answer on July 31, 2017, ECF 10, and moved for partial summary judgment on October 13, 2017, ECF 22, arguing that the Comey Memos may be withheld in full under Exemption 7(A), and that portions of the Memos may be withheld under Exemptions 1, 3, 6, 7(C), and 7(E).  CNN now opposes that motion and cross-moves for summary judgment on the grounds that the Comey Memos must be released under FOIA.

## ARGUMENT

## I.     STANDARD OF REVIEW

"FOIA cases typically and appropriately are decided on motions for summary judgment."

*Am. Immigration Council v. Dep't of Homeland Sec.*, 950 F. Supp. 2d 221, 229 (D.D.C. 2013).

Summary judgment is justified when the movant establishes "that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  However, "[u]nlike the review of other agency action that must be upheld if supported by

substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on

the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'"

*Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989)

(quoting 5 U.S.C. § 552(a)(4)(B)).  A court may therefore grant summary judgment to the

government in FOIA litigation based on information provided in agency affidavits or

declarations only if those filings "describe the justifications for nondisclosure with *reasonably*

*specific* detail, demonstrate that the information withheld *logically* falls within the claimed

exemption, and are *not controverted* by either contrary evidence in the record nor by evidence of

agency bad faith."  *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (emphasis

added) (citation omitted).  In conducting this analysis, courts are guided by the principle that

FOIA's objective is "'to pierce the veil of administrative secrecy and to open agency action to

the light of public scrutiny,'" and that its exemptions are accordingly to be "construed narrowly

in keeping with FOIA's presumption in favor of disclosure."  *Pub. Citizen, Inc. v. OMB*, 598

F.3d 865, 869 (D.C. Cir. 2010) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 360-61

(1976)).

## II.      THE FBI HAS IMPROPERLY WITHHELD THE COMEY MEMOS

The FBI has not justified withholding the Comey Memos in whole or in part.  Its motion

offers only vague, generalized arguments for keeping the Comey Memos secret, and it puts

forward implausible applications of the exemptions that the FBI relies on.  Moreover, where it

cites to the record before this Court at all, the FBI ignores contrary evidence weighing in favor of

the Comey Memos' release.

### A.      Some or All of the Comey Memos Must be Released Due to Prior Disclosure

The Court should order the release of the memos because their contents already have

been publicly disclosed.  Under the public domain doctrine, "when information has been

'officially acknowledged,' its disclosure may be compelled even over an agency's otherwise

valid exemption claim."  *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007) (quoting *Fitzgibbon v.

CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990)).  The D.C. Circuit applies a three-part test for whether

the public domain doctrine is triggered: (1) the "information requested must be as specific as the

information previously released," (2) "the information requested must match the information

previously disclosed," and (3) "the information requested must already have been made public

through an official and documented disclosure."  *Id.* (quoting *Fitzgibbon*, 911 F.2d at 765).

Here, CNN has met its threshold showing that the "information has been previously

disclosed" through details already "in the public domain that duplicates that being withheld."

*Pub. Citizen v. Dep't of State*, 11 F.3d 198, 201 (D.C. Cir. 1993).  In the exchange with Senator

Lankford during his Senate testimony, Comey explained that a personal friend – Professor

Richman – had received a copy of at least portions of the Comey Memos.  *See* SUMF ¶ 37.  The

FBI does not contend that Comey lacked the authority as FBI Director to authorize the release of

his own unclassified memos.  Rather, the FBI asserts that this disclosure (1) was "made while

13

Mr. Comey was no longer in the employ of the FBI but rather was a private citizen," and (2) did not "constitute a disclosure of the exact contents of *all* of the memos." *See* Mem. in Supp. of Defs.' Mot. for Partial Summ. J. ("FBI Mem.") at 17, Oct. 13, 2017, ECF 22-1 (emphasis added). But the FBI cites no material on the record in support of that assertion, as required under Rule 56(c)(1). *See id.* at 17-18; Decl. of David M. Hardy ("Hardy Decl.") ¶ 108, Oct. 13, 2017, ECF 22-2 (stating only that Comey "was no longer an FBI official at the point that he provided his testimony before the [Senate]").

The FBI's position is also irreconcilable with the timeline recounted by the President. President Trump stated through counsel, on the day of Comey's Senate testimony, that Comey had disclosed details of their meetings and conversations beginning before his May 9, 2017 firing, by "no later than March 2017 when friends of Mr. Comey have stated he disclosed to them the conversations he had with the President during their January 27, 2017 dinner and February 14, 2017 White House meeting." SUMF ¶ 39. And the following day, President Trump stated through counsel that his prior statement "was accurate." SUMF ¶ 40. The President's position, therefore, is that (1) Comey disclosed details about their conversations to third parties while he was still FBI Director, and (2) the information disclosed is virtually identical to the information now being withheld in at least some of the Comey Memos. That constitutes an "official disclosure" under the law of this circuit.

As the information the FBI seeks to withhold is already in the public domain, and, according to the President, was released during Comey's official term of service, the Court should release the information contained in the Comey Memos.

**B.     The Comey Memos May Not Be Withheld Under Exemption 7**

The FBI seeks to withhold the Comey Memos in full under Exemption 7(A) and in part under Exemptions 7(C) and 7(E).  But none of these Exemption 7 categories can justify keeping any portion of the memos secret, because as a threshold matter the FBI has failed to demonstrate that the memos were "compiled for law enforcement purposes."  5 U.S.C. § 552(b)(7).  To the contrary, Comey testified that the memos were not compiled for law enforcement purposes.

To justify its withholdings under Exemption 7, the FBI misapplies the two-part test from *Center for National Security Studies v. Department of Justice*, which holds that "[t]o establish a law enforcement purpose, [the agency]'s declarations must establish (1) 'a rational nexus between the investigation and one of the agency's law enforcement duties;' and (2) 'a connection between an individual or incident and a possible security risk or violation of federal law.'"  331 F.3d 918, 926 (D.C. Cir. 2003) (quoting *Campbell v. Dep't of Justice*, 164 F.3d 20, 32 (D.C. Cir. 1998)).  The FBI then asserts that the investigation into Russian interference in the 2016 election is "unquestionably within the law enforcement duties of the FBI," and that this "investigation is based on a viable connection between an 'incident' . . . and a possible security risk or violation of federal law."  *See* FBI Mem. at 13-14.

But the FBI has skipped the initial step in this analysis.  The two-part test applied in *Center for National Security Studies v. Department of Justice* originated in the D.C. Circuit decision *Pratt v. Webster*, 673 F.2d 408 (D.C. Cir. 1982).  In *Pratt*, the court made clear that "the agency's investigatory activities" must "give rise to the documents sought" in the first place.  *Id.* at 420.  As the D.C. Circuit explained, "[w]hile Congress intended that 'law enforcement purpose' be broadly construed, it was not meant to include investigatory activities wholly unrelated to law enforcement agencies' legislated functions of preventing risks to the national

15

security and violations of the criminal laws and of apprehending those who do violate the laws." *Id.* at 420-21.

The D.C. Circuit is consistent in its narrow construction of the "law enforcement purpose" required for application of Exemption 7. For example, in *Lesar v. Department of Justice*, the court reasoned that if a FOIA request sought "actual FBI records relating to the Bureau's surveillance of Dr. [Martin Luther] King," the court "would have serious doubts whether these could be construed in their entirety as 'investigatory records compiled for law enforcement purposes,'" because "the available evidence indicates that at some point this investigation wrongly strayed beyond its initial lawful scope and took on the nature of a campaign to harass and attempt to discredit Dr. King." *See* 636 F.2d 472, 486-87 (D.C. Cir. 1980). Similarly, in *Pratt*, the D.C. Circuit noted that where "many of the FBI's goals and methods in its COINTELPRO activities against the [Black Panther Party] give us serious pause," the court would not "intimate that all COINTELPRO documents would pass the Exemption 7 threshold, or even that all COINTELPRO documents concerning the Black Panther Party would necessarily meet this test." *See* 673 F.2d at 423 & n.36. And in *Demetracopoulos v. FBI*, where plaintiff "assert[ed] that the FBI inquiry . . . was conducted for the purely political purpose to 'get' something on an embarrassing opponent of [a] State Department policy," and "not a legitimate law enforcement reason," the court conducted its own "review of the documents" to assure "that the investigation of plaintiff by the FBI was not a mere sham designed to intimidate or embarrass him in his role of critic of [the relevant] policy" before finding that Exemption 7 could apply. *See* 510 F. Supp. 529, 531 (D.D.C. 1981) (internal marks omitted).

Here, former Director Comey testified that he created the Comey Memos with the intent to share them with the public if the President continued to make the FBI's integrity a political

issue.  Comey was clear to the Senate that he created the memos because he was "honestly concerned [President Trump] might lie about the nature of [their] meeting[s]" and feared "there might come a day when [he] would need a record of what had happened, not just to defend [himself], but to defend the FBI and our integrity as an institution and the independence of our investigative function."  *See* SUMF ¶¶ 7-8.  The author of the Comey Memos therefore made clear, in public testimony, that his discussions with President Trump were not, as consistent Exemption 7 precedent in this circuit requires, an "investigatory activit[y]" at all, and that he did not create the Comey Memos in furtherance of an investigation.  To the contrary, then-Director Comey created the memos to further his goal of preserving the FBI's "integrity as an institution."

The FBI makes two additional arguments on this point, neither of which withstands scrutiny.  First, the FBI asserts that "records not initially obtained or generated for law enforcement purposes may qualify if they were subsequently assembled for a valid law enforcement purpose."  FBI Mem. at 13.  That is true as far as it goes, but the FBI never explains how the Comey Memos, clearly not written for a law enforcement purpose, have subsequently been "compiled" for a law enforcement purpose.  Quite the contrary: the FBI's public Declaration states only that the memos contain "references" to information that is "related to the Russia investigation" before jumping to the conclusion that this "information and by extension the memos in which it is referenced were compiled for law enforcement purposes."  *See* Hardy Decl. ¶ 67.  The FBI's expansive argument – that a record created for political purposes is somehow compiled for law enforcement purposes because it "references" information "related" to an investigation – ignores the rule that exemptions be "construed narrowly in keeping with FOIA's presumption in favor of disclosure."  *Pub. Citizen*, 598 F.3d at 869 (citing *Rose*, 425 U.S. at 361).

Second, the FBI argues that "'[l]ess exacting proof' of a legitimate law enforcement purpose is required of law enforcement agencies such as the Department of Justice and the FBI." FBI Mem. at 13 (citing *Pratt*, 673 F.2d at 418 & n.25, and *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 926). But "while [the] measure of a criminal law enforcement agency's 'law enforcement purpose' is necessarily deferential, . . . it is not vacuous." *Pratt*, 673 F.2d at 421. *Pratt* does not "require[] a court to sanction agency claims that are pretextual or otherwise strain credulity." *King v. Dep't of Justice*, 830 F.2d 210, 230 (D.C. Cir. 1987). And in making this claim, the FBI asks the Court to ignore Comey's own testimony as to the memos' purpose.

Accordingly, as the Comey Memos were written for political and not law enforcement purposes, and the FBI has failed to demonstrate the Comey Memos were compiled for law enforcement purposes, Exemption 7 does not apply, and the Court should release the memos.

**C.      The Comey Memos May Not Be Withheld Under Exemption 7(A)**

As to the specific subsections of Exemption 7, the FBI has failed to show why 7(A), which only permits withholding where release of those records "could reasonably be expected to interfere with enforcement proceedings," would apply. *See* 5 U.S.C. § 552(b)(7)(A). The record contains no evidence that the Comey Memos could reasonably be expected to interfere with any enforcement proceedings.

The D.C. Circuit has explained that Congress enacted Exemption 7(A) to ensure agencies are not "hindered in their investigations or placed at a disadvantage when it [comes] time to present their case.'" *Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice*, 746 F.3d 1082, 1096 (D.C. Cir. 2014) ("*CREW*") (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 224 (1978)). Exemption 7(A) applies where an "investigation continues to gather evidence for a possible future criminal case, and that case would be jeopardized by the premature release

of that evidence." *Juarez v. Dep't of Justice*, 518 F.3d 54, 59 (D.C. Cir. 2008). "To justify

withholding," therefore, the FBI must "demonstrate that 'disclosure (1) could reasonably be

expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably

anticipated.'" *CREW*, 746 F.3d at 1096 (quoting *Mapother v. Dep't of Justice*, 3 F.3d 1533,

1540 (D.C. Cir. 1993)). While courts "give deference to an agency's predictive judgment of the

harm that will result from disclosure of information, it is not sufficient for the agency to simply

assert that disclosure will interfere with enforcement proceedings; it must rather demonstrate

*how* disclosure will do so." *Id.* at 1098 (emphasis in original) (internal marks and citations

omitted).

In invoking Exemption 7(A), the FBI simply asserts:

- That it:

> has generally explained . . . that the Comey Memos include
> information regarding confidential aspects of the Russia
> investigation, and that disclosure of the Comey Memos and the
> information contained therein could reasonably be expected to
> adversely affect the ongoing investigation, as well as any law
> enforcement proceedings that may ultimately result from this
> investigation, by revealing the scope and focus of the investigation,
> and whether particular activities, information, or evidence is or is
> not of interest in the investigation.

FBI Mem. at 15 (citing Hardy Decl. ¶¶ 67, 71).

- That the Comey Memos "include numerous references to sensitive information directly

  related to the Russia investigation, including information which would reveal aspects of

  the investigation's subjects, scope, and focus." Hardy Decl. ¶ 67.

- And that "[b]roadly speaking, disclosing the Comey Memos and the information

  contained in them could reasonably be expected to adversely affect the pending

  investigation by revealing the scope and focus of the investigation, and whether particular

persons, activities, information, or evidence is or is not of interest in the investigation."
*Id.* ¶ 71.

These bare, cookie-cutter representations, which at most aver to "references" to the
investigation and do not reflect that the Comey Memos contain sensitive investigatory details
themselves, offer precisely the vague and conclusory information courts in this circuit have
rejected under Exemption 7(A) assertions.  *See, e.g.*, *Gray v. U.S. Army Criminal Investigation
Command*, 742 F. Supp. 2d 68, 75 (D.D.C. 2010) (finding that "conclusory, boilerplate
statements, without reference to specific documents or even categories of documents, fail to
support the agency's motion for summary judgment on the basis of Exemption 7(A)," and
observing that the agency's declaration "appear[s] designed to cover every scenario in which a
plaintiff seeks the disclosure of records related to a law enforcement proceeding"); *Bartko v.
Dep't of Justice*, 62 F. Supp. 3d 134, 147 (D.D.C. 2014) (Boasberg, J.) (denying summary
judgment for the government on Exemption 7(A) because declaration of David Hardy "provides
no *specifics* about, for example, the investigation – or even the type of investigation – that could
be compromised or *how* the release of the information requested would interfere with any
particular ongoing investigation.") (emphasis added); *cf. Campbell v. Dep't of Health & Human
Servs.*, 682 F.2d 256, 265 (D.C. Cir. 1982) (requiring on remand that the government make
submissions that "demonstrate specifically how each document or category of documents, if
disclosed, would interfere with the investigation, for example, how revelation of any particular
record or record category identified as responsive to [plaintiff]'s request would reveal to
particular targets, actual or potential, the scope, direction, or focus of the [agency] inquiry").

The FBI's Exemption 7(A) argument is therefore not sufficient to justify withholding any
portion of the Comey Memos – let alone withholding the memos in their entirety.

**D.      The Comey Memos May Not Be Withheld Under Exemption 7(E)**

Exemption 7(E) authorizes an agency to withhold law enforcement investigatory records

or information "but only to the extent that the production . . .  would disclose techniques and

procedures for law enforcement investigations or prosecutions, or would disclose guidelines for

law enforcement investigations or prosecutions if such disclosure could reasonably be expected

to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  To qualify for withholding under

Exemption 7(E), the techniques or procedures at issue must not "be already well known to the

public."  *Goldstein v. Office of Indep. Counsel*, 1999 WL 570862, at *13-14 (D.D.C. July 29,

1999) (ordering release of documents withheld under Exemption 7(E) where disclosure would

not risk circumvention of the law and information was commonly known to the public).  For

example, in *Albuquerque Publishing Co. v. Department of Justice*, the court rejected a 7(E)

assertion and unsealed an in camera affidavit on grounds that the exemption did not apply to

"information pertaining to techniques that are commonly described or depicted in movies,

popular novels, stories or magazines, or on television," and that the court saw "nothing

exceptional or secret" in the documents' description of  "techniques such as eavesdropping,

wiretapping, and surreptitious tape recording and photographing."  726 F. Supp. 851, 857-58

(D.D.C. 1989); *see also Shapiro v. Dep't of Justice*, 153 F. Supp. 3d 253, 273 (D.D.C. 2016)

("[T]he purpose of Exemption 7(E) is to prevent the public from learning about the existence of

confidential law enforcement techniques, not to prevent it from learning about the use of already-

disclosed law enforcement techniques.").

Moreover, courts hold government agencies asserting this exemption to stringent proof.

*See PHE, Inc. v. Dep't of Justice*, 983 F.2d 248, 252-53 (D.C. Cir. 1993) (rejecting as

"inadequate" a "vague and conclusory" agency affidavit that "did not demonstrate that the

material it withheld created a risk of circumvention of the law within [Exemption 7(E)]").  In 7(E) cases, the agency has the specific burden of "demonstrat[ing] logically how the release of the requested information might create a risk of circumvention of the law."  *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011) (citation omitted).

Here, in invoking Exemption 7(E), the FBI fails to assert that any "techniques or procedures" revealed by the Comey Memos are not well known to the public already – nor does the FBI cite any material on the record to support that argument, as it must under Rule 56(c)(1). *See* FBI Mem. at 26-28; Hardy Decl. ¶¶ 104-06.  Additionally, under the guarded circumstances of Comey's meetings with President-elect and President Trump, it is entirely implausible that Comey would have shared the kind of operational details about investigatory techniques or procedures that Exemption 7(E) is meant to protect.  The FBI's vague assertions about law enforcement techniques, and its conclusory and illogical assertions about the alleged risk of circumvention of the law, are entirely insufficient to justify withholding the Comey Memos.

**E.**      **The Comey Memos May Not Be Withheld Under Exemptions 6 or 7(C)**

Despite the undeniable public interest in the information, the FBI seeks to withhold under Exemptions 6 and 7(C) portions of the Comey Memos consisting of "the names of, and some identifying information about" four categories of persons: (1) FBI employees; (2) relative(s) of the FBI employee(s); (3) "individual(s) providing information to the FBI" during the Russia investigation; and (4) individuals who were "merely mentioned" in the Comey Memos.  *See* FBI Mem. at 28.  All of these withholdings are improper.

Exemption 6 provides that records may be withheld only if they are "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  Exemption 7(C) narrowly authorizes an

agency to withhold "records or information compiled for law enforcement purposes, but only to

the extent that the production of such law enforcement records or information . . . could

reasonably be expected to constitute an unwarranted invasion of personal privacy."  *Id.*

§ 552(b)(7)(C).  As the FBI correctly notes, Exemptions 6 and 7(C) in this way both "balance[]

individuals' privacy interests against the public's interest in disclosure."  Hardy Decl. ¶ 99.  *See*

*100Reporters LLC v. Dep't of Justice*, 248 F. Supp. 3d 115, 158 (D.D.C. 2017) ("Both

exemptions require agencies and reviewing courts to 'balance the privacy interests that would be

compromised by disclosure against the public interest in the release of the requested

information.'" (quoting *Beck v. Dep't of Justice*, 997 F.2d 1489, 1491 (D.C. Cir. 1993))).

In *News-Press v. Department of Homeland Security*, for example, news organizations

sought information from the Federal Emergency Management Agency ("FEMA") about claims

for federal aid and insurance made after federally-declared disasters, and FEMA sought to

withhold those records – which the court noted would reveal "whether FEMA has been a good

steward of billions of taxpayer dollars" – under Exemption 6.  489 F.3d 1173, 1178 (11th Cir.

2007).  The Eleventh Circuit "acknowledge[d] the privacy interests at stake," but held that

disclosure was required because the "the magnitude of this public interest is potentially

enormous," further observing that it is "precisely the kind of public interest that meets the

FOIA's core purpose of shedding light on what the government is up to."  *Id.* at 1206.

The D.C. Circuit similarly has held that when the persons in question are "high-level"

government employees, this status "diminishes their privacy interests . . . because of the

corresponding public interest in knowing how public employees are performing their jobs."

*Stern v. FBI*, 737 F.2d 84, 92-94 (D.C. Cir. 1984).  As the court noted in *Armstrong v. Executive

Office of the President*, an alleged privacy interest "will always be dependent on the context in

23

which it has been asserted." 97 F.3d 575, 581 (D.C. Cir. 1996) (addressing Exemption 6).  The

"'public interest in disclosure' to be weighed in this balance" against these privacy interests

under Exemptions 6 and 7(C) "is the extent to which disclosure would serve the 'core purpose of

the FOIA,' which is 'contribut[ing] significantly to public understanding of the operations or

activities of the government.'" *Dep't of Def. v. FLRA*, 510 U.S. 487, 495 (1994) (quoting

*Reporters Comm.*, 489 U.S. at 775).

Here, in attempting to elevate the privacy interest, the FBI first sweepingly asserts that

"its employees . . . enjoy substantial privacy protections by virtue of their FBI employment." *See*

FBI Mem. at 30 (citing Hardy Decl. ¶ 102).  But the FBI has given no indication that the names

it seeks to withhold under Exemptions 6 and 7(C) are those of only lower-level employees.

Rather, Comey has testified President Trump spoke to him about FBI Deputy Director Andrew

McCabe, *see* SUMF ¶ 20, whom the President also made central to his criticisms of the FBI's

handling of the Clinton email investigation.  Senior FBI employees such as Deputy Director

McCabe have greatly diminished privacy interests, especially in light of the overwhelming

public interest in any political discussion between President Trump and his embattled FBI

Director.  *See Stern*, 737 F.2d at 93-94.  To the extent that McCabe or other senior FBI

employees were identified in the Comey Memos, neither Exemption 6 nor 7(C) will shield their

names.

The FBI likewise asserts that "relatives of [FBI] employees, like anyone merely

mentioned in an FBI record, maintain similarly high privacy interests," and that an "individual

providing information to the FBI in its investigation also has substantial privacy interests."  FBI

Mem. at 30.  But here, Comey testified that at one point in their discussions President Trump

mentioned one particular relative of an FBI employee: Dr. Jill McCabe, the wife of Deputy

Director McCabe and a former Democratic candidate for the Virginia State Senate.  *See* SUMF

¶ 20.  In that same conversation President Trump may also have mentioned Virginia Governor

Terry McAuliffe.  But Dr. McCabe and Governor McAuliffe are not merely private individuals,

and in the context of a conversation between the President and the FBI Director, their privacy

interests are diminished, rather than heightened.  The same would be true if the Comey Memos

include the names of or identifying information about members of Congress, senior political

operatives, diplomats, or any other high-profile individuals who may have been "merely

mentioned" during the conversations between Comey and President Trump.

Moreover, under both exemptions, the balance tips overwhelmingly in favor of disclosure

given the undeniable public interest in the political pressure any White House – and especially,

given recent history, this White House – brings to bear on the FBI.  Because of the unparalleled

public interest in these records, it is inconceivable that the FBI could identify a personal privacy

interest weighty enough to justify any withholding.  *See News-Press*, 489 F.3d at 1205.

**F.     The Comey Memos May Not Be Withheld Under Exemption 1**

The FBI also erroneously seeks to withhold portions of the Comey Memos under

Exemption 1, which allows an agency to withhold records that are "(A) specifically authorized

under criteria established by an Executive order to be kept secret in the interest of national

defense or foreign policy and (B) are in fact properly classified pursuant to such Executive

order."  5 U.S.C. § 552(b)(1).  While "[a]gencies may establish the applicability of Exemption 1

by affidavit (or declaration)," the affidavit must "describe[] the justifications for withholding the

information with specific detail, demonstrate[] that the information withheld logically falls

within the claimed exemption," and not be "contradicted by contrary evidence in the record or by

evidence of the agency's bad faith" to justify granting summary judgment for the agency on the

Exemption 1 claim. *Judicial Watch, Inc. v. Dep't of Def.*, 715 F.3d 937, 940-41 (D.C. Cir. 2013) (internal marks and citation omitted).  The agency's rationale for withholding under Exemption 1 must also be "logical" and "plausible." *Gardels v. CIA*, 689 F.2d 1100, 1105 (D.C. Cir. 1982) ("[T]he issue is whether on the whole record the Agency's judgment objectively survives the test of reasonableness, good faith, specificity, and plausibility.").  A document is not  "properly classified" if the purpose of the classification is to: "(1) conceal violations of law, inefficiency, or administrative error; (2) prevent embarrassment to a person, organization, or agency; (3) restrain competition; or (4) prevent or delay the release of information that does not require protection in the interest of the national security."  *See* Exec. Order No. 13,526 § 1.7(a), 75 Fed. Reg. 707 (Dec. 29, 2009); *see also* Hardy Decl. ¶ 80(c) (noting that "before information can be considered to be properly classified," certain "prohibitions and limitations on classification specified in E.O. 13526 § 1.7" must be followed).

While the FBI has not publicly identified which portions of the Comey Memos it now claims are classified, its position is undermined both by "contrary evidence in the record" and by the implausibility of its arguments.  First, Comey specifically testified that at least some of the memos were written to be unclassified records.  *See, e.g.*, SUMF ¶ 16 (Comey "immediately prepared an *unclassified* memo of the [February 14, 2017] conversation about Flynn and discussed the matter with FBI senior leadership.") (emphasis added).  Comey also made reference to more than one unclassified memo in an exchange with Senator Roy Blunt during his Senate testimony:

> BLUNT: Were all your memos that you recorded on classified or other memos that might be yours as a private citizen?
>
> COMEY: I'm not following the question.
>
> BLUNT: You said you used classified —

> COMEY: Not the classified documents.  Unclassified. I don't have
> *any of them* anymore. I gave *them* to the special counsel. My view
> was that the content of *those* unclassified, memorialization of *those*
> *conversations* was my recollection recorded.

See Decl. of Charles D. Tobin ¶ 5 & Ex. 5 at 28, Nov. 3, 2017 (emphasis added).  And given that

Comey was FBI Director at the time he wrote the memos, he was fully empowered to create

unclassified records as he intended.

Therefore, the FBI's argument that the unclassified memos now fall within the scope of

Exemption 1 is implausible and contradicted by evidence on the record.

## G.     The Comey Memos May Not Be Withheld Under Exemption 3

Exemption 3 authorizes an agency to withhold records that are "specifically exempted

from disclosure by statute . . . , if that statute . . . requires that the matters be withheld from the

public in such a manner as to leave no discretion on the issue . . . or establishes particular criteria

for withholding or refers to particular types of matters to be withheld."  5 U.S.C. § 552(b)(3).  In

order to properly invoke Exemption 3, the FBI must establish (1) that the statute at issue

qualifies as an exempting statute under Exemption 3, and (2) that the records in question must be

withheld under that statute.  *CIA v. Sims*, 471 U.S. 159, 167 (1985).

To justify its Exemption 3 claim, the FBI asserts that the Comey Memos contain

information about "intelligence sources and methods," the disclosure of which is prohibited

under the National Security Act of 1947, 50 U.S.C. § 3024(i)(l).  *See* FBI Mem. at 25-26.  The

FBI bears the burden on Exemption 3 to establish that the portions of the Comey Memos it seeks

to withhold "can reasonably be expected to lead to unauthorized disclosure of intelligence

sources and methods."  *Gardels*, 689 F.2d at 1103 (quoting *Halperin v. CIA*, 629 F.2d 144, 147

(D.C. Cir. 1980)).  Further, the FBI's asserted justification under Exemption 3 must also be

"logical or plausible."  *Murphy v. Exec. Office for U.S. Attorneys*, 789 F.3d 204, 209 (D.C. Cir.

2015) (citation omitted).

As with its other claims, under the undisputed facts surrounding the creation of the

Comey Memos, the FBI's invocation of Exemption 3 is neither logical nor plausible.  Comey

testified he wrote the memos because he did not trust President Trump's "nature."  For all the

same reasons discussed above with respect to "techniques and procedures" under Exemption

7(E), it is implausible that under those guarded circumstances, Comey would have shared with

President Trump, and therefore recorded in the Comey Memos, sensitive details about specific

"intelligence sources and methods" in any investigation they would have discussed.  The FBI has

therefore failed to justify withholding any portion of the Comey Memos under Exemption 3.

## III.    THE FBI MUST PRODUCE ALL REASONABLY SEGREGABLE NON-EXEMPT PORTIONS OF THE COMEY MEMOS

Even if the Court were to find that the public domain doctrine does not apply to any of

the Comey Memos and that the FBI has carried its burden of demonstrating that at least one

exemption applies to the memos, FOIA still requires that "[a]ny reasonably segregable portion"

of the memos be produced "after deletion of the portions which are exempt."  5 U.S.C. § 552(b).

To withhold any requested document in its entirety, therefore, an agency "must demonstrate that

it cannot segregate the exempt material from the non-exempt."  *Hertzberg v. Veneman*, 273 F.

Supp. 2d 67, 90 (D.D.C. 2003) (citing *Kimberlin v. Dep't of Justice*, 139 F.3d 944, 949-50 (D.C.

Cir. 1998)).  "[A] blanket declaration that all facts are so intertwined to prevent disclosure under

the FOIA does not constitute a sufficient explanation of non-segregability."  *Wilderness Soc'y v.*

*Dep't of Interior*, 344 F. Supp. 2d 1, 19 (D.D.C. 2004); *see also Mead Data Cent., Inc. v. Dep't*

*of Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977) ("[I]f the Air Force decides to continue in its

claim that the non-exempt material in these documents is not reasonably segregable . . . , it must

provide a more detailed justification than the conclusory statements it has offered to date."). Instead, "[t]o justify withholding a document in full, an agency must show with reasonable specificity why the document cannot be further segregated, or why the document is not reasonably segregable – for example, because the nonexempt material would be an essentially meaningless set of words and phrases." *Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec.*, 926 F. Supp. 2d 311, 315 (D.D.C. 2013) (internal marks and citations omitted).

Here, the FBI asserts in insufficient, conclusory fashion that it "has concluded that no non-exempt information exists that can be reasonably segregated and released to plaintiffs," and moreover that "[t]o provide any further details about this determination risks the very harms that the FBI is trying to avoid" in citing the various exemptions discussed above. Hardy Decl. ¶ 109. This bare conclusion contradicts Comey's testimony about information that the Comey Memos can reasonably be expected to contain – the President's words in demanding loyalty from the FBI Director; the Director's responses; the Director's contemporaneous impressions and concerns; the President's tone of voice, posture, and gestures; any interruptions to their conversations; even the dinner menu – and that cannot justifiably be withheld under any exemption. On this record, a blanket withholding of all portions of the Comey Memos would be entirely improper.

## IV.    THE FBI'S REQUEST TO FILE AN *EX PARTE* DECLARATION SHOULD BE DENIED BECAUSE THE COURT CAN REVIEW THE MEMOS *IN CAMERA*

Finally, the FBI's request to file an additional sealed, *ex parte* declaration in support of its motion for partial summary judgment should be denied. The FBI cites only two decisions of the D.C. Circuit in arguing for the propriety of such a secret declaration: *Arieff v. Department of Navy*, 712 F.2d 1462 (D.C. Cir. 1983), and *Hayden v. NSA*, 608 F.2d 1381 (D.C. Cir. 1979). But those decisions both pre-date *Lykins v. Department of Justice*, where the D.C. Circuit questioned

"[t]he legitimacy of accepting *in camera* affidavits (as opposed to *in camera* review of withheld

documents)," and held that "a trial court should not use *in camera* affidavits unless necessary

and, if such affidavits are used, it should be certain to make the public record as complete as

possible."  725 F.2d 1455, 1465 (D.C. Cir. 1984).

   The court later reiterated that position in *Armstrong*, observing that while "the use of in

camera review is generally encouraged, the use of in camera affidavits has generally been

disfavored." 97 F.3d at 580.  And more recently in *Roth v. Department of Justice*, the D.C.

Circuit explained that "[r]equiring agencies to provide public explanations for their redactions

allows for adversarial testing of the agencies' claims, which helps focus the court's attention on

the most important issues in the litigation and may reveal not otherwise apparent flaws in the

agencies' reasoning," while noting that an agency "may supplement its explanation by making

the documents available for *in camera* review."  642 F.3d 1161, 1185 (D.C. Cir. 2011).

Moreover, filing a sealed *ex parte* declaration shields the declarant's very identity from scrutiny,

which prevents opposing parties from being able to uncover and bring to light – as part of the

adversarial process – any documented infirmities in the assertions that the declarant has made in

other pieces of FOIA litigation.[2]

---

[2] Many courts, for instance, have rejected the sufficiency of Mr. Hardy's routine, boilerplate
assertions.  *See, e.g.*, *CREW*, 746 F.3d at 1102 (Hardy's "near-verbatim recitation of the statutory
standard is inadequate."); *Johnson v. FBI*, 118 F. Supp. 3d 784, 798 (E.D. Pa. 2015) ("The Hardy
Declaration" recites only "vague, general, and patently conclusory language."); *Sciacca v. FBI*,
23 F. Supp. 3d 17, 30 (D.D.C. 2014) ("[T]he Hardy Declaration is manifestly insufficient as a
matter of law to allow the Court to assess the applicability of the FOIA exemptions."); *Elec.
Frontier Found. v. CIA*, 2013 WL 5443048, at *22 (N.D. Cal. Sept. 30, 2013) ("The Hardy
[D]eclaration fails to provide a sufficiently detailed and particularized explanation of the basis
for the agency's nondisclosure. . . . [T]he FBI has proffered generalized and conclusory reasons
for redacting."); *El Badrawi v. Dep't of Homeland Sec.*, 583 F. Supp. 2d 285, 304-05, 313 (D.
Conn. 2008) (concluding that Hardy's declaration "fails to meet the 'relatively detailed and
nonconclusory' standard," and finding that FBI's filing of repeated supplemental affidavits

Consistent with this Circuit's practice, therefore, the Court should not allow the FBI to make unchallenged *ex parte* arguments from an unknown declarant about the Comey Memos when the FBI can just as easily offer up the memos themselves for the Court's *in camera* review. The Court should release the *ex parte* declaration to the public docket.

## CONCLUSION

For the foregoing reasons, CNN respectfully requests that its motion for summary judgment be granted, that the FBI's motion for partial summary judgment be denied, that the FBI's motion to submit an in camera, *ex parte* declaration be denied, and that the Court award CNN its costs and reasonable attorneys' fees incurred in this action.

Dated:  November 3, 2017              Respectfully submitted,

BALLARD SPAHR LLP

/s/ *Charles D. Tobin*
Charles D. Tobin (#455593)
Adrianna C. Rodriguez (#1020616)
Maxwell S. Mishkin (#1031356)
1909 K Street, NW, 12th Floor
Washington, DC 20006
Telephone: (202) 661-2200
Fax: (202) 661-2299
tobinc@ballardspahr.com
rodriguezac@ballardspahr.com
mishkinm@ballardspahr.com

*Counsel for Plaintiff Cable News Network, Inc.*

---

"leaves the court with little faith that the agencies will timely submit comprehensive and sufficiently detailed affidavits, even if specifically ordered to do so").

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CABLE NEWS NETWORK, INC.,

        Plaintiff,

v.

FEDERAL BUREAU OF INVESTIGATION,

        Defendant.

Case No. 1:17-cv-01167-JEB

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE
IS NO GENUINE DISPUTE AND RESPONSE TO DEFENDANT'S
<u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>**

Plaintiff Cable News Network, Inc. ("CNN"), by and through its undersigned counsel and pursuant to Local Civil Rule 7(h), hereby submits its Statement of Material Facts as to Which There is no Genuine Dispute in connection with its Cross-Motion for Summary Judgment, together with its Response to the Statement of Material Facts as to Which There is no Genuine Dispute submitted by Defendant Federal Bureau of Investigation ("FBI") with its Motion for Partial Summary Judgment, Oct. 13, 2017, ECF 22-10 ("FBI's Statement").

**CNN'S STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE**

1.      During his general election campaign against Hilary Clinton, unhappy with the conclusion of the FBI investigation into her official use of a private email server, candidate Donald J. Trump released a video on Twitter asserting that "the Department of Justice, the State Department, and the FBI colluded – got together – to make Hillary Clinton look less guilty and look a lot better than she looks."  He declared that such behavior "shows corruption at the highest level," adding, "this is collusion between the FBI, Department of Justice, and the State Department to try and make Hillary Clinton look like an innocent person when she's guilty of

very high crimes." *See* Declaration of Charles D. Tobin, executed November 3, 2017 ("Tobin Decl.") ¶ 1 & Ex. 1 at 1.

2.      After the FBI briefly re-opened the investigation of the Clinton emails, and Director James B. Comey then notified Congress that the bureau had not changed its conclusions, candidate Trump responded to the audience at a campaign rally, "Hillary Clinton is guilty.  She knows it, the FBI knows it, the people know it."  *See* Tobin Decl. ¶ 2 & Ex. 2 at 2.

3.      When asked in an interview on November 13, 2016 whether he would retain the FBI Director, then just three years into his 10-year term, President-elect Trump stated, "I think that I would rather not comment on that yet.  I don't – I haven't made up my mind.  I respect him a lot.  I respect the FBI a lot . . . I would certainly like to talk to him.  And – see him.  This is a tough time for him.  And I would like to talk to him before I'd answer a question like that."  *See* Tobin Decl. ¶ 3 & Ex. 3 at 1.

4.      Comey and President-elect Trump met for the first time on January 6, 2017.  *See* Tobin Decl. ¶ 4 & Ex. 4 ("Comey Statement") at 1.

5.      As Comey testified before the Senate Select Committee on Intelligence, he attended the meeting with other leaders of the intelligence community to "brief [President-elect Trump] and his new national security team on the findings of an [intelligence] assessment concerning Russian efforts to interfere in the [2016] election."  *See* Comey Statement at 1.

6.      Immediately following this meeting, Comey "felt compelled to document [his] first conversation with the President-Elect in a memo," which he "began to type . . . on a laptop in an FBI vehicle outside Trump Tower the moment [he] walked out of the meeting."  *See* Comey Statement at 2.

7.      Comey testified that he felt the urgent need to memorialize the meeting based on "the nature of the person," explaining that he "was honestly concerned [President-elect Trump] might lie about the nature of our meeting so I thought it important to document."  *See* Tobin Decl. ¶ 5 & Ex. 5 ("Comey Transcript") at 10.

8.      Comey later elaborated, in an exchange with Senator Mark Warner, that he created the memos to be ready "to defend the FBI and our integrity as an institution and the independence of our investigative function."

> WARNER: I think that's a very important statement you just made. Then, unlike your dealings with presidents of either parties in your past experience, in every subsequent meeting or conversation with this president, you created a written record. Did you feel that you needed to create this written record of these memos, because they might need to be relied on at some future date?

> COMEY: Sure. I created records after conversations that I think I did it after each of our nine conversations.  If I didn't, I did it for nearly all of them especially the ones that were substantive.  I knew there might come a day when I would need a record of what had happened, not just to defend myself, but to defend the FBI and our integrity as an institution and the independence of our investigative function.  That's what made this so difficult is it was a combination of circumstances, subject matter and the particular person.

*See* Comey Transcript at 10.

9.      According to Comey, "[c]reating written records immediately after one-on-one conversations with Mr. Trump was my practice from [the January 6, 2017 meeting] forward." *See* Comey Statement at 2.

10.     One week after he took office, President Trump abruptly invited Comey to a one-on-one dinner at the White House.  *See* Comey Statement at 2-4.

11.     At the dinner, Comey testified, President Trump asked if he "wanted to stay on as FBI Director," noting that "lots of people wanted [the] job."  Comey interpreted this as "at least

in part, an effort to have [him] ask for [his] job and create some sort of patronage relationship." *See* Comey Statement at 3.

12.     When Comey expressed that he "was not on anybody's side politically," President Trump responded, "I need loyalty, I expect loyalty."  Later that evening, President Trump repeated, "I need loyalty," to which Comey responded, "You will always get honesty from me," leading President Trump to reply, "That's what I want, honest loyalty."  *See* Comey Statement at 3-4.

13.     Comey "wrote a detailed memo about the dinner immediately afterwards and shared it with the senior leadership team of the FBI." *See* Comey Statement at 4.

14.     In his Senate testimony, Comey observed that "common sense told [him]" that President Trump was "looking to get something in exchange for granting [his] request to stay in the job." *See* Comey Transcript at 11.

15.     Following the resignation of President Trump's National Security Advisor Michael Flynn, on February 14, 2017, President Trump asked Comey to stay behind after a scheduled meeting in the Oval Office.  The President waited until Attorney General Jeff Sessions and Senior Advisor to the President Jared Kushner had left the room, and when the two were alone, President Trump stated to Comey, "I want to talk about Mike Flynn."  President Trump told Comey that Flynn "is a good guy and has been through a lot," adding, "I hope you can see your way clear to letting this go, to letting Flynn go.  He is a good guy.  I hope you can let this go." *See* Comey Statement at 4-5.

16.     Comey told the Senate that he "immediately prepared an unclassified memo of the conversation about Flynn and discussed the matter with FBI senior leadership." *See* Comey Statement at 5.

17.     In subsequent testimony, Comey clarified that his intent in preparing an unclassified memo was to "make it easier for us to discuss within the FBI and the government, and to hold onto it in a way that makes it accessible to us." *See* Comey Transcript at 12.

18.     Following the February 14 meeting, Comey "implore[d] the Attorney General to prevent any future direct communication between the President and [himself]." *See* Comey Statement at 6.

19.     On the morning of March 30, 2017, President Trump called Comey and "asked why there had been a congressional hearing about Russia the previous week." *See* Comey Statement at 6.

20.     President Trump subsequently stated that he "hadn't brought up 'the McCabe thing'" – an apparent reference to FBI Deputy Director Andrew McCabe, whose wife Dr. Jill McCabe had received political contributions during her Virginia State Senate campaign from entities linked to Virginia Governor Terry McAuliffe – because Comey "had said McCabe was honorable." *See* Comey Statement at 7; Tobin Decl. ¶¶ 6, 19 & Ex. 6  at 1-2, 19 at 1.

21.     Comey later testified that he "didn't understand why the President was bringing this up." *See* Comey Statement at 7.

22.     On April 11, 2017, Comey spoke with President Trump for the last time. President Trump called Comey to ask what he had done to "get out" the message that President Trump was not personally under investigation with respect to the Russia probe.  Before the call ended, the President told Comey: "I have been very loyal to you, very loyal; we had that thing you know." *See* Comey Statement at 7.

23.     On May 9, 2017, President Trump dismissed Comey from the position of FBI

Director, purportedly based on the recommendation of Attorney General Sessions and Deputy

Attorney General Rod Rosenstein.  *See* Tobin Decl. ¶ 7 & Ex. 7 at 1.

24.     A memorandum prepared by Rosenstein and attached to the President's

termination letter pointed to Comey's "handling of the conclusion of the investigation of

Secretary Clinton's emails" as the justification for the termination.  *See* Tobin Decl. ¶ 7 & Ex. 7

at 7.

25.     As recently as October 18, 2017, Attorney General Sessions testified to the Senate

Judiciary Committee that it was Comey's handling of the Clinton email investigation that led to

his firing.  *See* Tobin Decl. ¶ 8 & Ex. 8 at 6.

26.     According to a *New York Times* report, however, on May 10, 2017, President

Trump "told Russian officials in the Oval Office . . . that firing [Comey] had relieved 'great

pressure' on him," and the President described Comey himself as "crazy, a real nut job."  *See*

Tobin Decl. ¶ 9 & Ex. 9 at 1.

27.     Then-deputy White House Press Secretary Sarah Huckabee Sanders further stated

that Comey had committed "basic atrocities" that led to his firing.  *See* Tobin Decl. ¶ 10 & Ex.

10 at 1.

28.     President Trump discussed Comey's firing in more detail during an interview

with NBC News on May 11, 2017, telling the network that Comey "wanted to have dinner

because he wanted to stay on," adding, "I think he asked for the dinner.  And he wanted to stay

on as the FBI head.  And I said I'll, you know, consider and we'll see what happens."  *See* Tobin

Decl. ¶ 11 & Ex. 11 at 4.

29.     President Trump also conceded that he had decided to fire Comey "regardless of

[the] recommendation" from Deputy Attorney General Rosenstein:

> [B]ut regardless of recommendation I was going to fire Comey
> knowing, there was no good time to do it.  And in fact when I
> decided to just do it, I said to myself, I said you know, this Russia
> thing with Trump and Russia is a made up story, it's an excuse by
> the Democrats for having lost an election that they should have
> won . . . . This was an excuse for having lost an election.

*See* Tobin Decl. ¶ 11 & Ex. 11 at 6.

30.     Also on May 11, 2017, *The New York Times* reported about the January 27 White

House dinner.  According to that report, Comey and President Trump "made small talk about the

election and the crowd sizes at Mr. Trump's rallies," until President Trump "turned the

conversation to whether Mr. Comey would pledge his loyalty to him."  *See* Tobin Decl. ¶ 12 &

Ex. 12 at 1.

31.     As the *Times* also noted, this account differed from "the dinner described by Mr.

Trump in his interview with NBC," as President Trump "told NBC that Mr. Comey requested it

to ask to keep his job."  According to the *Times*, Comey "described details of his refusal to

pledge his loyalty to Mr. Trump to several people close to him on the condition that they not

discuss it publicly while he was F.B.I. director."  *See* Tobin Decl. ¶ 12 & Ex. 12 at 3-4.

32.     The White House disputed this account, as according to his spokesperson,

President Trump "would never even suggest the expectation of personal loyalty, only loyalty to

our country and its great people."  *See* Tobin Decl. ¶ 12 & Ex. 12 at 4.

33.     On May 12, 2017, the day after the *Times* reported on the January 27 dinner,

President Trump tweeted: "James Comey better hope that there are no 'tapes' of our

conversations before he starts leaking to the press!"  *See* Tobin Decl. ¶ 13 & Ex. 13 at 1.

34.     As he later testified, Comey reacted to President Trump's statement by directing

his friend – later identified as Columbia Law School Professor Daniel Richman – to "share the

content of the memo with a reporter."  *See* Comey Transcript at 23; Tobin Decl. ¶ 14 & Ex. 14 at

1-2.

35.     On May 16, 2017, the *Times* published a report about the February 14, 2017 Oval

Office meeting between Comey and President Trump, directly referring to "a memo Mr. Comey

wrote shortly after the meeting."  According to the report, "Mr. Comey shared the existence of

the memo with senior F.B.I. officials and close associates," and "one of Mr. Comey's associates

read parts of [the memo] to a *Times* reporter."  *See* Tobin Decl. ¶ 15 & Ex. 15 at 1-2.

36.     On June 8, 2017, one month after he had been dismissed by President Trump,

Comey submitted a written statement and appeared in person before the Senate Select

Committee on Intelligence.  *See* Comey Statement at 1; Comey Transcript at 1.

37.     Of particular note, the hearing included the following exchange about the memos

between Comey and Senator James Lankford:

> LANKFORD: The individual that you told about your memos, that
> then sent on to *The New York Times* – [did they] have a copy of the
> memos or [were they] told orally?
>
> COMEY: Had a copy at the time.
>
> LANKFORD: Do they still have a copy of those memos?
>
> COMEY: Good question.  I think so.  I guess I can't say for sure
> sitting here, but – I guess I don't know.  But I think so.

*See* Comey Transcript at 31.

38.     When asked if he would "encourage [Special Counsel Robert] Mueller to release

[the] memos," Comey replied, "Sure."  *See* Comey Transcript at 36.

39.     Shortly after Comey's testimony, President Trump's counsel issued a statement asserting that Comey had disclosed details of their interactions beginning "no later than March 2017 when friends of Mr. Comey have stated he disclosed to them the conversations he had with the President during their January 27, 2017 dinner and February 14, 2017 White House meeting."  The statement further declared that President Trump "never told Mr. Comey, 'I need loyalty, I expect loyalty' in form or substance."  *See* Tobin Decl. ¶ 16 & Ex. 16 at 3.

40.     The following day, the President, again through counsel, asserted that the previous day's statement "was accurate" and noted that "[i]t is obvious that whomever was the source for the May 11, 2017 New York Times story got that information from the memos or from someone reading or who had read the memos."  *See* Tobin Decl. ¶ 17 & Ex. 17 at 1.

41.     On May 16, 2017, shortly after the Comey Memos came to light, CNN submitted a FOIA request ("the Request") to the FBI for "copies of all records of notes taken by or communications sent from FBI Director James Comey regarding or documenting interactions (including interviews and other conversations) with President Donald Trump."  CNN requested a fee waiver as a news organization and sought expedited processing.  *See* Compl. Ex. A, June 15, 2017, ECF 1-1.

42.     On May 23, 2017, the FBI granted CNN's request for a fee waiver but denied its request for expedited processing.  *See* Compl. Exs. C & D, ECF 1-3 & 1-4.

43.     CNN timely appealed the denial of its expedited processing request. *See* Compl. Ex. E, ECF 1-5.

44.     On June 2, 2017, the Department of Justice's Office of Information Policy reversed the denial and remanded the Request to the FBI with directions to process it "as quickly as practicable."  *See* Compl. Ex. F, ECF 1-6.

45.     On June 7, 2017, through counsel, CNN emailed FBI Section Chief David M. Hardy seeking a status update on the Request.  As that email observed, "Given that today Mr. Comey publicly confirmed that the memos exist, are not classified, and he divulged the details of those memos, it would now be appropriate for the FBI to comply with CNN's FOIA request immediately."  *See* Compl. Ex. G, ECF 1-7.

46.     On June 8, 2017, the FBI responded to CNN's email, stating that the Request would be processed "as soon as practicable."  *See* Compl. Ex. H at 2, ECF 1-8.

47.     On June 12, 2017, the FBI informed CNN that "[t]he FBI's FOIPA Program is searching the FBI's indices for potentially responsive documents."  *See* Compl. Ex. H at 1.

48.     On June 15, 2017, CNN filed this lawsuit against the FBI seeking the release of the Comey Memos.  *See* Compl., ECF 1.

49.     The following day, the FBI notified CNN that it was withholding the Comey Memos in their entirety under Exemption 7(A), stating that "[t]he records responsive to [CNN's] request are law enforcement records," that "[t]here is a pending or prospective law enforcement proceeding relevant to these responsive records," and that "release of the information in these responsive records could reasonably be expected to interfere with enforcement proceedings." *See* Tobin Decl. ¶ 18 & Ex. 18 at 1.

## RESPONSE TO FBI'S STATEMENT

As an initial matter, CNN objects to those portions of the FBI's Statement that recite legal arguments or conclusions.  *See Morgan v. Fed. Aviation Admin.*, 657 F. Supp. 2d 146, 152 (D.D.C. 2009) (where purported "'facts' amount to legal arguments, the court is not required to accept them as true in ruling on [a] motion for summary judgment").

1.     The facts set forth in this paragraph are undisputed.

2.      The facts set forth in this paragraph are undisputed.

3.      The facts set forth in this paragraph are undisputed.

4.      The facts set forth in this paragraph are undisputed.

5.      Disputed.  Whether information about the Russia investigation has been "officially acknowledged" or "publicly confirmed" constitutes a legal argument or conclusion. CNN respectfully refers the Court to CNN's statement of material facts not in dispute for citation to the evidence of record that supports CNN's disagreement with the FBI's legal conclusions.

6.      The facts set forth in this paragraph are undisputed.

7.      The facts set forth in this paragraph are undisputed.

8.      Disputed.  Whether there has been "official confirmation" of Comey's testimony and whether the Comey Memos have "entered the public domain" constitute legal arguments or conclusions.  CNN respectfully refers the Court to CNN's statement of material facts not in dispute for citation to the evidence of record that supports CNN's disagreement with the FBI's legal conclusions.

9.      The facts set forth in this paragraph are undisputed.

10.     The facts set forth in this paragraph are undisputed.

11.     The facts set forth in this paragraph are undisputed, but immaterial.

12.     The facts set forth in this paragraph are undisputed, but immaterial.

13.     The facts set forth in this paragraph are undisputed, but immaterial.

14.     The facts set forth in this paragraph are undisputed, but immaterial.

15.     The facts set forth in this paragraph are undisputed, but immaterial.

16.     The facts set forth in this paragraph are undisputed, but immaterial.

17.     The facts set forth in this paragraph are undisputed, but immaterial.

18.    The facts set forth in this paragraph are undisputed, but immaterial.

19.    The facts set forth in this paragraph are undisputed, but immaterial.

20.    The facts set forth in this paragraph are undisputed, but immaterial.

21.    The facts set forth in this paragraph are undisputed, but immaterial.

22.    The facts set forth in this paragraph are undisputed, but immaterial.

23.    The facts set forth in this paragraph are undisputed, but immaterial.

24.    The facts set forth in this paragraph are undisputed.

25.    Disputed.  Whether the Comey Memos contain information "compiled for" the Russia investigation and whether disclosure of the memos "could reasonably be expected to adversely affect the [Russia] investigation, as well as any law enforcement proceedings that may ultimately result from this investigation" constitute legal arguments or conclusions.  CNN respectfully refers the Court to CNN's statement of material facts not in dispute for citation to the evidence of record that supports CNN's disagreement with the FBI's legal conclusions.

26.    Disputed.  Whether "release of the Comey Memos would cause harm to the investigative efforts" constitutes a legal argument or conclusion.  CNN respectfully refers the Court to CNN's statement of material facts not in dispute for citation to the evidence of record that supports CNN's disagreement with the FBI's legal conclusions.

27.    Because the Comey Memos have not been provided to CNN, CNN is unable to assert whether it disputes or does not dispute statements of fact made in this paragraph.

28.    The facts set forth in this paragraph are undisputed.

29.    The facts set forth in this paragraph are undisputed.

30.     Disputed in part.  The consequences of "unauthorized disclosure of information concerning foreign relations or foreign activities of the United States" that "can reasonably be expected" depend on the nature of the information that has been disclosed.

31.     Disputed in part.  The National Security Act of 1947 prohibits the unauthorized disclosure of information concerning intelligence sources and methods, not all such disclosure.

32.     Disputed in part.  Whether "[p]ublicly disclosing the particular techniques and procedures utilized in an investigation could reasonably be expected to risk circumvention of the law" depends in part on how well known the techniques and procedures are to the public already.

33.     Disputed.  Whether individuals mentioned in the Comey Memos have a strong or weak privacy interest constitutes a legal argument or conclusion.  CNN respectfully refers the Court to CNN's statement of material facts not in dispute for citation to the evidence of record that supports CNN's disagreement with the FBI's legal conclusions.

34.     Disputed.  Whether the public has an interest in the names and other information of individuals mentioned in the Comey Memos constitutes a legal argument or conclusion.  CNN respectfully refers the Court to CNN's statement of material facts not in dispute for citation to the evidence of record that supports CNN's disagreement with the FBI's legal conclusions.

Dated:  November 3, 2017                Respectfully submitted,

                                        BALLARD SPAHR LLP

                                        /s/ *Charles D. Tobin*
                                        Charles D. Tobin (#455593)
                                        Adrianna C. Rodriguez (#1020616)
                                        Maxwell S. Mishkin (#1031356)
                                        1909 K Street, NW, 12th Floor
                                        Washington, DC 20006
                                        Telephone: (202) 661-2200
                                        Fax: (202) 661-2299

tobinc@ballardspahr.com
rodriguezac@ballardspahr.com
mishkinm@ballardspahr.com

*Counsel for Plaintiff Cable News Network, Inc.*