**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **CABLE NEWS NETWORK, INC.,** | |
| **Plaintiff,** | |
| v. | **Civil Action Nos. 17-1167, 17-1175,** |
| | **17-1189, 17-1212,** |
| **FEDERAL BUREAU OF** | **17-1830 (JEB)** |
| **INVESTIGATION,** | |
| **Defendant.** | |
| **(And Consolidated Cases)** | |

## <u>MEMORANDUM OPINION</u>

On May 9, 2017, President Donald Trump fired James Comey as Director of the Federal Bureau of Investigation. In the fallout from that event, news rapidly circulated about numerous private conversations between the two men over the preceding months. The exchanges left the former Director feeling unnerved and, apparently, wanting a paper trail. On June 8, Comey testified publicly that while still in office, he had created several contemporaneous memoranda documenting up to nine conversations with the President. The content of those memos has since been the subject of intense public speculation and is the focus of these consolidated cases.

Plaintiffs, which include various news organizations and non-profits, all sought copies of the so-called Comey Memos via a tried-and-true method: The Freedom of Information Act, 5 U.S.C. § 552 *et seq.* The Government denied each request, claiming that the release of these documents would interfere with the Office of Special Counsel's ongoing investigation into links between Russia and Trump's 2016 campaign team. Plaintiffs then brought these suits, and both sides now seek summary judgment. After reviewing the Memos *in camera*, as well as receiving

a sealed *ex parte* proffer from the Special Counsel's Office, the Court agrees with the Government's assessment. As it prevails here, the Comey Memos, at least for now, will remain in the hands of the Special Counsel and not the public.

**I.     Background**

Drawing from public reports, the Court begins by recounting the now-familiar story of Comey's termination, as well as his much-discussed Memos. (The appointment of and investigation by the Special Counsel will be covered in Part III, *infra*.) It then outlines the procedural history of this case.

A.     Factual Background

On March 20, 2017, then-Director Comey confirmed in public testimony "that the FBI, as part of our counterintelligence mission, is investigating the Russian government's efforts to interfere in the 2016 presidential election, and that includes investigating the nature of any links between individuals associated with the Trump campaign and Russia's efforts." Statement Before the House Permanent Select Committee on Intelligence, *available at* https://www.fbi.gov/ news/testimony/hpsci-hearing-titled-russian-active-measures-investigation. He added, "As with any counterintelligence investigation, this will also include an assessment of whether any crimes were committed." Id. Two months later, the President fired Comey, citing, among other reasons, frustration with the ongoing probe into Russian interference, which he saw as "an excuse by the Democrats for having lost [the] election." CNN Statement of Undisputed Material Facts, ¶ 29.

On May 16, 2017 — one week after Comey left office — news of his Memos first broke. The New York Times published a report about an Oval Office meeting between President Trump and the then-Director, said to have taken place on February 14 of that year. During this one-on-

one conversation, the President allegedly referenced a potential investigation into his former National Security Advisor Michael Flynn's contacts with Russia, telling Comey, "I hope you can see your way clear to letting this go, to letting Flynn go." Michael S. Schmidt, Comey Memo Says Trump Asked Him to End Flynn Investigation, N.Y. Times (May 16, 2017), available at https://www.nytimes.com/2017/05/16/us/politics/james-comey-trump-flynn-russia-investigation.html. The Times report was based on "a memo Mr. Comey wrote shortly after the meeting." Id. According to the newspaper, "Mr. Comey shared the existence of the memo with senior F.B.I. officials and close associates," one of whom "read parts of [the Memo] to a Times reporter." Id.

Spurred by this report, the Senate Select Committee on Intelligence held a hearing, during which Comey corroborated the Times account. On June 8, he testified under oath for nearly three hours, fielding myriad questions about his Memos. See Hearing with Former FBI Director James Comey, 115th Cong. (June 8, 2017) (Statement of James B. Comey), available at https://www.intelligence.senate.gov/sites/default/files/documents/os-jcomey-060817.pdf. He there explained that after his first conversation with then-President-Elect Trump, he "felt compelled to document" their encounter in a memo, which he "began to type . . . on a laptop in an FBI vehicle outside Trump Tower the moment [he] walked out of the meeting." Id. at 2.

According to Comey, "Creating written records immediately after one-on-one conversations with Mr. Trump was [his] practice from that point forward." Id. He thought he had done so "after each of [his] nine conversations" with the President, or at least "for nearly all of them, especially the ones that were substantive." Transcript of Comey Hearing, available at https://www.intelligence.senate.gov/hearings/open-hearing-former-fbi-director-james-comey#. Comey said he had memorialized these conversations out of concern that President Trump

"might lie about the nature of our meeting."  Id.  In such a scenario, he wanted a contemporaneous account "to defend the FBI and our integrity as an institution and the independence of our investigative function."  Id.

B.    Procedural Background

The same day that news spread of Comey's memoranda, Plaintiff Cable News Network submitted a FOIA request for copies of "all records of notes taken by or communications sent from FBI Director James Comey regarding or documenting interactions (including interviews and other conversations) with President Donald Trump."  Def. MSJ (First Declaration of David M. Hardy), ¶ 6; see also id., Exh. CNN-B (CNN FOIA Request).  CNN was not the only one interested in the Comey Memos.  Plaintiffs Daily Caller News Foundation, non-profit organizations Judicial Watch and Freedom Watch, and USA Today (the business name of Gannett Satellite Information Network), along with its reporter Brad Heath, the James Madison Project, and journalists Garrett Graff and Lachlan Markay, all submitted FOIA requests to the same end.  See First Hardy Decl., ¶¶ 14, 21, 30, 37, 44.  Some Plaintiffs (including the USA Today group and Freedom Watch) sought additional related records, which are outside the scope of the instant summary-judgment motions.  See, e.g., id., ¶ 44.

The Department of Justice responded to each request by letter dated June 16, 2017, invoking Exemption 7(A) to withhold all documents.  To wit, it stated: "The records responsive to your request are law enforcement records. There is a pending or prospective law enforcement proceeding relevant to these responsive records, and the release of the information could reasonably be expected to interfere with enforcement proceedings."  Id., Exhs. CNN-F, USA Today-D, JMP/Graff-D, JMP/Markay-C, JW-D, FW-D.  Undeterred, all Plaintiffs timely brought

actions in this Court, suing, variously, the FBI and DOJ.  The Court consolidated their cases on

July 31, 2017.  See Minute Order.

Four months later, the Government moved for partial summary judgment as to all

requests related to the Comey Memos, and Plaintiffs, in turn, filed cross-motions for the same.

To bolster its case, the Department of Justice also sought leave to introduce an *ex parte* and *in

camera* affidavit from David W. Archey, a Deputy Assistant Director with the

Counterintelligence Division, who currently supervises all FBI personnel assigned to the

investigation into Russia's interference with the 2016 Presidential election.  See ECF No. 23.

After the parties finished briefing, the Court granted the Government's request and ordered, at

Plaintiffs' behest, that it also produce all withheld Memos for *in camera* review.  See Minute

Order of Jan. 11, 2018.

The Court reviewed those submissions and, out of an abundance of caution, thought it

helpful to seek more specifics as to the Memos' connection with an ongoing investigation.  It

therefore asked that an attorney from the Office of Special Counsel proffer such information.

Michael R. Dreeben, who serves as Counsel to the Special Counsel, did so in a sealed, on-the-

record *ex parte* session.  Finally, in response to this Court's follow-up questions about that sealed

proffer, the Government submitted the Third Declaration of David W. Archey *in camera* and *ex

parte*.  See ECF No. 47.  (The agency previously moved to submit the Second Declaration of

David W. Archey regarding records other than the Memos, see ECF No. 46, and the Court has

not yet ruled on that motion.)  Although none of this material is currently available to Plaintiffs,

all forms part of the record that could be reviewed on appeal or in any subsequent litigation.

II.     **Legal Standard**

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

FOIA cases typically are decided on motions for summary judgment. See Brayton v. Office of U.S. Trade Rep., 641 F.3d 521, 527 (D.C. Cir. 2011). In a FOIA case, the Court may accept an "agency's affidavits, without pre-summary judgment discovery, if the affidavits are made in good faith and provide reasonably specific detail concerning the methods used to produce the information sought." Broaddrick v. Exec. Office of the President, 139 F. Supp. 2d 55, 64 (D.D.C. 2001). "Agency affidavits are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal quotation marks and citation omitted). "Summary judgment may not be appropriate without *in*

*camera* review," however, "when agency affidavits in support of a claim of exemption are

insufficiently detailed." Armstrong v. Exec. Office of the President, 97 F.3d 575, 578 (D.C. Cir.

1996). In such a circumstance, "district court judges [have] broad discretion in determining

whether *in camera* review is appropriate." Id. at 577–78.

## III.    Analysis

The country (or at least the Beltway) has spent months abuzz about the Comey Memos

and what they might reveal. Despite rampant media speculation, however, the Memos

themselves have remained out of public view. The Government hopes to keep it that way, but to

withhold release under FOIA, it must satisfy two elements. First, it must "demonstrate the . . .

adequacy of the search" for relevant documents. Perry v. Block, 684 F.2d 121, 127 (D.C. Cir.

1982). Second, it must show that the withheld material "falls within one of nine statutory

exemptions." People for the Ethical Treatment of Animals v. Nat'l Institutes of Health, 745 F.3d

535, 540 (D.C. Cir. 2014). Plaintiffs attack the Government's efforts at each step.

### A.    Adequacy of Search

"An agency fulfills its obligations under FOIA if it can demonstrate beyond material

doubt that its search was 'reasonably calculated to uncover all relevant documents.'" Valencia-

Lucena v. Coast Guard, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting Truitt v. Dep't of State, 897

F.2d 540, 542 (D.C. Cir. 1990)); see also Steinberg v. DOJ, 23 F.3d 548, 551 (D.C. Cir. 1994).

The adequacy of an agency's search for documents under FOIA "is judged by a standard of

reasonableness and depends, not surprisingly, upon the facts of each case." Weisberg v. DOJ,

745 F.2d 1476, 1485 (D.C. Cir. 1984).

Here, the FBI's Records Management Division, which was "involved in compiling and

preserving" the former Director's records, first located the memoranda. See First Hardy Decl.,

¶ 62.  It passed them along to the National Security and Cyber Law Branch of the FBI's Office of the General Counsel, which is responsible for providing legal advice "regarding the Russian interference investigation," Second Declaration of David M. Hardy, ¶ 4, and thus was "already familiar" with the relevant records.  See First Hardy Decl., ¶ 62.  That group then confirmed that the located materials "were, in fact, the full set of memos."  Id.  Just to play it safe, the Government has also double checked with the Special Counsel's Office, which has since compiled the Memos.  They, too, concluded that the FBI had located all of Comey's records. See Second Hardy Decl., ¶ 4.  In sum, "[t]he FBI is confident that it has identified and located the entire collection of documents comprising the 'Comey Memos.'"  Id.

Two Plaintiffs, nevertheless, remain unconvinced.  Daily Caller and USA Today argue that the agency has not adequately explained its search efforts, variously noting that "the FBI did not conduct its search using the standard method of searching its Central Records System," USA Today Br. at 5, and that the agency must "identify the number of records they located."  DCNF Br. at 6.  Neither argument holds water.

While querying an electronic database may be appropriate in the mine-run FOIA foray, the requests here center on a "discrete set of extraordinarily high-profile" and easily identifiable records — namely, any memoranda that then-Director Comey wrote documenting his conversations with President Trump.  See Judicial Watch, Inc. v. Dep't of Defense, 857 F. Supp. 2d 44, 54 (D.D.C. 2012) (holding DOD's search for post-mortem photographs of Osama Bin Laden sufficient, as "the relevant individuals [would be] well aware" whether such records existed).  Allowing officials with "relevant knowledge of these documents" to search for them, see First Hardy Decl., ¶ 62, is thus "reasonable[e]" given the "facts of [this] case."  Weisberg, 745 F.2d at 1485.  The Government avers that it has located all Memos, and Plaintiffs' "[m]ere

speculation that as yet uncovered documents may exist does not undermine the finding that the agency conducted a reasonable search for them." SafeCard Servs., 926 F.2d at 1201.

Nor must the Department reveal the exact number of documents located, as it asserts that doing so "could reveal sensitive nonpublic information and compromise the investigation." Def. Reply at 8–9. "[W]here, as here, an agency indicates that no additional information concerning an investigation may be publicly disclosed without revealing precisely the information that the agency seeks to withhold," the Court can properly resolve the issue by *in camera* review. See Barnard v. Dep't of Homeland Sec'y, 598 F. Supp. 2d 1, 16 (D.D.C. 2009). Indeed, Daily Caller alternatively asks this "Court [to] review the Comey Memos *in camera* to determine whether all responsive records have been located." DCNF Reply at 3 n.3. The Court, having accepted that invitation, sees no reason to doubt the Government's search effort.

B.    Valid Exemption

Although the Government invokes a slew of exemptions — including 1, 3, 6, 7(C) and 7(E) — to justify withholding the Memos, it primarily leans on Exemption 7(A). Because the Court deems this last one applicable, it "need not address the other exemptions invoked by the government and reserve[s] judgment on whether they too would support withholding" the Comey Memos. See Ctr. for Nat'l Security. Studies v. U.S. Dep't of Justice, 331 F.3d 918, 925 (D.C. Cir. 2003).

"[J]udicial review of an asserted Exemption 7 privilege requires a two-part inquiry." Federal Bureau of Investigation v. Abramson, 456 U.S. 615, 622 (1982). As a threshold matter, the Court must determine whether the withheld "records or information" were "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). If the agency so establishes, it must then demonstrate that a particular subpart of Exemption 7 applies. Here, it must show that release of

those records "could reasonably be expected to interfere with enforcement proceedings."  <u>Id.</u>
§ 552(b)(7)(A).  The Court discusses each requirement in turn.

       *1.  Exemption 7 Threshold*

     The Government offers two explanations as to why the Comey Memos satisfy Exemption

7's threshold requirement.  First, it says that they <u>contain</u> information that was originally

compiled as part of the FBI's investigation into Russian interference.  <u>See</u> Def. Reply at 10.

Second, it indicates that the Memos <u>themselves</u> have since been compiled for law-enforcement

purposes.  <u>Id.</u> at 2, 10.  The Court focuses on this latter theory, as it alone would place "all

portions" of the Memos within Exemption 7's purview.  <u>Id.</u> at 10.

     DOJ's public briefing (however vague) suggests that the Comey Memos "have been

compiled into[] the ongoing investigation by the Special Counsel into Russian interference in the

2016 election."  <u>Id.</u> at 2.  By way of background, Acting Attorney General Rod Rosenstein

appointed Robert S. Mueller as Special Counsel on May 17, 2017.  The Office of Special

Counsel has revealed little about the scope of its investigation, but Rosenstein's initial order

authorized Mueller to investigate "(i) any links and/or coordination between the Russian

government and individuals associated with the campaign of President Donald Trump; and (ii)

any matters that arose or may arise directly from the investigation; and (iii) any other matters

with the scope of 28 C.F.R. § 600.4(a)."  DOJ Order No. 3915–2017 (May 17, 2017).  Under that

section, the Special Counsel's jurisdiction includes "the authority to investigate and prosecute

federal crimes committed in the course of, and with intent to interfere with, the Special

Counsel's investigation, such as perjury, obstruction of justice, destruction of evidence, and

intimidation of witnesses."  Although the Government has been tight-lipped in its briefing about

exactly why the Special Counsel compiled these Memos, the First Archey Declaration confirms

that the Office did so for law-enforcement purposes — *i.e.*, in service of that investigation.

Without reviewing the Archey Declaration, Plaintiffs, of course, are somewhat hamstrung

in their ability to dispute this position.  Instead, they focus their fire on Comey's intent when he

first created the Memos.  CNN, Judicial Watch, and Daily Caller argue that the Director, by his

own admission, penned these Memos not "in furtherance of an investigation but for 'political'

purposes," to "preserv[e] the FBI's integrity as an institution."  CNN Br. at 15–17; see also JW

Br. at 11; DCNF Br. at 9–10.  That may be so, but it matters not if the Memos "were generated

on an earlier occasion and for a different purpose."  John Doe Agency v. John Doe Corp., 493

U.S. 146, 154 (1989).  Rather, the Supreme Court has made clear that the "objects sought merely

must have been 'compiled' when the Government invokes the Exemption."  Id. at 153.  In other

words, Exemption 7 applies to "materials originally collected for a benign purpose" so long as

they were "eventually . . . compiled or incorporated into a law-enforcement investigatory file."

Gould Inc. v. General Servs. Admin., 688 F. Supp. 689, 697 (D.D.C. 1988).  Comey's intent —

whatever it was — is therefore irrelevant for Exemption 7 purposes.

The Government thus need show only that it has since "compiled" the Memos for law-

enforcement purposes, a bar it easily clears.  The Supreme Court "has given a fairly broad

meaning to 'compiled' under § 552(b)(7)," Milner v. Dep't of Navy, 562 U.S. 562, 584–85

(2011) (Alito, J., concurring), holding that "[a] compilation, in its ordinary meaning, is

something composed of materials collected and assembled from various sources or other

documents."  John Doe Agency, 493 U.S. at 153.  The D.C. Circuit, too, has explained that "the

term 'compiled' in Exemption 7 requires that a document be created, gathered, or used by an

agency for law enforcement purposes at some time before the agency invokes the exemption."

Pub. Employees for Environmental Responsibility v. U.S. Sec., Int'l Boundary and Water

Comm'n, U.S.-Mexico, 740 F.3d 195, 203 (D.C. Cir. 2014) (emphasis added).  Here, the Special

Counsel has "gathered" or "used" each of the Comey Memos for his investigation.  That suffices

to satisfy Section 7's threshold requirement.  See W. Journalism Ctr. v. Office of Indep't

Counsel, 926 F. Supp. 189, 191–92 (D.D.C. 1996) ("The materials obtained from the designated

investigative agencies have been made part of the Independent Counsel's overall continuing

investigation and by definition have been compiled for law enforcement purposes.").

Plaintiffs try to chip away at this conclusion, but none of their counterarguments proves

persuasive.  First up, CNN correctly points out that in order to rely on 7(A), the agency must

have compiled the documents before it invoked that exemption on June 16, 2017.  See Pub.

Employees, 740 F.3d at 203.  In his public testimony on June 8, Comey averred, on two separate

occasions, that he had already turned over his copies of the Memos to the Special Counsel team.

See Transcript of Comey Hearing.  It stands to reason, then, that the Special Counsel had

compiled them by at least that date.  The Government has also submitted another ex parte

Archey Declaration clarifying that the Special Counsel had indeed assembled the Comey Memos

before June 16.  See Third Archey Decl., ¶ 4.

Next, Daily Caller highlights that "the FBI searched for and located records in archived,

administrative files," rather than "in the Special Counsel's files."  DCNF Br. at 10.  This is true,

but irrelevant.  As explained earlier, the exemption applies to "documents already collected by

the Government originally for non-law-enforcement purposes."  John Doe Agency, 493 U.S. at

153.  Naturally enough, copies of those documents might remain in their original, innocuous file.

But a "plaintiff may not circumvent the effect of Exemption 7 by seeking information in the

investigatory file from other unprotected government sources."  Gould, 688 F. Supp. at 698 n.23.

Nor does the agency lose Exemption 7 protection simply because it happened to search for the documents there, rather than in the Special Counsel's files.  The fact that "other copies exist in government files does not strip these documents — and the information they contain — of their exemption from disclosure."  Id.; see also John Doe Agency, 493 U.S. at 153 (approvingly citing Gould).

> ### 2.   Exemption 7(A)

The Court turns now to whether releasing the Memos "could reasonably be expected to interfere with enforcement proceedings."  5 U.S.C. § 552(b)(7)(A).  In enacting this exemption, "Congress recognized that law enforcement agencies had legitimate needs to keep certain records confidential, lest the agencies be hindered in their investigations."  NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 224 (1978).  To that end, "Exemption 7(A) does not require a presently pending 'enforcement proceeding.'"  Ctr. for Nat'l Security, 331 F.3d at 926.  Instead, "an ongoing criminal investigation typically triggers Exemption 7(A)."  CREW v. DOJ, 746 F.3d 1082, 1098 (D.C. Cir. 2014).  "[S]o long as the investigation continues to gather evidence for a possible future criminal case, and that case would be jeopardized by the premature release of that evidence, Exemption 7(A) applies."  Juarez v. Dep't of Justice, 518 F.3d 54, 59 (D.C. Cir. 2008); see also Sussman v. U.S. Marshals Serv., 494 F.3d 1106, 1114 (D.C. Cir. 2007) ("The enforcement proceedings need not be currently ongoing; it suffices for them to be reasonably anticipated.") (internal quotation marks omitted).

In evaluating the Department's Exemption 7(A) defense, this Court must "give deference to an agency's predictive judgment of the harm that will result from disclosure of information." CREW, 746 F.3d at 1098.  It cannot, however, act as a rubber stamp simply because the agency "assert[s] that disclosure will interfere with enforcement proceedings; it must rather demonstrate

how disclosure will do so." Id. (internal quotation marks omitted).  The Court concluded that DOJ's initial submissions fell short in that respect, as they lacked "specific information about the impact of the disclosures" or the "individual or entity that is the subject of the ongoing investigation." Id. at 129–30.  Even after an *in camera* review of the First Archey Declaration and the Memos themselves, the Court asked an attorney from the Office of Special Counsel to make an on-the-record proffer about the investigation.  Having heard this, the Court is now fully convinced that disclosure "could reasonably be expected to interfere" with that ongoing investigation.  See 5 U.S.C. § 552(b)(7)(A).

In disputing that conclusion, Plaintiffs make much of the fact that Comey himself testified about the contents of at least some Memos.  In light of those public statements, they wonder how much damage release could inflict now.  While Comey may have testified about some material in his Memos, he has never disseminated copies publicly.  As the D.C. Circuit has held, "[T]he fact that information exists in some form in the public domain does not necessarily mean that official disclosure will not cause harm cognizable under a FOIA exemption." Wolf v. CIA, 473 F.3d 370, 378 (D.C. Cir. 2007).

Until the Memos themselves enter the public domain, much remains uncertain about their contents, including "the level of detail in the memos, the extent to which they corroborate Mr. Comey's testimony, and the extent to which they contain information that was not the subject of his testimony." Def. Reply at 15–16.  Those "lingering doubts" about the accuracy or thoroughness of Comey's testimony suffice to satisfy Exemption 7(A).  Military Audit Project v. Casey, 656 F.2d 724, 745 (D.C. Cir. 1981) (noting benefits of leaving foreign intelligence services with "lingering doubts" regarding accuracy of reported information); see also Afshar v. U.S. Dep't of State, 702 F.2d 1125, 1130–31 (D.C. Cir. 1983) (distinguishing between

"[u]nofficial leaks and public surmise" and "official acknowledgment"); Wilson v. CIA, 586 F.3d 171, 195 (2d Cir. 2009) ("[A]nything short of [an official] disclosure necessarily preserves some increment of doubt regarding the reliability of the publicly available information.").

That is not to say, as Daily Caller suggests, that DOJ (or this Court) has adopted the position that "Director Comey lied under oath[.]"  DCNF Reply Br. at 5.  On the contrary, the Department has been mum on the accuracy of his testimony.  The important point is that until the Memos are released, the public (or potential witnesses) cannot know how accurate his recall of the Memos' contents was.  And perhaps more to the point, they cannot gauge "the level of detail in the memos" and "the extent to which they contain information that was not the subject of his testimony."  Gov't Reply at 15–16.

C.      Public Disclosure

As a variant of their prior-disclosure argument, Plaintiffs argue that Justice has waived any FOIA exemption pursuant to the public-domain doctrine.  Under that doctrine, "materials normally immunized from disclosure under FOIA lose their protective cloak once disclosed and preserved in a permanent public record."  Cottone v. Reno, 193 F.3d 550, 554 (D.C. Cir. 1999). Plaintiffs argue such is the case here, principally because Comey testified publicly as to the contents of the documents and also provided a copy of at least one Memo to his personal friend, Columbia Law School Professor Daniel Richman.  These actions, they say, forfeited any "otherwise valid exemption claim," at least as to those Memos (or portions thereof) publicly discussed.  See Wolf, 473 F.3d at 378 (quoting Fitzgibbon v. CIA, 911 F.2d 755, 765 (D.C. Cir. 1990)).  Separately examining each contention, the Court disagrees.

15

*1.  Public Testimony*

This Circuit employs a three-part test to determine whether the public-domain doctrine applies: (1) the "information requested must be as specific as the information previously released"; (2) "the information requested must match the information previously disclosed"; and (3) "the information requested must already have been made public through an official and documented disclosure." Am. Civil Liberties Union v. U.S. Dep't of Def., 628 F.3d 612, 620–21 (D.C. Cir. 2011).

Plaintiffs' reliance on Comey's congressional testimony flunks all three prongs.  As discussed above, his paraphrased statements do not necessarily "match" any portion of his Memos, nor are they necessarily as "specific" as the original.  Id.  The D.C. Circuit has "insist[ed] on exactitude" as to these requirements, and "[p]rior disclosure of similar information does not suffice; instead, the specific information sought by the plaintiff must already be in the public domain by official disclosure."  Wolf, 473 F.3d at 378 (emphasis omitted).  In this case, the Director's oral account of the Memos is no substitute for the written hard copy.  See, e.g., id. (holding that although former CIA Director had officially acknowledged "existence" of records by reading from them during congressional testimony, agency could still establish that "contents" of those records were exempt).

In any event, Comey no longer served as FBI Director when he testified and therefore lacked any authority to make official releases on that agency's behalf.   To be "official," the release must have been by "the agency from which the information is being sought."  Frugone v. CIA, 169 F.3d 772, 774 (D.C. Cir. 1999).  Statements made by former government officials, even high-level ones, do not constitute official acknowledgment.  See Afshar, 702 F.2d at 1133 (holding that "a number of books by former CIA agents and officials, all of which were

submitted to the agency for prepublication review" still fell short of "an official and documented

disclosure, as the release of CIA cables would be"); see also Hudson River Sloop Clearwater,

Inc. v. Dep't of Navy, 891 F.2d 414, 421 (2d Cir. 1989) ("Admiral Carroll's statements cannot

effect an official disclosure of information since he is no longer an active naval officer.");

Simmons v. U.S. Dep't of Justice, 796 F.2d 709, 712 (4th Cir. 1986) (holding FOIA exemption

not overcome, even where former FBI agent released documents in question because "release

from an official source naturally confirms the accuracy of the previously leaked information").

## 2. *Disclosure to Professor Richman*

In his congressional testimony, Comey also admitted that he had shared a copy of at least

his February 14 Memo with a "good friend" who is "a professor at Columbia law school."

Transcript of Comey Hearing.  The Plaintiffs presume this friend to be Professor Daniel

Richman, see, e.g., CNN SOMF, ¶ 34; JW SOMF, ¶ 48, and the Government does not directly

dispute that assertion.  See Gov't Response to CNN's SOMF, ¶ 34; Response to JW'S SOMF,

¶¶ 35-48.  The Court therefore adopts the same assumption and considers whether the February

14 Memo (or any others disclosed to Richman) must be released.

The parties debate exactly when Comey made that disclosure, as the Government says it

is "unaware" whether "Director Comey, during his tenure as Director, publicly shared the

memos, their contents, or details about the conversations they document."  Second Hardy Decl.,

¶ 6.  But even if it occurred before his termination, Comey apparently never intended to do so in

his official capacity; rather, at the time, he considered the Memos his "own personal"

recollections, which he "felt free to share" "[a]s a private citizen."  Transcript of Comey Hearing.

Consequently, the Department reports that it "has not located any documented official disclosure

of the memos or their contents."  Second Hardy Decl., ¶ 6.  Against that backdrop, the Director's

17

entrustment of his then-personal Memos to a friend falls short of an "official and documented disclosure."  ACLU, 628 F.3d at 620–21 ("[T]he information requested must already have been made public through an official and documented disclosure.").  That alone could defeat Plaintiffs' claims.

At any rate, Comey's limited disclosure to one friend, even if made in his official capacity, is insufficient to waive Exemption 7(A) protection.  The D.C. Circuit has counseled that "while the logic of FOIA postulates that an exemption can serve no purpose once information . . . becomes public, we must be confident that the information sought is truly public and that the requester receive no more than what is publicly available before we find a waiver." Cottone, 193 F.3d at 555 (internal quotation and citation omitted).  For the public-domain doctrine to apply, the specific information sought must have already been "disclosed and preserved in a permanent public record."  Id. at 554; see also Davis v. Dep't of Justice, 968 F.2d 1276, 1280 (D.C. Cir. 1992).

In this case, the withheld documents are far from "truly public."  On the contrary, they exist — at most — in one law professor's possession.  Professor Richman's home or office hardly qualifies as the "public domain."   The D.C. Circuit's opinion in Students Against Genocide v. Department of State, 257 F.3d 828 (D.C. Cir. 2001), is instructive on this point. There, the Court of Appeals considered classified "spy satellite" and "spy plane" photographs that then-U.S. Ambassador Madeleine Albright had shown to foreign delegates of the United Nations Security Council.  Id. at 830.  The plaintiff organizations argued that Ambassador Albright had waived the pertinent FOIA exemptions by such display.  Id. at 836.  The Circuit rejected that position, explaining that the photographs "plainly [did] not fall within the [public-domain] doctrine. They were not released to the general public; only the Security Council

delegates saw them."  Id.; see also Muslim Advocates v. Dep't of Justice, 833 F. Supp. 2d 92,

101–02 (D.D.C. 2011) (holding public-domain doctrine did not apply to FBI's Domestic

Investigations and Operations Guide, even though agency had allowed several civil-rights groups

to view and take notes on disputed chapters).

 True, Professor Richman (at least at one point) may have possessed some subset of the

Memos, whereas the delegates in Students Against Genocide only saw the withheld photographs.

That difference, however, is of no moment.  As an initial matter, Richman has publicly reported

returning all documents to the FBI.  See Matt Zapotosky, Comey Friend Says He Is 'Turning

Over Relevant' Documents to FBI, Wash. Post (June 13, 2017),

https://www.washingtonpost.com/politics/2017/ live-updates/trump-white-house/sessions-to-

testify-before-senate-intelligence-committee/comey-friend-says-he-is-turning-over-relevant-

documents-to-fbi/?utm_term=.78194270be35.  If that is so, it is clear that no "permanent public

record[s]" remain of the Memos.  See Cottone, 193 F.3d at 554.

 Even if Richman retained copies, that would not vitiate the agency's exemption.  In

arguing otherwise, Plaintiffs latch onto language in Students Against Genocide stating that "a

disclosure made to any FOIA requester is effectively a disclosure to the world at large."  257

F.3d at 826 (emphasis added).  They argue by analogy that a disclosure made to any person has

the same effect, but that is a bridge too far.  Comey's discretionary release of documents to a

close friend is hardly analogous to the agency's release of information due to statutory

obligation.  In the latter scenario, it is reasonable to assume that the requester will publicize the

material, and neither the agency nor court has any basis to "limit that dissemination."  Id.  Here,

by contrast, Comey apparently made a judgment call that he could entrust at least one Memo to

Richman without their broader release.  His choice to do so did not automatically catapult those

documents into the public domain, and the Court will not assume Richman will release them more widely absent evidence to the contrary.

In fact, at this point — almost nine months since Comey could have shared any Memo in his official capacity —  Richman has still not released anything.  Although he, apparently at Comey's behest, described the contents of the February 14 Memo to the New York Times, the newspaper made clear that it had "not viewed a copy of the memo"; instead, Richman "read parts of it to a Times reporter."  Schmidt, Comey Memo Says Trump Asked Him to End Flynn Investigation, N.Y. Times (May 16, 2017).  To the extent Richman still holds copies, he has kept them close to his vest.  Were it otherwise, Plaintiffs would have little need to seek the Memos by way of FOIA.

In like circumstances, "courts generally find no waiver under § 552(b)(7)(A) even though there has been a limited, discretionary disclosure." Anderson v. Dep't of Treasury, No. 98-1112, 1999 WL 282784, at *4 (W.D. Tenn. Mar. 24, 1999); see also Erb v. Dep't of Justice, 572 F. Supp. 954, 956 (W.D. Mich. 1983) (holding that there had been no waiver of Exemption 7(A) even where prosecutor had disclosed FBI report to counsel for target of investigation).  Similarly, the D.C. Circuit has noted that with respect to classified information, "a limited disclosure to a small number of individuals might not be enough to render classification inappropriate." Ancient Coin Collectors Guild v. U.S. Dep't of State, 641 F.3d 504, 510 (D.C. Cir. 2011).

The Court acknowledges that this situation is rather unprecedented; it is not every day that an FBI Director feels the need to memorialize his conversations with a sitting President and then publicize that he did so.  But the caselaw aligns with common sense.  The public-domain doctrine exists because release of a "truly public" document can do little harm to the agency's interests; in that case, the exemption "can serve no purpose."  Cottone, 193 F.3d at 555.  Here, by

contrast, the Memos are possibly held by one person outside the agency, and the Bureau and Special Counsel still have something to lose by their dissemination to the broader public.  The Court therefore holds that Comey's release of any documents to his close friend does not waive the agency's otherwise valid Exemption 7(A) defense.

### 3.   Other Arguments

Plaintiffs also raise an array of other arguments for waiver, but the Court can dispose of each in short order.  First, USA Today contends that this Court has discretion to treat "President Trump's public denial of the substantive accuracy of Director Comey's claims [as] incorporating by reference the substance of what Director Comey said occurred."  USA Today Br. at 12.  Plaintiff's logic is a bit hard to parse, and it admits to lacking any "case law on-point" for its position, but the upshot seems to be that the President's denials somehow constitute an "official disclosure" of any referenced Memo's contents.  Id. at 11.  This theory suffers at least two flaws.  First, Trump repudiated Comey's testimony; he never discussed nor purported to know the contents of the Memos themselves.  He therefore could not have "incorporated" that information by reference into any official disclosure.  Second, the President's denials hardly recited any portion of the Memos verbatim and thus are not as "specific" as the records sought nor an exact "match" for their content.  See ACLU, 628 F.3d at 620–21.

Daily Caller and Judicial Watch next argue that the FBI "officially acknowledged" Comey's testimony when it failed to "dispute, disavow, [or] even disagree" with it.  See DCNF Br. at 13; see also JW Br. at 15.  Far from "an official and documented disclosure," however, the agency's silence is just that — silence.  See ACLU, 628 F.3d at 620–21.  It had no duty to respond to an ex-employee's testimony, and it has, by design, disclosed nothing about whether Comey's statements were an accurate synopsis of the Memos or as detailed as the originals.

Finally, Judicial Watch maintains that the agency itself revealed the "potential connection between the memo [concerning the Flynn discussion] and Special Counsel Mueller's investigation."  JW Reply at 3.  It suggests that voluntarily disclosing this connection somehow "undermines" the agency's entire Exemption 7(A) defense, such that it must now disclose the Memo *in toto*.  Id.  Plaintiff invokes Labow v. Department of Justice, 831 F.3d 523 (D.C. Cir. 2016), but such reliance is quite a stretch.  In Labow, the Government resisted the release of documents under Exemption 3, which protects, *inter alia*, materials related to a grand jury's identity, investigation, or deliberation.  Id. at 529–30.  The agency contended that although the documents were not damning when standing alone, a grand jury had subpoenaed them, such that release would "reveal the direction" of its investigation.  Id. at 529.  The Court of Appeals rejected that argument, noting that the Government had blown its own cover by linking the documents to the grand jury in the first place.  Id. at 529–30.

By contrast, DOJ does not argue here that release of the documents is harmful merely because they are in the Special Counsel's folder.  Instead, Justice seeks to protect the contents of the Memos, as release would reveal "the level of detail in the memos, the extent to which they corroborate Mr. Comey's testimony, and the extent to which they contain information that was not the subject of his testimony."  Def. Reply 15–16.  None of that information is public, and Exemption 7(A) thus applies with full force.

   D.     Segregability

Even if this Court stops short of releasing some or all Memos in full, Plaintiffs alternatively ask that it require the Department to turn over any non-exempt portions of those records.  See, e.g., CNN Br. at 28-29.  FOIA requires that an agency produce "[a]ny reasonably segregable portion" of a record "after deletion of the portions which are exempt."  5 U.S.C.

§ 552(b).  In making a determination as to segregability or any other question under FOIA, a district court judge "may examine the contents of . . . agency records *in camera*."  5 U.S.C. § 552(a)(4)(B); see also Armstrong, 97 F.3d at 578–79.  That analysis, however, "does not call for parsing the [Comey Memos] 'line-by-line' or segregating material 'dispersed throughout the document,'" as Plaintiffs suggest.  See Nat'l Ass'n of Crim. Defense Lawyers v. DOJ Exec. Office for U.S. Attorneys, 844 F.3d 246, 257 (D.C. Cir. 2016) (quoting Mead Data Ctr. Inc. v. Dep't of Air Force, 566 F.2d 242, 261 (D.C. Cir. 1977)).  "Instead, the emphasis is on segregation of non-exempt material found in 'logically divisible sections.'"  Id. (quoting Mead Data, 566 at 261 n.54).

Here, the Government asserts that no "logically divisible" section of the Memos is segregable.  Indeed, releasing any portion would necessarily reveal their "level of detail," as well as the extent to which those records do — or do not — corroborate Comey's testimony or include any information omitted from that public account.  See Def. Reply 15–16.  The Court has reviewed the disputed documents *in camera* and confirmed that no portion is reasonably segregable.

It stresses, however, that Exemption 7(A) is temporal in nature and not designed to "endlessly protect material simply because it [is] in an investigatory file."  Robbins Tire & Rubber, 437 U.S. at 230.  The Special Counsel's investigation will not last forever, and "once the relevant enforcement proceedings are over, the exemption no longer applies."  Stein v. SEC, 266 F. Supp. 3d 326, 343–344 (D.D.C. 2017).  When the investigation in this case is "either concluded or abandoned," Plaintiffs "may seek release of the records under the FOIA at that time," subject to any other exemptions that may apply.  Barney v. IRS, 618 F.2d 1268, 1273–74 (8th Cir. 1980); see also Maydak v. Dep't of Justice, 218 F.3d 760 (D.C. Cir. 2000) (noting that

Government may rely on other exemptions, so long as they were previously "genuinely assert[ed]," once Exemption 7(A) is no longer available).

E.    Rule 56(d) Discovery

Finally, Freedom Watch moves under Federal Rule of Civil Procedure 56(d) to place the summary-judgment proceedings on ice until it can conduct discovery.  Under that Rule, a court may defer considering a motion for summary judgment, deny the motion, or allow time for the non-movant to obtain affidavits or declarations or to take discovery if that party "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition."  Such an affidavit must state "with sufficient particularity why additional discovery is necessary."  United States ex rel. Folliard v. Gov't Acquisitions, Inc., 764 F.3d 19, 26 (D.C. Cir. 2014) (citation and internal quotation marks omitted).  Specifically, the non-movant's affidavit must: (1) "outline the particular facts the non-movant intends to discover and describe why those facts are necessary to the litigation"; (2) "explain why the non-movant could not produce the facts in opposition to the motion for summary judgment"; and (3) "show the information is in fact discoverable."  Id. (citations and internal quotation marks omitted).

Plaintiff asks this Court to allow discovery or, alternatively, to "review all responsive documentation in camera and then inform the parties of its determination of which of the documents, if any, truly fall under any valid FOIA exemption."  FW Br. at 5.  Now that the Court has followed this latter course, it is not clear whether Freedom Watch's request for discovery still stands.  To the extent it does, the Court denies it.  Plaintiff never makes clear exactly what it seeks in discovery, other than noting that the agency has "failed to even provide a Vaughn index," which would catalog the documents withheld.  Id. at 4.  But the agency has now provided the Court with the actual Comey Memos, giving it all materials needed to evaluate Exemption

7(A). Plaintiff has thus failed to identify any other documents that might be "necessary to the litigation." Folliard, 764 F.3d at 26 (internal quotation mark omitted).

## IV.    Conclusion

For the foregoing reasons, the Court grants Defendants' Motion for Partial Summary Judgment and denies Plaintiffs' Cross-Motions.  It also denies Plaintiff Freedom Watch's Motion for Relief under Rule 56(d).  A contemporaneous Order to that effect will issue this day.


/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  February 2, 2018