# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CABLE NEWS NETWORK, INC.,

     Plaintiff,

v.

FEDERAL BUREAU OF INVESTIGATION,

     Defendant.

Civil Action No. 1:17-cv-01167-JEB

## **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON REMAND**

This action arises under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.  It involves a FOIA request for records memorializing conversations between former Director of the Federal Bureau of Investigation ("FBI"), James B. Comey, and President Donald J. Trump, referred to as the "Comey Memos."  Defendant FBI has withheld portions of those Comey Memos that are responsive to plaintiff Cable News Network's request pursuant to FOIA Exemptions 1, 3, and 7.  Defendant hereby moves pursuant to Federal Rule of Civil Procedure 56 for summary judgment in its favor.  The reasons for this Motion are set forth in the accompanying Memorandum in Support of Defendants' Motion for Summary Judgment on Remand, the Statement of Material Facts as to Which There is No Genuine Dispute, and the Fifth Declaration of David M. Hardy.  A proposed order is filed concurrently herewith.

Dated:  December 14, 2018

Respectfully submitted,

CHAD A. READLER
Principal Deputy Assistant Attorney General
Civil Division

MARCIA BERMAN
Assistant Director, Civil Division

*/s/Carol Federighi*
CAROL FEDERIGHI
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Phone: (202) 514-1903
Email: carol.federighi@usdoj.gov

*Counsel for Defendant*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CABLE NEWS NETWORK, INC., <br><br>     Plaintiff, <br><br> v. <br><br> FEDERAL BUREAU OF INVESTIGATION, <br><br>     Defendant. | Civil Action No. 1:17-cv-01167-JEB |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY
<u>JUDGMENT ON REMAND</u>**

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

ARGUMENT ...................................................................................................................... 5

I.      THE COURT HAS ALREADY DETERMINED THAT THE FBI
        CONDUCTED AN ADEQUATE SEARCH AND THAT HOLDING
        SHOULD NOT BE DISTURBED ....................................................................... 7

II.     THE FBI PROPERLY WITHHELD PORTIONS OF THE RECORDS
        PURSUANT TO EXEMPTION 1 ......................................................................... 9

III.    THE FBI PROPERLY WITHHELD PORTIONS OF THE RECORDS
        PURSUANT TO EXEMPTION 3 ....................................................................... 17

IV.     PORTIONS OF THE RECORDS ARE EXEMPT FROM DISCLOSURE
        PURSUANT TO EXEMPTION 7 ....................................................................... 19

        A.      The Records Have Been Compiled For Law Enforcement Purposes ................. 19

        B.      The FBI Properly Withheld Portions Of The Records Pursuant To
                Exemption 7(E) ....................................................................................... 21

        C.      The FBI Properly Withheld Portions Of The Records Pursuant To
                Exemption 7(A) ....................................................................................... 22

CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*American Civil Liberties Union v. U.S. Department of D*efense,
   628 F.3d 612 (D.C. Cir. 2011) ............................................................ 9

*American Civil Liberties Union v. Department  of Defense*,
   389 F. Supp. 2d 547 (S.D.N.Y. 2005) .................................................. 15

*Alyeska Pipeline Service Co. v. U.S. EPA*,
   856 F.2d 309 (D.C. Cir. 1988) ....................................................... 6, 24

*Ancient Coin Collectors Guild v. U.S. Department of State*,
   641 F.3d 504 (D.C. Cir. 2011) ............................................................ 6

*Armstrong v. Executive Office of the President*,
   97 F.3d 575 (D.C. Cir. 1996) ............................................................. 6

*Blackwell v. FBI*,
   646 F.3d 37 (D.C. Cir. 2011) ........................................................... 21

*Cable News Network v. FBI*,
   293 F. Supp. 3d 59 (D.D.C. 2018) ............................................ 1, *passim*

*Charles v. Office of the Armed Forces Medical Examiner*,
   979 F. Supp. 2d 35 (D.D.C. 2013) ...................................................... 7

*CIA v. Sims*,
   471 U.S. 159 (1985) .............................................................. 5, 12, 18

*Citizens for Responsibility and Ethics in Washington v. U.S. Department of Justice*,
   746 F.3d 1082 (D.C. Cir. 2014) ........................................................ 23

*Center for National Security Studies v. U.S. Department of Justice*,
   331 F.3d 918 (D.C. Cir. 2003) .............................................. 11, 19, 23

*DeBrew v. Atwood*,
   244 F. Supp. 3d 123 (D.D.C. 2017) ..................................................... 8

*DiBacco v. U.S. Army*,
   795 F.3d 178 (D.C. Cir. 2015) ......................................................... 18

*Dorsey v. Executive Office for U.S. Attorneys*,
   926 F. Supp. 2d 253 (D.D.C. 2013) ..................................................... 6

*Electronic Frontier Foundation v. Department of Justice*,
  892 F. Supp. 2d 95 (D.D.C. 2012) ........................................................................... 13

*FBI v. Abramson*,
  456 U.S. 615 (1982) ................................................................................................... 5

*Fitzgibbon v. CIA*,
  911 F.2d 755 (D.C. Cir. 1990) ........................................................................... 17, 18

*Gardels v. CIA*,
  689 F.2d 1100 (D.C. Cir. 1982) ......................................................................... 12, 18

*Hayden v. National Security Agency*,
  608 F.2d 1381 (D.C. Cir. 1979) ............................................................................... 17

*Independent Petroleum Association of America v. Babbitt*,
  235 F.3d 588 (D.C. Cir. 2001) ................................................................................... 7

*John Doe Agency v. John Doe Corp.*,
  493 U.S. 146 (1989) ............................................................................................. 5, 19

*Juarez v. Department of Justice*,
  518 F.3d 54 (D.C. Cir. 2008) ................................................................................... 23

*Kansi v. U.S. Department of Justice*,
  11 F. Supp. 2d 42 (D.D.C. 1998) ............................................................................. 19

*Larson v. Department of State*,
  565 F.3d 857 (D.C. Cir. 2009) ....................................................................... 9, 11, 12

*LaShawn A. v. Barry*,
  87 F.3d 1389 (D.C. Cir. 1996) ................................................................................... 7

*Leadership Conference on Civil Rights v. Gonzales*,
  404 F. Supp. 2d 246 (D.D.C. 2005) ........................................................................... 5

*Mapother v. Department of Justice*,
  3 F.3d 1533 (D.C. Cir. 1993) ................................................................................... 22

*Maydak v. U.S. Department of Justice*,
  218 F.3d 760 (D.C. Cir. 2000) ................................................................................. 24

*McRae v. U.S. Department of Justice*,
  869 F. Supp. 2d 151 (D.D.C. 2012) ......................................................................... 21

*Meeropol v. Meese,*
   790 F.2d 942 (D.C. Cir. 1986) ............................................................................ 9

*Military Audit Project v. Casey,*
   656 F.2d 724 (D.C. Cir. 1981) ...................................................................... 6, 11

*Moore v. Bush,*
   601 F. Supp. 2d 6 (D.D.C. 2009) ................................................................. 7, 14

*Morley v. CIA,*
   508 F.3d 1108 (D.C. Cir. 2007) ......................................................................... 12

*Perry v. Block,*
   684 F.2d 121 (D.C. Cir. 1982) ............................................................................ 6

*Phillippi v. CIA,*
   655 F.2d 1325 (D.C. Cir. 1981) ......................................................................... 15

*Piper v. U.S. Department of Justice,*
   294 F. Supp. 2d 16 (D.D.C. 2003), *amended on other grounds*, 428 F. Supp. 2d 1 (D.D.C.
   2006), *jdgmt. aff'd*, 222 F. App'x 1 (D.C. Cir. 2007) ......................................... 6

*Pratt v. Webster,*
   673 F.2d 408 (D.C. Cir. 1982) ......................................................................... 19

*Quiñon v. FBI,*
   86 F.3d 1222 (D.C. Cir. 1996) ......................................................................... 19

*Safecard Services, Inc. v. Securities and Exchange Commission,*
   926 F.2d 1197 (D.C. Cir. 1991) ...................................................................... 6, 8

*Salisbury v. United States,*
   690 F.2d 966 (D.C. Cir. 1982) ......................................................................... 13

*Schoenman v. FBI,*
   575 F. Supp. 2d 136 (D.D.C. 2008) ................................................................. 15

*Suzhou Yuanda Enteprise, Co. v. U.S. Customs and Border Protection,*
   404 F. Supp. 2d 9 (D.D.C. 2005) ..................................................................... 24

*Swan v. SEC,*
   96 F.3d 498 (D.C. Cir. 1996) ........................................................................... 24

*Vazquez v. U.S. Department of Justice,*
   887 F. Supp. 2d 114 (D.D.C. 2012), *aff'd*, No. 13-5197, 2013 WL 6818207
   (D.C. Cir. Dec. 18, 2013) ................................................................................. 21

*Wolf v. CIA*,
   473 F.3d 370 (D.C. Cir. 2007) ............................................................................... 16

*Yunes v. U.S. Department of Justice,*
   263 F. Supp. 3d 82 (D.D.C. 2017) ........................................................................... 7

## STATUTES

5 U.S.C. § 552 ............................................................................................................... 1
5 U.S.C. § 552(a)(4)(B) .............................................................................................. 6
5 U.S.C. § 552(b) ......................................................................................................... 5
5 U.S.C. § 552(b)(1) .................................................................................................... 9
5 U.S.C. § 552(b)(3) .................................................................................................. 17
5 U.S.C. § 552(b)(7) .................................................................................................. 19
5 U.S.C. § 552(b)(7)(A) ..................................................................................... 1, 2, 22
5 U.S.C. § 552(b)(7)(E) ............................................................................................ 21
28 U.S.C. § 533 ......................................................................................................... 21
50 U.S.C. § 3024(i)(1) ........................................................................................ 18, 19

## OTHER MATERIAL

Executive Order No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009) ....................... 9, 10, 14

H.R. Rep. No. 1497, 89th Cong., 2 Sess. 6 (1966), *reprinted in*
   1966 U.S.C.C.A.N. 2418, 2423) ............................................................................... 5

## **INTRODUCTION**

This action involves a request submitted by plaintiff Cable News Network ("CNN") to defendant Federal Bureau of Investigation ("FBI") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.  CNN requested records created by then-Director of the FBI, James B. Comey, documenting his interactions with President Donald J. Trump; these records have been referred to as the "Comey Memos."  On February 2, 2018, this Court held that the FBI had conducted an adequate search for the Comey Memos and had properly withheld them in full under FOIA Exemption 7(A), 5 U.S.C. § 552(b)(7)(A), which protects documents compiled for law enforcement purposes where their disclosure "could reasonably be expected to interfere with enforcement proceedings."  *Cable News Network v. FBI*, 293 F. Supp. 3d 59 (D.D.C. 2018).  Plaintiff appealed but, while the appeal was pending, redacted versions of the Comey Memos were made public.  The court of appeals therefore remanded the appeal to this Court for it to consider the propriety of the limited redactions made to the public version of the memos, which this Court had not previously considered, as well as to consider whether other responsive records might exist.

The Court has already determined that the FBI conducted an adequate search and this holding is law of the case that should not be disturbed.  The seven memos located and released by the FBI (six of them responsive to CNN's request, which was date-limited) constitute the complete set of extant Comey Memos that the FBI was able to locate after an appropriate search, and there is no evidence that any additional memos responsive to CNN's request exist.  In addition, the FBI properly withheld small blocks of information from three of the memoranda responsive to CNN's request pursuant to FOIA Exemptions 1, 3, 7(A), and 7(E).  Specifically, the FBI properly withheld information concerning intelligence activities, sources, and methods,

information obtained from intelligence activities, sources, and methods, and information about foreign relations or foreign activities of the United States.  None of this information has been publicly disclosed and the FBI has minimized redactions and withheld only portions that cannot be reasonably segregated.  Accordingly, summary judgment should be granted in favor of defendant FBI.

## **BACKGROUND**

The factual background relevant to the requested records, as well as the background of the administrative processing of CNN's request, are set forth in more detail in the Court's prior opinion at 293 F. Supp. 3d 59 and the government's prior summary judgment motions in the consolidated cases (ECF Nos. 22 & 45), as well as in the declarations filed by the government in support of its motions.[1]

In brief, CNN's FOIA request to the FBI, dated May 16, 2017, sought "all records of notes taken by or communications sent from FBI Director James Comey regarding or documenting interactions (including interviews and other conversations) with President Donald Trump [from] January 20, 2017 [through] May 10, 2017."  *See* First Hardy Decl., Exhibit CNN-A.  The FBI initially withheld the requested records in full pursuant to FOIA Exemption 7(A), 5 U.S.C. § 552(b)(7)(A).  First Hardy Decl. ¶ 13 & Exh. CNN-F.  At that time, the FBI did not reveal the total number or volume of Comey Memos (responsive both to CNN's request and to

---

[1] *See* Decl. of David M. Hardy, Section Chief, Record/Information Dissemination Section, Records Management Division, FBI (Oct. 13, 2017) ("First Hardy Decl."), ECF No. 22-2; Second Decl. of David M. Hardy (Nov. 5, 2017) ("Second Hardy Decl."), ECF No. 36-1; Third Decl. of David M. Hardy (Jan. 19, 2018), ECF No. 45-2;  Fourth Declaration of David M. Hardy (Feb. 8, 2018), ECF No. 55-1; In Camera, Ex Parte Declaration of the FBI (Oct. 13, 2017); In Camera, Ex Parte Decl. of David Archey (Jan. 19, 2018); Third In Camera, Ex Parte Decl. of David W. Archey (Jan. 31, 2018); and the sealed on-the-record, ex parte proffer of Michael R. Dreeben, Counsel to the Special Counsel.

the other requests at issue in the consolidated cases) in order to avoid interfering with a pending

investigation. Fifth Decl. of David M. Hardy (Dec. 14, 2018) ("Fifth Hardy Decl.") ¶ 8 n.3 (Ex.

1 hereto). Because it could not publicly disclose this information when the case was initially

briefed, the FBI did not specify which Comey Memo or Memos were responsive to each

plaintiff's request. *Id.* In addition to Exemption 7(A), the FBI subsequently asserted other

exemptions that applied to certain portions of information contained in the Comey Memos,

specifically, Exemptions 1, 3, 6, 7(C) and 7(E). *See* First Hardy Decl., ¶¶ 63, 73-106.

On February 2, 2018, this Court granted the FBI's motion for partial summary judgment

addressing the withholding of the Comey Memos and denied CNN's cross-motion. *CNN v. FBI*.

293 F. Supp. 3d at 77. The Court found that the FBI had conducted adequate searches to locate

the records responsive to plaintiffs' requests; that the Comey Memos had been properly withheld

in full pursuant to FOIA Exemption 7(A); and that no portion of the memos was reasonably

segregable. *Id.* at 68-77. Because of the Court's conclusion that Exemption 7(A) was properly

asserted to withhold the records in full and that no portion of them was reasonably segregable, it

did not address the other exemptions asserted by the government to support withholding some or

all of the Comey Memos. *Id.* at 69.

CNN appealed the Court's February 2, 2018, decision and ensuing judgment, as did some

of the other plaintiffs in the consolidated cases. *See* CNN Notice of Appeal, Feb. 5, 2018, ECF

No. 52; CNN Notice of Appeal, Apr. 26, 2018, ECF No. 61. On April 19, 2018, while the

appeals were pending, the Department of Justice provided the Comey Memos in redacted form to

the Chairman of the Senate Select Committee on Intelligence and the Chairmen of the House

Committee on the Judiciary, House Committee on Oversight and Government Reform, and

House Permanent Select Committee on Intelligence.  Fifth Hardy Decl. ¶ 12.  Congress

subsequently disclosed copies of the memos to the media, and the media published them.  *Id.*

As a result of these events, the FBI concluded that it could no longer show a harm to a

pending investigation by release under the FOIA of the same memos that had been disclosed by

Congress to the media.  Fifth Hardy Decl. ¶ 13.  Therefore, on May 4, 2018, the FBI released its

own redacted copies of the Comey Memos by publishing them on the FBI's electronic reading

room, The Vault, at https://vault.fbi.gov/director-comey-memoranda-of-communications-with-

president-trump/ (hereafter, "The Vault").  *Id.*  This release consisted of seven memos totaling

fifteen pages and, in contrast to the version of the memos provided to Congress, labeled the

redactions with the pertinent FOIA exemptions.  *See* The Vault.  Four of the seven memos were

released in part; the other three memos were released in full.  Fifth Hardy Decl. ¶ 17; *see also*

The Vault.  Because CNN's request sought memos documenting only those interactions between

Mr. Comey and President Trump beginning on January 20, 2017, one of these memos (the first

one, consisting of two pages)) is not responsive to CNN's request.  Fifth Hardy Decl. ¶ 18 & n.5.

Accordingly, there are six memos responsive to CNN's request, totaling 13 pages, three of which

have been released in full.  *Id.* ¶¶ 18, 19 & Ex. B thereto.

On April 24, 2018, the D.C. Circuit sua sponte ordered CNN to show cause why its

appeal had not been rendered moot by "the recent public disclosure of records at issue."  Order,

No. 18-5041 (D.C. Cir. Apr. 24, 2018) (Doc. No. 1727918).  In response, CNN asked that the

case be remanded for further proceedings.  CNN's Resp. to Order Show Cause, No.18-5041

(D.C. Cir. May 17, 2018) (Doc. No. 1731461).  On August 8, 2018, the D.C. Circuit granted

CNN's request for remand.  Mandate & Order, No.18-5041 (D.C. Cir. Aug. 8, 2018) (Doc. No.

1744635).  The appeals court stated that "[f]urther proceedings in the district court are …

necessary to determine whether there exist any additional memoranda that have not been publically disclosed, and whether [CNN] is entitled to the disclosure of any unreleased memoranda or redacted portions of released memoranda." *Id*. at 2.

## ARGUMENT

The FOIA's "basic purpose" reflects a "general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." *John Doe Agency v. John Doe Corp*., 493 U.S. 146, 152 (1989). "Congress recognized, however, that public disclosure is not always in the public interest." *CIA v. Sims*, 471 U.S. 159, 166-67 (1985). Thus, FOIA is designed to achieve a "workable balance between the right of the public to know and the need of the Government to keep information in confidence to the extent necessary without permitting indiscriminate secrecy." *John Doe*, 493 U.S. at 152 (quoting H.R. Rep. No. 1497, 89th Cong., 2 Sess. 6 (1966), *reprinted in* 1966 U.S.C.C.A.N. 2418, 2423). To that end, FOIA mandates disclosure of government records unless the requested information falls within one of nine enumerated exceptions. *See* 5 U.S.C. § 552(b). While these exemptions are to be "narrowly construed," *FBI v. Abramson*, 456 U.S. 615, 630 (1982), courts still must respect the balance that Congress struck and give the exemptions a "meaningful reach and application." *John Doe Agency*, 493 U.S. at 152.

For a defendant agency to prevail on a motion for summary judgment in FOIA litigation, it must satisfy two elements. First, the agency must "demonstrate that [it] conducted an adequate search which was reasonably calculated to uncover all relevant documents." *Leadership Conf. on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 252 (D.D.C. 2005) (citations omitted). "Second, materials that are withheld must fall within a FOIA statutory exemption." *Id.* In

5

determining whether these standards have been met, Courts review agencies' responses to FOIA requests *de novo*. 5 U.S.C. § 552(a)(4)(B).

To demonstrate the adequacy of its search, "the agency may submit affidavits or declarations that explain in reasonable detail the scope and method of the agency's search." *Dorsey v. Exec. Office for U.S. Attorneys*, 926 F. Supp. 2d 253, 255-56 (D.D.C. 2013) (citing *Perry v. Block*, 684 F.2d 121, 126 (D.C. Cir. 1982)). "At summary judgment, a court may rely on [a] reasonably detailed affidavit … averring that all files likely to contain responsive materials (if such records exist) were searched." *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011) (quotations and citation omitted). To meet its burden of justifying withholding of documents, the government may submit an agency declaration that describes the withheld material with reasonable specificity and the reasons for non-disclosure. *See Armstrong v. Exec. Office of the President*, 97 F.3d 575, 577-78 (D.C. Cir. 1996).

The declarations submitted by the agency are accorded a presumption of good faith, *Safecard Servs., Inc. v. Securities & Exchange Comm'n*, 926 F.2d 1197, 1200 (D.C. Cir. 1991), and a presumption of expertise, *Piper v. U.S. Dep't of Justice*, 294 F. Supp. 2d 16, 20 (D.D.C. 2003), *amended on other grounds,* 428 F. Supp. 2d 1 (D.D.C. 2006), *jdgmt. aff'd*, 222 F. App'x 1 (D.C. Cir. 2007). "In the absence of contrary evidence, such affidavits or declarations are sufficient to demonstrate an agency's compliance with the FOIA." *Dorsey*, 926 F. Supp. 2d at 256 (citing *Perry*, 684 F.2d at 127). Summary judgment is to be freely granted where, as here, the declarations reveal that there are no material facts genuinely at issue and that the agency is entitled to judgment as a matter of law. *See Alyeska Pipeline Serv. Co. v. U.S. EPA*, 856 F.2d 309, 314-15 (D.C. Cir. 1988); *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir.

6

1981).  Accordingly, "FOIA cases are typically and appropriately decided on motions for

summary judgment."  *Moore v. Bush,* 601 F. Supp. 2d 6, 12 (D.D.C. 2009).

## I.     THE COURT HAS ALREADY DETERMINED THAT THE FBI CONDUCTED AN ADEQUATE SEARCH AND THAT HOLDING SHOULD NOT BE DISTURBED

When this case was first before this Court, CNN did not challenge the adequacy of the

FBI's search for records responsive to its request.  *See* CNN's Mot. Summ. J., ECF No. 25.

Some of the other plaintiffs in the consolidated cases did so, and, after review, the Court held

that search was adequate.  293 F. Supp. 3d at 68.  This holding is now law of the case and not

subject to challenge by CNN.  The law-of-the-case doctrine "prevents courts from reconsidering

issues that have already been decided in the same case."  *Indep. Petrol. Ass'n of Am. v. Babbitt*,

235 F.3d 588, 597 (D.C. Cir. 2001) (internal quotation marks omitted).  It embodies the principle

that "the same issue presented a second time in the same case in the same court should lead to

the same result."  *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc).  The

law-of-the-case may be revisited only if there is an intervening change in the law or if the

previous decision was "clearly erroneous and would work a manifest injustice."  *Id.* (internal

quotation marks omitted); *see also Yunes v. U.S. Dep't of Justice,* 263 F. Supp. 3d 82, 88

(D.D.C. 2017) (seeing no reason that the Court should disturb its earlier decision in FOIA case);

*Charles v. Office of the Armed Forces Medical Examiner*, 979 F. Supp. 2d 35, 41-42 (D.D.C.

2013) (adopting as law of the case the Court's "previous rulings that (a) Defendants failed to

invoke FOIA Exemption 6 properly …, and (b) Defendants properly invoked Exemption 5 …").

No reason exists to overturn the law of the case here with regard to the adequacy of the

FBI's search.  Neither the law nor the facts with regard to the FBI's search have changed since

the Court's first holding on February 2, 2018.  CNN may suggest that the Court's prior ruling

should be reconsidered because the FBI has now revealed that it has located only seven memos, and Mr. Comey may have written up to nine memos.  *See* CNN Resp. Order Show Cause, No. 18-5041 (D.C. Cir. filed May 17, 2018), at 11 (Doc. No. 173146).  However, the public disclosure of the number of extant memos (the only "new" fact) does not alter the details of the search which the Court already found to be adequate.  Moreover, there is no evidence that additional memoranda ever existed.  In the course of its search, the FBI carefully "consulted with the Special Counsel's Office and confirmed that the records … located and processed in response to this portion of plaintiffs' requests represent the universe of 'Corney Memos' that exist." Second Hardy Decl. ¶ 4.  CNN has pointed to Mr. Comey's statements that he thought he had written a memo after each of his conversations with the President and that there were possibly nine such conversations.  CNN Resp. Order Show Cause at 11.  However, in fact, Mr. Comey stated only that he "thought" he had written a memo for all conversations or, if he had not, he had "for nearly all of them."  *Id.*; *see* Transcript of Comey Hearing, *available at* https://www.intelligence.senate.gov/hearings/open-hearing-former-fbi-director-james-comey# (last visited Dec. 14, 2018) ("Transcript") ("I created records after conversations, and I think I did it after each of our nine conversations. If I didn't, I did it for nearly all of them, especially the ones that were substantive.").  This qualified recollection falls short of evidence that any additional memos exist or existed.

CNN's mere speculation that there could be more memos is not sufficient to overcome the Court's prior holding that the FBI's search as adequate.  "Mere speculation that as yet uncovered documents may exist does not undermine the finding that the agency conducted a reasonable search for them."  *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991); *see also DeBrew v. Atwood*, 244 F. Supp. 3d 123, 129 (D.D.C. 2017) ("[S]peculation as to

the existence of additional records … does not render the searches inadequate." (citation

omitted)).  The adequacy of an agency's search is "measured by the reasonableness of the effort

in light of the specific request." *Larson v. Dep't of State*, 565 F.3d 857, 869 (D.C. Cir. 2009)

(quoting *Meeropol v. Meese*, 790 F.2d 942, 956 (D.C. Cir. 1986)).  As already found by the

Court, the effort exerted by the FBI to locate the Comey Memos was adequate in this case in

light of CNN's specific request and the results achieved.

## II.     THE FBI PROPERLY WITHHELD PORTIONS OF THE RECORDS PURSUANT TO EXEMPTION 1

Portions of the Comey Memos have been redacted to protect classified information that is

exempt from disclosure pursuant to Exemption 1.  Fifth Hardy Decl. pp. 7-8 & ¶¶ 25-39.  This

information has been classified at the "Secret" or "Confidential" level.  *Id.* ¶ 25.  This

information is properly withheld.

Exemption 1 allows an agency to protect records that are:  (1) specifically authorized

under criteria established by an Executive Order to be kept secret in the interest of national

defense or foreign policy, and (2) are in fact properly classified pursuant to Executive Order.  *See*

5 U.S.C. § 552(b)(1).  As with the other exemptions, agencies may establish the applicability of

Exemption 1 by declaration.  *See Am. Civil Liberties Union v. U.S. Dep't of Def.*, 628 F.3d 612,

619 (D.C. Cir. 2011).

The current operative classification order for the purposes of Exemption 1 is Executive

Order No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009) [hereinafter "E.O. 13,526"], which sets

forth the substantive and procedural criteria that an agency must follow to properly invoke the

exemption.  Fifth Hardy Decl. ¶ 22.  E.O. 13,526 provides that, for information to be properly

classified:  (1) an "original classification authority" must have classified the information; (2) the

information must be "owned by, produced by or for, or be under the control of the United States

Government;" (3) the information must fall within one or more of protected categories of

information listed in section 1.4 of the E.O.; and (4) the original classification authority must

"determine[] that the unauthorized disclosure of the information reasonably could be expected to

result in damage to the national security" and be "able to identify or describe the damage."  E.O.

13,526, § 1.1(a)(1)-(4).  E.O. 13,526 also requires, in relevant part, that information should be

classified as "Secret" only if its unauthorized disclosure could reasonably be expected to cause

serious damage to the national security, and as "Confidential" only if its unauthorized disclosure

could reasonably be expected to cause damage to the national security.  E.O. 13,526,

§§ 1.2(a)(2)-(3).  In addition to these substantive requirements, certain procedural and

administrative requirements set forth in E.O. 13,526 must be followed before information can be

considered to be properly classified, such as proper identification and marking of documents.

Fifth Hardy Decl. ¶ 24.

Here, Section Chief Hardy has determined that the information for which Exemption 1

protection is sought is currently and properly classified at the Secret or Confidential level

pursuant to E.O. 13,526.  Fifth Hardy Decl. ¶ 25.  As an initial matter, Section Chief Hardy

established that the withheld classified information (1) is owned by, was produced by or for, and

is under the control of the U.S. Government; (2) was classified by an original classification

authority; (3) meets all of the procedural requirements of E.O. 13,526; and (4) falls within one or

more of the categories described in Section 1.4 of E.O. 13,526, namely § 1.4(c), information

pertaining to "intelligence activities (including covert action), intelligence sources or methods, or

cryptology," and § 1.4(d), information pertaining to "foreign relations or foreign activities of the

United States, including confidential sources."  *Id.*  Section Chief Hardy also confirmed that the

unauthorized disclosure of the classified information reasonably could be expected to result in damage to the national security (for information classified at the Confidential level) or serious damage to the national security (for information classified at the Secret level) and describes the expected damage to the extent possible on the public record.  Fifth Hardy Decl. ¶¶ 25-39. Specifically, the FBI first determined that some of the information at issue is properly classified under 1.4(c) for "intelligence activities (including covert action), intelligence sources or methods, or cryptology."  The information protected under this authority would, if disclosed, reveal (a) information about how the FBI did or did not use information provided by confidential intelligence sources as well as the reliability of that information (redaction blocks 10-15 and 18); (b) information about whether or not the FBI relied on a particular intelligence-gathering method/activity (Foreign Intelligence Surveillance Act ("FISA") surveillance) to surveil Lieutenant General Flynn (redaction blocks 16-17) and information that would reveal another intelligence method used to gather particular information (redaction block 19); (c) a statement about information known to the FBI concerning Lieutenant General Flynn as of a particular date (redaction block 9); and (d) non-public details about to whom a defensive intelligence briefing was provided (redaction block 8).  Fifth Hardy Decl. pp. 6-8 & ¶ 31.

Because agencies have "unique insights" into the adverse effects that might result from public disclosure of classified information, the courts must accord "substantial weight" to an agency's affidavits justifying classification.  *Larson*, 565 F.3d at 864 (citation omitted); *see also Military Audit Project*, 656 F.2d at 738.  As the D.C. Circuit has noted, "in the FOIA context, we have consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review."  *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 927 (D.C. Cir. 2003).  Thus, the issue for the Court is whether "on

the whole record, the [a]gency's judgment objectively survives the test of reasonableness, good faith, specificity and plausibility in this field of foreign intelligence in which [the agency] is expert and been given by Congress a special role." *Gardels v. CIA*, 689 F.2d 1100, 1105 (D.C. Cir. 1982). Indeed, the D.C. Circuit has instructed that "little proof or explanation is required beyond a plausible assertion that information is properly classified." *Morley v. CIA*, 508 F.3d 1108, 1124 (D.C. Cir. 2007).

Section Chief Hardy logically and plausibly explains why the four categories ((a)-(d)) of withheld information are properly classified here because disclosing details concerning the FBI's intelligence activities, sources, and methods would undermine the usefulness of those methods, to the detriment of national security. Thus, the Court should sustain the agency's withholding of this information. *See, e.g.*, *Larson*, 565 F.3d at 863 (holding that "[t]he CIA has carried its burden to show that FOIA Exemption 1 applies where the agency "described with reasonably specific detail … the importance for continuing intelligence operations of keeping intelligence sources and methods classified and confidential"); *see also Sims*, 471 U.S. at 175. First, he explains that disclosure of information about the FBI's use (or non-use) of the particular intelligence sources and methods/activities that was protected here (category (a), redaction blocks 10-15 and 18), as well as information known to the FBI concerning a specific individual as of a certain date (category (c), redaction block 9), would reveal particular, singular details about the FBI's intelligence interests, priorities, activities, and methods at a particular period of time and in relation to a particular set of circumstances. Fifth Hardy Decl. ¶ 32. He further explains that adversaries could use this information to thwart the FBI's intelligence-gathering mission. *Id.* Once an intelligence activity, source, or method – or the fact of its use or non-use in a certain situation – is discovered, its continued successful use is seriously jeopardized. *Id.*

¶ 29.  Moreover, even seemingly innocuous, indirect references to an intelligence activity, source, or method could have significant adverse effects when juxtaposed with other publicly-available data because terrorist organizations and other hostile or foreign intelligence groups have the capacity and ability to gather information from myriad sources, analyze it, and deduce means and methods from disparate details to defeat the U.S. government's collection efforts.  *Id.* ¶ 30.  Thus, the information described by Section Chief Hardy is properly classified and exempt under FOIA Exemption 1.[2]  *See Elect. Frontier Found. v. Dep't of Justice*, 892 F. Supp. 2d 95, 100 (D.D.C. 2012) (finding that FBI had adequately explained potential harm to national security from release of information concerning "intelligence sources or methods"); *see generally Salisbury v. United States*, 690 F.2d 966, 971 (D.C. Cir. 1982) (acknowledging "mosaic-like nature of intelligence gathering").

With regard to information concerning whether or not Lieutenant General Flynn was the target of FISA surveillance (category (b), redaction blocks 16 and 17), Section Chief Hardy explains that surveillance conducted pursuant to FISA is an intelligence-gathering method and the identities of surveillance targets are classified facts.  Fifth Hardy Decl. ¶ 33.  He asserts that revealing whether Lieutenant General Flynn was the subject of FISA surveillance would cause harm to national security by revealing details about the FBI's intelligence interests, priorities, activities, and methods at a particular point in time and in relation to a particular set of circumstances, which adversaries could use to avoid or thwart FBI scrutiny and intelligence-gathering efforts.[3]  *Id.*  Public disclosure of the other intelligence method protected by the FBI

---

[2]  This information is also being withheld pursuant to Exemption 3.

[3]  This information is also being withheld pursuant to Exemptions 3 and 7(E).

here, along with the information gathered by its use (also category (b), redaction block 19),

would similarly reveal such things.[4]  *Id.*  These redaction blocks are therefore properly classified

as well.  *See Moore*, 601 F. Supp. 2d at 15 (holding that information regarding whether plaintiff

was or was not a target of NSA surveillance was properly classified and exempt from release

under FOIA Exemption 1).

Finally, Mr. Hardy testifies that disclosing non-public details about defensive intelligence

briefings, including to whom such briefings are provided (category (d), redaction block 8), also

would adversely affect the FBI's ability to gather intelligence and protect the country and its

citizens from counterintelligence threats.  Fifth Hardy Decl. ¶ 34.  Defensive intelligence

briefings inform individuals that they may be targets of foreign intelligence efforts.  *Id.*

Revealing details of such briefings could, for example, reveal that the FBI knows that a

particular individual has been targeted or is vulnerable to targeting by foreign intelligence actors

and/or has information about the activities or tradecraft of such actors that would prompt the

briefings of particular individuals.  *Id.*  This knowledge, pieced together with other information

known to or publicly accessible by the hostile actors could cause them to develop

countermeasures, abandon known techniques/activities, or identify others to target.  *Id.*  This

information is thus properly classified pursuant to section 1.4(c) of E.O. 13,526.[5]

Second, in addition to the above information classified pursuant to section 1.4(c), the FBI

has also determined that some of the information at issue is properly classified under 1.4(d) as

information pertaining to "foreign relations or foreign activities of the United States, including

---

[4]  This information is also being withheld pursuant to Exemptions 3 and 7(A).

[5]  This information is also being withheld pursuant to Exemption 3.

confidential sources." Fifth Hardy Decl. ¶ 38. Specifically, the FBI protected the names of

specific countries or foreign leaders where disclosure would reveal the relative importance

attached by the President to contacts from one country/leader over another (redaction blocks 1-

7). *Id.* The FBI also protected a reference about the President's observation about responding to

a question he was asked about Russian President Putin (redaction block 20) and information

reflecting the President's impressions of specific foreign leaders (redaction blocks 21-24). *Id.* In

the context of other surrounding information, disclosure of this redacted information could

reasonably be expected to impair or adversely impact relations with the referenced countries, and

thus, cause harm to the national security. *Id.* The FBI's assertion of Exemption 1 should be

upheld here as well. *See Phillippi v. CIA*, 655 F.2d 1325, 1332-33 (D.C. Cir. 1981) (holding that

information was properly classified when "official confirmation [of the information sought]

could have an adverse effect on our relations with the Soviets" given "the world of international

diplomacy, where face-saving may often be as important as substance"); *Schoenman v. FBI*, 575

F. Supp. 2d 136, 153 (D.D.C. 2008) (holding that intelligence agency properly classified

"deliberative descriptions, commentary, and analysis on [foreign] government and defense

establishment" because disclosure would damage "working relationship" and lead to less

effective foreign intelligence collection); *Am. Civil Liberties Union v. Dep't of Defense*, 389 F.

Supp. 2d 547, 561 (S.D.N.Y. 2005) (reasoning that "even if the only question was whether to

recognize officially that which was informally or unofficially believed to exist, the niceties of

international diplomacy sometimes make it important not to embarrass a foreign country or its

leaders, and exemptions from FOIA protect that concern as well").

  As part of its analysis of the applicability of Exemption 1, the FBI also reviewed the

information that the government has officially released about the pending investigation to date.

Fifth Hardy Decl. ¶ 39.  Specifically, the FBI considered the public information available from

the indictments stemming from the investigation into Russian interference in the 2016 election

and other documents made available by the Government in those cases; the released portions of

the Comey Memos; the released portions of the Carter Page FISA materials; and information

made public in the memorandum drafted by the Majority Staff of the House Permanent Select

Committee on Intelligence ("HPSCI"), which was declassified and released by the President

("the Nunes Memo"); the response memorandum released by HPSCI Minority Staff ("the Schiff

Memo") and a memorandum authored by Senators Grassley and Graham referring Steele to the

FBI for possible criminal violations ("the Grassley/Graham Memo").  *Id.*  The FBI concluded

that the information withheld under Exemption 1 here still needs to be protected to prevent harm

to national security, notwithstanding and in some instances because of what has already been

made publicly available.  *Id.*

The FBI also considered whether it had waived its ability to claim exemptions by prior

official disclosures of the same information, and, for the same reasons, concluded that it had not.

Fifth Hardy Decl. ¶¶ 57-58.  The classified information redacted in the Comey Memos does not

match any information that has been officially publicly disclosed by the Executive Branch nor

does not it match information in the referenced Congressional memoranda.  *Id.* Therefore, there

has been no waiver as to this information.  *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007)

("[P]rior disclosure of similar information does not suffice; instead, the specific information

sought by the plaintiff must already be in the public domain by official disclosure.").

The FBI also reasonably determined that all segregable information had been released.

Fifth Hardy Decl. ¶ 58.  Notably, three of the six memos responsive to CNN's request were

released in whole and, of the three released in part, only minimal redactions were taken to protect

information that is currently and properly classified, that is prohibited from disclosure by statute, or that would cause harm to law enforcement interests.  The three memos released in part contain 24 redaction blocks in total, most of which were of one, two, or a few words apiece.  *Id*.  No further segregation is reasonably possible.

## III.     THE FBI PROPERLY WITHHELD PORTIONS OF THE RECORDS PURSUANT TO EXEMPTION 3

FOIA Exemption 3 protects information that is specifically exempted from public disclosure by a statute that:

> (A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and
>
> (B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

5 U.S.C. § 552(b)(3).  As the Court of Appeals has explained, "'Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage.'"  *Fitzgibbon v. CIA*, 911 F.2d 755, 761-62 (D.C. Cir. 1990).  Thus, "[a] specific showing of potential harm to national security … is irrelevant to the language of [an Exemption 3 statute].  Congress has already, in enacting the statute, decided that disclosure of [the specified information] is potentially harmful."  *Hayden v. Nat'l Sec. Agency*, 608 F.2d 1381, 1390 (D.C. Cir. 1979).

As explained above, the Comey Memos include information that is classified pursuant to E.O. 13,526, § 1.4(c), to protect intelligence sources and methods (redaction blocks 8-19).  That same information is also exempt under Exemption 3.  Fifth Hardy Decl. ¶ 41.  Specifically,

disclosure of information concerning intelligence sources and methods is prohibited pursuant to

the National Security Act of 1947, as amended, which provides that the Director of National

Intelligence (DNI) "shall protect intelligence sources and methods from unauthorized

disclosure." 50 U.S.C. § 3024(i)(1). As relevant to the application of Exemption 3, this

provision was enacted before the date of enactment of the OPEN FOIA Act of 2009, and on its

face, leaves no discretion to agencies about withholding from the public information about

intelligence sources and methods. It is therefore "settled" that this statute falls within Exemption

3. *Gardels*, 689 F.2d at 1103 (discussing substantively similar predecessor statute applicable to

CIA which provided that "the Director of Central Intelligence shall be responsible for protecting

intelligence sources and methods from unauthorized disclosure"); *accord Sims*, 471 U.S. at 167-

68, 193; *Fitzgibbon*, 911 F.2d at 761 ("There is thus no doubt that [the predecessor CIA statute]

is a proper exemption statute under exemption 3."); *DiBacco v. U.S. Army*, 795 F.3d 178, 183

(D.C. Cir. 2015).

    In order to fulfill its obligation of protecting intelligence sources and methods, the DNI is

authorized to establish and implement guidelines for the Intelligence Community ("IC") for the

classification of information under applicable laws, Executive Orders, or other Presidential

Directives, and for access to and dissemination of intelligence. 50 U.S.C. § 3024(i)(1). The FBI

is one of the member agencies comprising the IC, and as such must protect intelligence sources

and methods. Fifth Hardy Decl. ¶ 43. Accordingly, information in the Comey Memos that

reveals intelligence sources and methods is prohibited from disclosure pursuant to 50 U.S.C.

§ 3024(i)(1), *id.* ¶ 44, and thus properly exempt from disclosure under Exemption 3. As

discussed above, the FBI also determined that none of the withheld information has been

officially disclosed and that all reasonably segregable portions had been released.  Fifth Hardy

Decl. ¶¶ 57-59.

## IV.    PORTIONS OF THE RECORDS ARE EXEMPT FROM DISCLOSURE
##        PURSUANT TO EXEMPTION 7

### A.  The Records Have Been Compiled For Law Enforcement Purposes

The FBI asserts Exemptions 7(A) and 7(E) as justification for withholding some

information.  Fifth Hardy Decl. pp. 7-8.  To establish the applicability of any of the subparts of

Exemption 7, the government must first show that the records were "compiled for law

enforcement purposes."  5 U.S.C. § 552(b)(7).  Investigative documents qualify as records

"compiled for law enforcement purposes" if the agency's declarations establish (1) "a rational

nexus between the investigation and one of the agency's law enforcement duties"; and (2) "a

connection between an individual or incident and a possible security risk or violation of federal

law."  *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 926 (internal quotation marks omitted); *see also*

*Quiñon v. FBI*, 86 F.3d 1222, 1228 (D.C. Cir. 1996).  "[L]ess exacting proof" of a legitimate law

enforcement purpose is required of law enforcement agencies such as the Department of Justice

and the FBI.  *Pratt v. Webster*, 673 F.2d 408, 418 & n.25 (D.C. Cir. 1982); *see also Ctr. for Nat'l*

*Sec. Studies*, 331 F.3d at 926.  Records not initially obtained or generated for law enforcement

purposes may qualify if they were subsequently assembled for a valid law enforcement purpose.

*John Doe*, 493 U.S. at 154-55; *see also Kansi v. U.S. Dep't of Justice*, 11 F. Supp. 2d 42, 44

(D.D.C. 1998) ("[O]nce [the records at issue] are assembled by the FBI for its law enforcement

purposes, all documents qualify for protection under Exemption 7 regardless of their original

source.").

Here, the Court has already found that the records at issue have themselves been compiled for law enforcement purposes. *CNN v. FBI*, 293 F. Supp. 3d at 69-70. This holding is law of the case and, in the absence of any change in the law or facts, should not be reconsidered by the Court. Specifically, the Court found that both the public declarations submitted by the government and the first *in camera* and *ex parte* declaration of David Archey, "easily" cleared the bar of establishing that the Comey Memos had been compiled into the Special Counsel's investigation into Russian interference in the 2016 election at the time the government invoked Exemption 7. *Id.* Nothing has since ensued to alter this analysis – the only change is that the government's invocation of Exemption 7 now covers just a subset of the information as to which it was originally claimed, as a result of the public release of the majority of the information. But that release did not change the Comey Memos' status has having been compiled into the investigation.

A second reason exists for concluding that the information redacted pursuant to Exemption 7 was compiled for law enforcement purposes, that is, that these redactions "*contain* information that was originally compiled as part of the FBI's investigation into Russian interference." *See CNN v. FBI*, 293 F. Supp. 3d at 69 (discussing government's two theories of compilation). The specific information redacted was compiled through investigative efforts by the FBI in support of the pending investigation, or concerns whether or not particular investigative efforts (*i.e.*, FISA-authorized surveillance) had occurred in the pending investigation. Fifth Hardy Decl. ¶¶ 50, 54; First Hardy Decl. ¶ 56. Therefore, this information was compiled for law enforcement purposes.

Finally, the investigation at issue is unquestionably within the law enforcement duties of the FBI, which include undertaking counterintelligence and national security investigations, and

detecting and investigating possible violations of Federal criminal laws.  *See* 28 U.S.C. § 533;

Fifth Hardy Decl. ¶ 46.  It is also within the authority of the Special Counsel, which has

specifically been tasked with investigating Russian involvement in the election and prosecuting

any federal crimes unearthed.  DOJ Order No. 3915-2017.  And the investigation is based on a

viable connection between an "incident" (alleged Russian interference in the election) and a

possible security risk or violation of federal law.  *See* Transcript.  Accordingly, the records at

issue have been "compiled for law enforcement purposes."

### B.  The FBI Properly Withheld Portions Of The Records Pursuant To Exemption 7(E)

Exemption 7(E) protects "records or information compiled for law enforcement purposes

[when release] would disclose techniques and procedures for law enforcement investigations or

prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if

such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C.

§ 552(b)(7)(E).  This exemption affords categorical protection to techniques and procedures used

in law enforcement investigations.  *McRae v. U.S. Dep't of Justice*, 869 F. Supp. 2d 151, 168

(D.D.C. 2012); *but see Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011) (applying, without

analysis, "risk of circumvention" standard to law enforcement techniques and procedures).  It

protects techniques and procedures that are not well-known to the public as well as non-public

details about the use of publicly-known techniques and procedures.  *Vazquez v. U.S. Dep't of

Justice*, 887 F. Supp. 2d 114, 117 (D.D.C. 2012), *aff'd*, No. 13-5197, 2013 WL 6818207 (D.C.

Cir. Dec. 18, 2013).

Exemption 7(E) applies to the FBI's redaction of two pieces of information (redaction

blocks 16 and 17) that would reveal whether or not the FBI conducted FISA-authorized

surveillance of Lieutenant General Flynn.  Fifth Hardy Decl. ¶ 52.  FISA-authorized surveillance

is a technique used to further FBI national security investigations, as well as its intelligence

mission.  While it is known that the FBI conducts surveillance under the FISA, as well as other

types of authorized surveillance, there has been no official public acknowledgement that the FBI

did or did not conduct FISA-authorized surveillance of Lieutenant General Flynn.  *Id.*

Disclosure of such non-public details about when and against which targets the FBI has or has

not conducted such surveillance would reveal the circumstances under which the FBI will or will

not seek authority to do so.  *Id.*  Over time, disclosure of such information would create a mosaic

that criminals and other adversaries could use to predict when, where, and against whom

surveillance may occur; detect it when it is occurring; and develop and utilize countermeasures

to defeat or avoid it.  *Id.*  Accordingly, this information is properly protected under Exemption

(b)(7)(E).

### C.  The FBI Properly Withheld Portions Of The Records Pursuant To Exemption 7(A)

Exemption 7(A) protects "records or information compiled for law enforcement purposes

[when release] could reasonably be expected to interfere with enforcement proceedings."  5

U.S.C. § 552(b)(7)(A).  The government must show that production of the records at issue "(1)

could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending

or reasonably anticipated."  *Mapother v. Dep't of Justice*, 3 F.3d 1533, 1540 (D.C. Cir. 1993)

(emphasis omitted); *see* 5 U.S.C. § 552(b)(7)(A).  "Exemption 7(A) does not require a presently

pending 'enforcement proceeding'" – "an ongoing … investigation" suffices.  *Ctr. for Nat'l*

*Security Studies*, 331 F.3d at 926; *see also Citizens for Responsibility & Ethics in Wash. v. U.S.*

*Dep't of Justice*, 746 F.3d 1082, 1098 (D.C. Cir. 2014) ("[A]n ongoing criminal investigation

typically triggers Exemption 7(A)."); *Juarez v. Dep't of Justice*, 518 F.3d 54, 59 (D.C. Cir. 2008) ("[S]o long as the investigation continues to gather evidence for a possible future criminal case, and that case would be jeopardized by the premature release of that evidence, Exemption 7(A) applies.").

In order to protect its investigation into Russian interference in the election, which remains pending, Fifth Hardy Decl. ¶ 49, the FBI is continuing to withhold pursuant to Exemption 7(A) a reference to an intelligence method and the information derived from it that is relevant to the pending investigation (redaction block 19). *Id.* ¶ 55.   In addition to the harms to national security that would be caused by revealing such information, described previously,[6] the FBI determined that disclosure of this information could also reasonably be expected to cause interference with the pending investigation.  *Id.*  Specifically, disclosure of the use of a particular intelligence method and information derived from it at an identifiable point in time can reasonably be expected to prematurely reveal particular information or areas of interest in the investigation, as well as information that is available to the investigators, and thereby risks revealing some non-public aspects of the focus of the investigation at a specific point in time.  *Id.* This would provide targets, potential targets, or others intent on interfering with the investigation with information that they could use to attempt to undermine the investigation by fabricating records or information to counter what the investigators already know or adulterating/destroying evidence that the investigators might not already know about or have, or taking other steps to thwart investigative efforts.  *Id.*

Accordingly, the FBI properly relied on Exemption (b)(7)(A) to redact this information

---

[6] The information was also protected pursuant to Exemptions 1 and 3.

from the Comey Memos.  *See Alyeska Pipeline Serv. Co*., 856 F.2d at 312 (upholding assertion

of Exemption 7(A) where disclosure would "prematurely reveal[] to the subject of this ongoing

investigation the size, scope and direction of this investigation" and "expose the particular types

of allegedly illegal activities being investigated"); *Swan v. SEC*, 96 F.3d 498, 500 (D.C. Cir.

1996) (the "records could reveal much about the focus and scope of the [agency's] investigation,

and are thus precisely the sort of information exemption 7(A) allows an agency to keep secret");

*Suzhou Yuanda Enter., Co. v. U.S. Customs & Border Prot*., 404 F. Supp. 2d 9, 14 (D.D.C. 2005)

(upholding Exemption 7(A) claim where "disclosure of the information … could inform the

public of the evidence sought and scrutinized in this type of investigation").  The courts have

recognized that not only would disclosure of such investigative progress and priorities chill

witnesses and alert targets, but it would provide targets or witnesses with an opportunity to

impede the investigation or formulate their testimony to rebut evidence already gathered.

*Maydak v. U.S. Dep't of Justice*, 218 F.3d 760, 762 (D.C. Cir. 2000) ("The principal purpose of

Exemption 7(A) is to prevent disclosures which might prematurely reveal the government's

cases in court, its evidence and strategies, or the nature, scope, direction, and focus of its

investigations, and thereby enable suspects to establish defenses or fraudulent alibis or to destroy

or alter evidence.").

      In evaluating the application of Exemption 7(A), the FBI considered the official public

disclosures about the pending investigation and concluded that disclosure of this information

nevertheless could reasonably be expected to adversely affect the investigation.  Fifth Hardy

Decl. ¶ 56.  Further, as discussed above, the FBI also determined that none of the withheld

information has been officially disclosed and that all reasonably segregable portions had been

released.  *Id.* ¶¶ 57-59.  Accordingly, the FBI properly withheld this information pursuant to

Exemption 7(A).

## **CONCLUSION**

For the reasons stated above, defendant's motion for summary judgment should be

granted.

Dated:  December 14, 2018                            Respectfully submitted,

                                                     CHAD A. READLER
                                                     Principal Deputy Assistant Attorney General
                                                     Civil Division

                                                     MARCIA BERMAN
                                                     Assistant Director, Civil Division

                                                     */s/Carol Federighi*
                                                     CAROL FEDERIGHI
                                                     Senior Trial Counsel
                                                     United States Department of Justice
                                                     Civil Division, Federal Programs Branch
                                                     P.O. Box 883
                                                     Washington, DC 20044
                                                     Phone: (202) 514-1903
                                                     Email: carol.federighi@usdoj.gov

                                                     *Counsel for Defendant*

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CABLE NEWS NETWORK, INC.,

     Plaintiff,

v.

FEDERAL BUREAU OF INVESTIGATION,

     Defendant.

Civil Action No. 1:17-cv-1167-JEB

## <u>FIFTH DECLARATION OF DAVID M. HARDY</u>

I, David M. Hardy, declare as follows:

(1)     I am the Section Chief of the Record/Information Dissemination Section ("RIDS"), Information Management Division ("IMD"), in Winchester, Virginia.[1] I have held this position since August 1, 2002. Prior to my joining the Federal Bureau of Investigation ("FBI"), from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law. In that capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy. From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters. I am also an attorney who has been licensed to practice law in the State of Texas since 1980.

(2)     In my official capacity as Section Chief of RIDS, I supervise approximately 237 employees who staff a total of twelve Federal Bureau of Investigation Headquarters ("FBIHQ") units and three field operational service center units whose collective mission is to effectively

---

[1] IMD was previously the Records Management Division or RMD.

plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA as amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009, and FOIA Improvement Act of 2016; the Privacy Act of 1974; Executive Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. My responsibilities also include the review of FBI information for classification purposes as mandated by Executive Order 13526, 75 Fed. Reg. 707 (Jan. 5, 2010), and the preparation of declarations in support of Exemption (b)(1) claims asserted under the FOIA. I have been designated by the Attorney General of the United States as an original classification authority and a declassification authority pursuant to Executive Order 13526, §§ 1.3 and 3.1. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552a. Specifically, I am aware of the FBI's handling of the FOIA requests to FBI at issue in this litigation, which was originally consolidated under Civil Action No. 17-cv-1167 (D.D.C.), to include the following lawsuits: *CNN v. FBI,* 17-cv-1167 (D.D.C.); *Gannett Satellite Information Network et al. v. DOJ*, 17-cv-1175 (D.D.C.); *Judicial Watch v. DOJ*, 17-cv-1189 (D.D.C.); *Freedom Watch v. DOJ & FBI*, 17-cv-1212 (D.D.C.); and *Daily Caller v. DOJ*, 17-cv-1830 (D.D.C.). *See* Civil Action No. 17-cv-1167 (D.D.C.), Minute Order dated July 26, 2017 (consolidating all lawsuits except the Daily Caller lawsuit) and Minute Order dated September 7, 2017 (consolidating the Daily Caller lawsuit).

(4)     The only remaining plaintiff in the consolidated cases is CNN.

(5)     This declaration incorporates by reference and supplements all prior declarations submitted in this case:  ECF No. 22-2, Declaration of David M. Hardy (October 13, 2017) ("First Hardy Declaration"), ECF No. 36-1, Second Declaration of David M. Hardy (November 5, 2017) ("Second Hardy Declaration"), and ECF No. 45-2, Third Declaration of David M. Hardy (January 19, 2018) ("Third Hardy Declaration"); ECF No. 55-1, Fourth Declaration of David M. Hardy (February 8, 2018); the *in camera* and *ex parte* declarations previously submitted in support of the FBI's motion for partial summary judgment regarding the Comey Memos (ECF No. 22), *see In Camera, Ex Parte* Declaration of the FBI (October 13, 2017); Third *In Camera, Ex Parte* Declaration of David W. Archey (January 31, 2018); the *in camera* and *ex parte* declaration submitted in conjunction with the FBI's second partial motion for partial summary judgment (ECF No. 45) on January 31, 2018, *see In Camera, Ex Parte* Declaration of David Archey (January 19, 2018); and the sealed on-the-record, *ex parte* proffer of Michael R. Dreeben, Counsel to the Special Counsel.  *See* ECF No. 49, Memorandum Opinion, at p. 5.  It is being submitted in support of the FBI's present motion for summary judgment.

(6)     The full administrative history of the consolidated plaintiffs' FOIA requests is set forth in ECF No. 22-2, First Hardy Declaration, ¶¶ 6–59.  Other than the portions that may be relevant or necessary for contextual purposes here, the administrative history will not be repeated.

(7)     The FOIA requests in the above-referenced cases generally sought one or all of the so-called "Comey Memos," *i.e.*, a series of records that former Director Comey publicly stated he wrote following his one-on-one interactions with President Donald Trump in order to document/record those conversations.  CNN's FOIA request to the FBI, dated May 16, 2017,

specifically sought "all records of notes taken by or communications sent from FBI Director James Comey regarding or documenting interactions (including interviews and other conversations) with President Donald Trump [from] January 20, 2017 [through] May 10, 2017." *See* ECF No. 22-2, First Hardy Declaration, Exhibit CNN-A.[2]

(8)     The FBI acknowledged the existence of records responsive to CNN's request but withheld them in full pursuant to Exemption (b)(7)(A). The FBI also asserted all other exemptions that applied to information contained in the responsive records. *See* ECF No. 22-2, First Hardy Declaration, ¶¶ 63 and 73-106; *In Camera, Ex Parte* Declaration of David Archey (October 13, 2017).[3]

(9)     DOJ moved for summary judgment as to the withholding of the Comey Memos on October 13, 2017. ECF No. 22, Motion for Partial Summary Judgment (Partial).

(10)     On February 2, 2018, this Court granted DOJ's partial motion as to the Comey Memos, and denied plaintiffs' cross-motions for partial summary judgment. *See* ECF No. 49, Memorandum Opinion, and ECF No. 48, Order. Specifically, the Court found that the FBI had conducted adequate searches to locate the records responsive to plaintiffs' requests[4]; that the Comey Memos had been properly withheld in full pursuant to FOIA Exemption (b)(7)(A); and that no portion of the memos was reasonably segregable. ECF No. 49, Memorandum Opinion, at 7-15 and 22-23. Because of the Court's conclusion that Exemption (b)(7)(A) was properly asserted to withhold the records in full and that no portion of them was reasonably segregable, it

---

[2] Some plaintiffs also requested records other than the Comey Memos themselves. CNN, however, requested only the memos.

[3] At that time, the FBI did not reveal the total number or volume of Comey Memos in order to avoid interfering with a pending investigation. Because it could not publicly disclose this information when the case was initially briefed, the FBI did not specify which Comey Memo or Memos were responsive to each plaintiff's request.

[4] CNN did not challenge the adequacy of the FBI's searches for responsive records. *See* ECF No. 49, Memorandum Opinion, at 8 (citations omitted).

4

did not address the other exemptions asserted by DOJ to support withholding some or all of the Comey Memos. *Id.* at 9.

(11)    On February 5, 2018, CNN filed its Notice of Appeal of this Court's summary judgment decision. *See* ECF No. 52, Notice of Appeal by CNN.

(12)    On April 19, 2018, DOJ responded to requests by Congress for access to the Comey Memos, providing the memos in redacted form to the Chairman of the Senate Select Committee on Intelligence and the Chairmen of the House Committee on the Judiciary, House Committee on Oversight and Government Reform, and House Permanent Select Committee on Intelligence. That evening, Congress disclosed copies of the memos to the media; multiple media outlets published them; and former Director Comey discussed them live on the Rachel Maddow Show on MSNBC.

(13)    As a result of the events of April 19, 2018 described above, the FBI concluded that it could no longer show a harm to a pending investigation by release under the FOIA of the same memos that had been disclosed by Congress to the media. Consequently, on May 4, 2018, the FBI released the Comey Memos under the FOIA by publishing them on the FBI's electronic reading room, The Vault, at https://vault.fbi.gov/director-comey-memoranda-of-communications-with-president-trump/.

(14)    In light of the FBI's disclosure of the memos under the FOIA, CNN sought remand of its case, which was ultimately granted.

(15)    In seeking remand to this Court, CNN raised two issues about which it wished to continue litigating: (1) whether the documents released by the FBI on May 4, 2018 were all documents responsive to its request, and (2) whether it was entitled to access to the redacted portions of the released records.

## ISSUE #1 – RESPONSIVE RECORDS

(16)     As previously noted, CNN did not challenge the adequacy of the FBI's search for responsive records in this case. Moreover, this Court previously held that the FBI's search was adequate and granted summary judgment to the government on this issue.

(17)     The FBI's search for the Comey Memos requested by CNN is described in ECF No. 22-2, First Hardy Declaration, ¶ 62 and ECF No. 36-1, Second Hardy Declaration, ¶ 4. Based on that search, upheld by this Court, the FBI located the seven memos, totaling 15 pages, that were provided to Congress on April 19, 2018 and that were officially released to the public by the FBI on May 4, 2018. Three of the memos were released in full and the other four were released in part.

(18)     Only six of the Comey Memos (or 13 pages) fall within the temporal scope of CNN's FOIA request and thus are responsive to that request.[5] The non-exempt portions of those six responsive memos have been released to CNN through publication on The Vault. *See also* Exhibit A (CNN letter).

## ISSUE #2 – FOIA EXEMPTIONS

(19)     The FBI redacted a modicum of information on six pages of the Comey Memos responsive to and within the scope of CNN's request. The FBI relied on FOIA Exemptions (b)(1), (b)(3), (b)(7)(A), and (b)(7)(E) to withhold information on these pages. (The remaining seven pages responsive to CNN's request were released in full.) The FBI previously asserted and defended each of these exemptions when it initially moved for summary judgment as to the

---

[5] CNN's FOIA request specified that the "scope of [its] request is records between January 20, 2017 and May 10, 2017." *See* ECF No. 22-2, First Hardy Declaration, Exhibit CNN-A. The first Comey Memo (which can be found on The Vault) is dated January 7, 2017. It is outside the scope of, and thus not responsive to, CNN's FOIA request. It will not otherwise be addressed herein.

Comey Memos.  However, because it withheld the Comey Memos in full to protect pending investigative interests, the FBI was unable to address the underlying exemptions in detail on the public record when it first moved for summary judgment.  The FBI does so here.

### INDEX OF RELEASED IN PART DOCUMENTS WITHIN THE SCOPE OF CNN'S REQUEST[6]

| BATES PAGE # | REDACTION BLOCK | DESCRIPTION OF INFORMATION PROTECTED | EXEMPTION(S) |
|---|---|---|---|
| 3-4[7] | 1-7 | References to foreign countries or foreign leaders that reflect the relative importance attached by the President to contacts from one over another. | (b)(1)/§1.4(d)[8] |
| 5 | 8 | The name of a person to whom the FBI gave a defensive intelligence briefing. | (b)(1)/§1.4(c)[9] (b)(3) |
|  | 9 | Statement about information known to the FBI concerning Lieutenant General Flynn. | (b)(1)/§1.4(c) (b)(3) |
|  | 10-15 | Information about the use and reliability or lack thereof of confidential source reporting. | (b)(1)/§1.4(c) (b)(3) |
| 6 | 16-17 | Information reflecting whether or not the FBI had obtained a FISA order to surveil Lieutenant General Flynn. | (b)(1)/§1.4(c) (b)(3) (b)(7)(E) |
| 7 | 18 | Information about the use of confidential source reporting. | (b)(1)/§1.4(c) (b)(3) |
|  | 19 | Reference to an intelligence method and information derived from it. | (b)(1)/§1.4(c) (b)(3) (b)(7)(A) |
|  | 20 | Reference about President Trump's view on how to answer a question he | (b)(1)/§1.4(d) |

---

[6] Of the six Comey Memos responsive to and falling within the temporal scope of CNN's request, three of them were released in full.  They have not been included in this index.

The other three Comey Memos responsive to and falling within the temporal scope of CNN's request were released in part.  They are represented in this index.  They have been Bates numbered and each redaction block has been numbered for ease of review and briefing here.

[7] Bates pages 1-4 are a single document; pages 1-2 were released in full and therefore are not included in this index.

[8] "§1.4(d)" refers to E.O. 13526, § 1.4(d).

[9] "§1.4(c)" refers to E.O. 13526, § 1.4(c).

| BATES PAGE # | REDACTION BLOCK | DESCRIPTION OF INFORMATION PROTECTED | EXEMPTION(S) |
|---|---|---|---|
|  |  | was asked about Russian President Putin. |  |
| 8 | 21-24 | References to specific foreign leaders reflecting the President's impressions of them. | (b)(1)/§1.4(d) |

## EXEMPTION (b)(1) – CLASSIFIED INFORMATION

(20)    The FBI has protected a limited amount of information in the Comey Memos because it is classified.  Exemption (b)(1) protects from disclosure records that are:

(A)    specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy; and

(B)    are in fact properly classified pursuant to such Executive Order.

5 U.S.C. § 552(b)(1).

(21)    The FBI's analysis of whether Exemption (b)(1) permits the withholding of agency information consists of two significant steps.  The FBI must determine first whether the information contained in the records qualifies for classification under the applicable Executive Order governing classification and protection of national security information, and second whether the information actually has been classified in compliance with the various substantive and procedural criteria of the Executive Order.

(22)    E.O. 13526 presently governs the classification and protection of information that affects the national security (*i.e.*, "the national defense of foreign relations of the United States," § 6.1(cc)), and prescribes the various substantive and procedural criteria for classifying information.  I am bound by the requirements of E.O. 13526 when making classification determinations.

(23)    For information to be properly classified, and thus properly withheld pursuant to Exemption (b)(1), the information must meet the substantive requirements set forth in E.O.

13526 § 1.1(a), which requires:

(1)    an original classification authority must have classified the information;

(2)    the information must be owned by, produced by or for, or be under the control of the United States Government;

(3)    the information must fall within one or more of the categories of information listed in § 1.4 of [the] order; and

(4)    the original classification authority must determine that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority must be able to identify or describe the damage.

(24)    In addition to these substantive requirements, certain procedural and administrative requirements set forth in E.O. 13526 must be followed before information can be considered to be properly classified, such as proper identification and marking of documents. Specifically, E.O. 13526 requires that:

(a)    Each document was marked as required and stamped with the proper classification designation. *See* E.O. 13526, § 1.6(a)(1) – (5).

(b)    Each document was marked to indicate clearly which portions are classified and which portions are exempt from declassification as set forth in E.O. 13526 § 1.5(b). *See* E.O. 13526, § 1.6(a)(5)(c).

(c)    The prohibitions and limitations on classification specified in E.O. 13526, § 1.7 were followed.

(d)    The declassification policies set forth in E.O. 13526, §§ 3.1 and 3.3 were followed.

(e)    Any reasonably segregable portions of these classified documents that did not meet the standards for classification under E.O. 13526 were declassified and marked for release, unless withholding was otherwise warranted under applicable law.

(25)    With the above requirements in mind, I determined that the information protected pursuant to Exemption (b)(1) in the Comey Memos is currently and properly classified. Specifically, this information is owned by, was produced by or for, and is under the control of

9

the U.S. Government; was classified by an original classification authority; meets all of the procedural requirements of E.O. 13526; and warrants classification at the SECRET level to protect "intelligence activities (including covert action), intelligence sources or methods, or cryptology," *see* E.O. 13526, § 1.4(c), and at the CONFIDENTIAL or SECRET level to "foreign relations or foreign activities of the United States, including confidential sources," *see* E.O. 13526, § 1.4(d), because unauthorized disclosure of this information could be expected to cause damage to national security (for information classified at the CONFIDENTIAL level) or serious damage to national security (for information classified at the SECRET level). Each category of classified information is discussed further below.

(26)    I examined the information protected in this case pursuant to Exemption (b)(1) in light of the body of information available to me concerning the national defense and foreign relations of the United States. This information was not examined in isolation. Instead, it was evaluated with careful consideration given to the impact that its disclosure could have on other sensitive information contained elsewhere in the United States Intelligence Community's files. Equal consideration was given to the impact that other information – both in the public domain and likely known or suspected by present or potential adversaries of the United States – would have upon the information protected here.

(27)    The justifications for protecting classified information here were prepared with the intent that they be read with consideration given to the context in which the classified information is found. This context includes not only the surrounding unclassified information, but also other information already in the public domain, as well as information likely known or suspected by other hostile intelligence entities. It is my judgment that any greater specificity in the descriptions and justifications set forth with respect to information relating to intelligence

10

activities, sources, and methods and foreign relations/activities of the United States could reasonably be expected to harm interests that FOIA exemptions were designed to protect.

### E.O. 13526, § 1.4(c) – Intelligence Activities, Sources and Methods

(28)    E.O. 13526, § 1.4(c) authorizes the classification of "intelligence activities (including covert action), intelligence sources or methods, or cryptology." An intelligence activity, source, or method includes any intelligence action or technique utilized by the FBI against a targeted individual or organization that has been determined to be of national security interest, and includes any procedure (human or non-human) utilized to obtain information concerning such individual or organization. An intelligence activity, source, or method has two characteristics. First, the intelligence activity, source, or method, and information generated by it, is needed by United States Intelligence/Counterintelligence agencies to carry out their missions. Second, confidentiality must be maintained with respect to the use or non-use of the activity, source, or method, including intelligence sources, if the viability, productivity, and usefulness of the activity, source, and method are to be preserved.

(29)    Intelligence activities, sources, and methods must be protected from disclosure in every situation in which a certain intelligence capability, technique, or interest – or its specific use – is unknown to the groups against which it is deployed, since those groups could take countermeasures to nullify its effectiveness. Intelligence activities, sources, and methods are valuable only so long as they remain unknown and unsuspected. Once an intelligence activity, source, or method – or the fact of its use or non-use in a certain situation – is discovered, its continued successful use is seriously jeopardized.

(30)    Moreover, the U.S. Government must do more than prevent explicit references to intelligence activities, sources, and methods; it must also prevent indirect references to them.

11

One vehicle for gathering information about the U.S. Government's capabilities is by reviewing officially-released information. We know that terrorist organizations and other hostile or Foreign Intelligence groups have the capacity and ability to gather information from myriad sources, analyze it, and deduce means and methods from disparate details to defeat the U.S. Government's collection efforts. Thus, even seemingly innocuous, indirect references to an intelligence activity, source, or method could have significant adverse effects when juxtaposed with other publicly-available data.

(31)   Here, information covered by Exemption (b)(1) in conjunction with E.O. 13526, § 1.4(c) would, if disclosed, reveal (a) information about how the FBI did or did not use information provided by confidential intelligence sources as well as the reliability of that information (redaction blocks 10-15 and 18); (b) information about whether or not the FBI relied on a particular intelligence-gathering method/activity (Foreign Intelligence Surveillance Act ("FISA") surveillance) to gather intelligence information about a specific target (redaction blocks 16-17) and information that would reveal another intelligence method used to gather particular information (redaction block 19); (c) a statement about information known to the FBI concerning Lieutenant General Flynn as of a particular date (redaction block 9); and (d) non-public details about to whom a defensive intelligence briefing was provided (redaction block 8).

(32)   Disclosure of the limited information about the FBI's use (or non-use) of the particular intelligence sources and methods/activities that was protected here, as well as information known to the FBI concerning a specific individual as of a certain date, would reveal particular, singular details about the FBI's intelligence interests, priorities, activities, and methods at a particular period of time and in relation to a particular set of circumstances. Adversaries could use this information to thwart the FBI's intelligence-gathering mission and

efforts.

(33)    Surveillance conducted pursuant to FISA is an intelligence-gathering method. The identities of targets of FISA-authorized surveillance are classified facts. Disclosure here of whether or not Lieutenant General Flynn was the target of such surveillance would reveal details about the government's intelligence interests, priorities, activities, and methods at a particular period of time and in relation to a particular set of circumstances. Public disclosure of the other intelligence method protected by the FBI here, along with the information gathered by its use, would similarly reveal such things. Adversaries could use this information in conjunction with other information known about the use other intelligence sources, methods, or activities, as well as information known about other investigations, to take steps to counter intelligence that the government may have obtained if surveillance occurred, to conceal information that the government may not know if surveillance did not occur, and to take other actions to avoid or thwart scrutiny and intelligence-gathering efforts.

(34)    Finally, disclosing non-public details about defensive intelligence briefings, including to whom such briefings are provided, would provide information that adversaries could exploit to their advantage. Defensive intelligence briefings inform individuals that they may be targets of foreign intelligence efforts. Revealing details of such briefings could, for example, reveal that the FBI knows that a particular individual has been targeted or is vulnerable to targeting by foreign intelligence actors and/or has information about the activities or tradecraft of such actors that would prompt the briefings of particular individuals. This knowledge, pieced together with other information known to or publicly accessible by the hostile actors could cause them to develop countermeasures, abandon known techniques/activities, or identify others to target. This, in turn, would adversely affect the FBI's ability to gather intelligence and protect

13

the country and its citizens from counterintelligence threats.

(35)     All of the above-described information is highly desired by hostile actors who seek to thwart the FBI's intelligence-gathering mission and efforts. Thus, for the reasons discussed above, this information is currently and properly classified at the SECRET level because its disclosure could be expected to cause serious damage to national security.

## *E.O. 13526, § 1.4(d) – Foreign Relations or Foreign Activities*

(36)     E.O. 13526, § 1.4 (d) authorizes the classification of information about foreign relations or foreign activities of the United States, including confidential sources. Such information includes information gathered from/with the assistance of and/or about foreign countries. It is sensitive due in part to the delicate nature of international diplomacy, and must be handled with care so as not to jeopardize the fragile relationships that exist between the United States and certain foreign governments.

(37)     In general, the unauthorized disclosure of information concerning foreign relations or foreign activities of the United States can reasonably be expected to lead to diplomatic or economic retaliation against the United States; the loss of the cooperation and assistance of friendly nations; or the compromise of cooperative foreign sources, which may jeopardize their safety and curtail the flow of information from these sources.

(38)     Here, the FBI protected the names of specific countries or foreign leaders in reference to the relative importance attached by the President to contacts from one country/leader over another (redaction blocks 1-7). The FBI also protected a reference about the President's observation about responding to a question he was asked about Russian President Putin (redaction block 20), and information reflecting the President's impressions of specific foreign leaders (redaction blocks 21-24). In the context of other surrounding information, disclosure of

14

the redacted information could reasonably be expected to impair or adversely impact relations with the referenced countries, and thus, cause harm to the national security. Accordingly, the information is currently and properly classified at the CONFIDENTIAL level (redaction blocks 1-7 and 21-24) because disclosure could be expected to cause damage to national security, and the SECRET level (redaction number 20) because disclosure could be expected to cause serious damage to national security.

(39) As part of its analysis, the FBI also reviewed information that the government has officially released about the pending investigation to date, to include the public information available from the indictments stemming from the investigation into Russian interference in the 2016 election and other documents made available by the Government in those cases; the released portions of the Comey Memos; the released portions of the Carter Page FISA materials; and information made public in the memorandum drafted by the Majority Staff of the House Permanent Select Committee on Intelligence ("HPSCI"), which was declassified and released by the President (*i.e.*, the Nunes Memo), the response memorandum released by HPSCI Minority Staff (*i.e.*, the Schiff Memo), and a memorandum authored by Senators Grassley and Graham referring Steele to FBI for possible criminal violations (*i.e.*, the Grassley/Graham Memo).[10] The FBI concluded that the information withheld under Exemption (b)(1) here still needs to be protected to prevent harm to national security, notwithstanding and in some instances because of what has already been made publicly available.

---

[10] Although the FBI considered the information made public in the Nunes, Schiff, and Grassley/Graham Memos, which were drafted by Congress and reflect the views, judgments, and conclusions of their Congressional authors, the FBI has not opined on them, nor adopted/endorsed their contents and does not concede that these Congressional memoranda, or any other disclosures by Congress, constitute official public disclosures attributable to the Executive Branch.

## EXEMPTION (b)(3) – INFORMATION EXEMPTED FROM DISCLOSURE BY STATUTE

(40)     Exemption (b)(3) protects information that is specifically exempted from public

disclosure by a statute that :

> (A)(i) requires that the matters be withheld from the public in such
> a manner as to leave no discretion on the issue; or (ii) establishes
> particular criteria for withholding or refers to particular types of
> matters to be withheld; and
>
> (B) if enacted after the date of enactment of the OPEN FOIA Act
> of 2009, specifically cites to this paragraph.

5 U.S.C. § 552(b)(3).

(41)     The FBI redacted from the Comey Memos information that is classified pursuant

to E.O. 13526, § 1.4(c) to protect intelligence sources and methods. *See* redaction blocks 8-19.

Those same intelligence sources and methods are also exempt here under Exemption (b)(3).

Specifically, their disclosure is prohibited pursuant to the National Security Act of 1947, as

amended, which provides that the Director of National Intelligence (DNI) "shall protect

intelligence sources and methods from unauthorized disclosure."  50 U.S.C. § 3024(i)(1).

(42)     As relevant to the FBI's application of Exemption (b)(3), the National Security

Act of 1947 was enacted before the date of enactment of the OPEN FOIA Act of 2009, and on its

face, leaves no discretion to agencies about withholding from the public information about

intelligence sources and methods.

(43)     In order to fulfill its obligation of protecting intelligence sources and methods, the

DNI is authorized to establish and implement guidelines for the Intelligence Community ("IC")

for the classification of information under applicable laws, Executive Orders, or other

Presidential Directives, and for access to and dissemination of intelligence.  50 U.S.C. §§

3024(i)(1).  The FBI is one of the member agencies comprising the IC, and as such must protect

intelligence sources and methods.

(44)     Accordingly, the information in the Comey Memos that is classified pursuant to E.O. 13526, § 1.4(c) to protect intelligence sources and methods is also prohibited from disclosure pursuant to 50 U.S.C. § 3024(i)(1) and thus exempt from disclosure under Exemption (b)(3).

## EXEMPTION (b)(7)

(45)     Before an agency can invoke any of the harms enumerated in Exemption (b)(7), it must first demonstrate that the records or information at issue, if they exist, were "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). Law enforcement agencies such as the FBI must demonstrate that the records at issue, if any, are related to the enforcement of federal laws and that the enforcement activity is within the law enforcement duty of that agency.

(46)     Pursuant to 28 U.S.C. §§ 533 and 534, Executive Order 12333 as implemented by the Attorney General's Guidelines for Domestic FBI Operations, and 28 C.F.R. § 0.85, the FBI is the primary investigative agency of the federal government and has authority and responsibility to investigate all violations of federal law not exclusively assigned to another agency; to conduct investigations and activities to protect the United States and its people from terrorism and threats to national security; and to further the foreign intelligence objectives of the United States.

(47)     On March 20, 2017, then-FBI Director James B. Comey confirmed in public testimony before Congress "that the FBI, as part of our counterintelligence mission, is investigating the Russian government's efforts to interfere in the 2016 presidential election, and that includes investigating the nature of any links between individuals associated with the Trump campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts." Statement Before the House Permanent Select Committee on

Intelligence, available at https://www.fbi.gov/news/testimony/hpsci-hearing-titled-russian-active-measures-investigation). He added that "[a]s with any counterintelligence investigation, this will also include an assessment of whether any crimes were committed." *Id.*

(48)     On May 17, 2017, Deputy Attorney General Rod Rosenstein named former FBI Director Robert S. Mueller, III as Special Counsel. Under the terms of his appointment, Special Counsel Mueller is authorized to "conduct the investigation confirmed by then-FBI Director James B. Comey in testimony before the House Permanent Select Committee on Intelligence on March 20, 2017, including (i) any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump; and (ii) any matters that arose or may arise directly from the investigation; and (iii) any other matters within the scope of 28 C.F.R. § 600.4(a)." DOJ Order No. 3915-2017, Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters (May 17, 2017)). In addition, "[i]f the Special Counsel believes it necessary and appropriate, the Special Counsel is authorized to prosecute federal crimes arising from the investigation of these matters." *Id.*

(49)     This investigation is currently pending.

(50)     The information protected by the FBI in the Comey Memos contains information relevant to the pending investigation, as well as information concerning whether or not particular investigative efforts (*i.e.*, FISA-authorized surveillance) had occurred in the pending investigation. The pending investigation is clearly within the law enforcement duties of the FBI to undertake counterintelligence and national security investigations, and to detect and investigate possible violations of Federal criminal laws. *See* 28 U.S.C. § 533. Thus, the information protected under Exemption (b)(7) in the Comey Memos was compiled as part of and

in relation to an investigation within the FBI's law enforcement duties. As such, that information was compiled for law enforcement purposes.

## EXEMPTION (b)(7)(E) – INVESTIGATIVE TECHNIQUES AND PROCEDURES

(51)    Exemption (b)(7)(E) protects "records or information compiled for law enforcement purposes [when release] would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). This exemption affords categorical protection to techniques and procedures used in law enforcement investigations. It protects techniques and procedures that are not well-known to the public as well as non-public details about the use of publicly-known techniques and procedures.

(52)    Here, the FBI redacted two pieces of information (redaction blocks 16-17) that would reveal whether or not the FBI conducted FISA-authorized surveillance of Lieutenant General Flynn. FISA-authorized surveillance is a technique used to further FBI national security investigations, as well as its intelligence mission. While it is known that the FBI conducts surveillance under the FISA, as well as other types of authorized surveillance, there has been no official public acknowledgement that the FBI did or did not conduct FISA-authorized surveillance of Lieutenant General Flynn. Disclosure of such non-public details about when and against which targets the FBI has or has not conducted such surveillance reflect the circumstances under which the FBI will or will not seek authority to do so. Over time, disclosure of such information would create a mosaic that criminals and other adversaries could use to predict when, where, and against whom surveillance may occur; detect it when it is occurring; and develop and utilize countermeasures to defeat or avoid it. Accordingly, the FBI

19

protected these two pieces of information under Exemption (b)(7)(E).

**EXEMPTION (b)(7)(A) – PENDING INVESTIGATION**

(53)     Exemption (b)(7)(A) protects "records or information compiled for law

enforcement purposes [when release] could reasonably be expected to interfere with enforcement

proceedings." 5 U.S.C. § 552(b)(7)(A).  Application of this exemption requires:  the existence of

law enforcement records; a pending or prospective law enforcement proceeding; and a

determination that release of the information could reasonably be expected to interfere with the

enforcement proceeding.

(54)     As established above, the information protected under Exemption (b)(7) here was

compiled for law enforcement purposes in a pending investigation.

(55)     In order to protect that pending investigation, the FBI protected a reference to an

intelligence method utilized and information derived from it that is relevant to the pending

investigation (redaction block 19).[11]  Disclosure of this information could reasonably be

expected to affect the pending investigation.  Specifically, disclosure of the use of a particular

intelligence method and information derived from it at an identifiable period of time can

reasonably be expected to reveal particular information or areas of interest in the investigation,

as well as information that is available to the investigators.  In addition to the harms in revealing

such information as described previously in this declaration in relation to Exemption (b)(1),

which was also cited to protect the information, prematurely revealing this information risks

revealing some non-public aspects of the focus of the investigation at a specific point in time.

This would provide targets, potential targets, or others intent on interfering with the investigation

---

[11] When the Comey Memos were publicly disclosed, Exemption (b)(7)(A) was cited for redaction blocks 10-15 and 18.  The FBI is no longer relying on Exemption (b)(7)(A) for these redactions.

with information that they could use to attempt to undermine the investigation by fabricating records or information to counter what the investigators already know or adulterating/destroying evidence that the investigators might not already know about or have, or taking other steps to thwart investigative efforts.

(56)   In evaluating this single redaction made pursuant to Exemption (b)(7)(A), the FBI considered the official public disclosures about the pending investigation and concluded that disclosure of this information nevertheless could reasonably be expected to adversely affect the investigation.  Accordingly, the FBI concluded that this information continues to warrant protection under Exemption (b)(7)(A).

## PRIOR OFFICIAL, DOCUMENTED PUBLIC DISCLOSURES

(57)   The FBI has compared the minimal redacted information in the Comey Memos with other information that has been the subject of official documented public releases by the FBI and/or DOJ, to include:  the public information available from indictments stemming from the investigation into Russian interference in the 2016 election and other documents made available by the Government in those cases and the released portions of the Carter Page FISA materials.  The FBI has also compared with redacted information with information disclosed in the Nunes, Schiff, and Grassley/Graham Memos.[12]  The information redacted in the Comey Memos does not match any information that has been officially publicly disclosed by the Executive Branch nor does not it match information in the referenced Congressional memoranda.

(58)   Accordingly, the FBI's ability to assert exemptions and withhold this information has not been waived.

---

[12] The FBI does not concede that these Congressional memoranda, or any other disclosures by Congress, constitute official public disclosures attributable to the Executive Branch but nevertheless, in an abundance of caution, reviewed those materials here.

## SEGREGATION

(59)    Each page of the Comey Memos was carefully reviewed by subject matter experts in the FBI to determine what portions of the pages contained classified or otherwise exempt information requiring redaction pursuant to the FOIA and what portions could be segregated and released. Ultimately, three of the memos were released in whole, all of which were responsive to CNN's request. The other four Comey Memos were released in part; three of them are responsive to CNN's request. The released-in-part memos contained minimal redactions taken to protect information that is currently and properly classified, that is prohibited from disclosure by statute, or that would cause harm to law enforcement interests. The three released-in-part memos responsive to CNN's request contain 24 redaction blocks in total. The longest redactions in these materials, redaction numbers 9 and 24, each consist of one-and-a-half lines of text, which were redacted to protect currently and properly classified information. The remaining redactions were of one, two, or a few words apiece. The FBI concluded that all information in these redaction blocks is exempt or consists of random words (such as "of" or "the") which taken separately or together would have minimal or no information content, and thus were not reasonably segregable.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibits A and B attached hereto are true and correct copies.

Executed this 14th day of December 2018.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CABLE NEWS NETWORK, INC.,

     Plaintiff,

v.

FEDERAL BUREAU OF INVESTIGATION,

     Defendant.

Civil Action No. 1:17-cv-1167-JEB

**FIFTH DECLARATION OF DAVID M. HARDY**

# Exhibit A



**U.S. Department of Justice**

**Federal Bureau of Investigation**
*Washington, D.C. 20535*

May 4, 2018

MR. GREGORY WALLACE
CABLE NEWS NETWORK, INC.
820 FIRST STREET, NE
WASHINGTON, D.C. 20002

Civil Action No.:  17-cv-01167
FOIA Request No.:  1374094-000
Subject:  All Records of notes taken by or
communications sent from FBI Director
James Comey regarding or documenting
interactions with President Donald Trump

Dear Mr. Wallace,

Records responsive to your Freedom of Information Act (FOIA) request have been processed and
made available in the FBI's FOIA Library (The Vault) on the FBI's public website, http://vault.fbi.gov.  On the
right-hand side of the home page under the heading "Vault Links," you can search for your subject
alphabetically (click on "A-Z Index"), by category (click on "Categories"), or by entering text into our search
engine (click on "Search Vault").   The responsive records can be located under the search terms "Director
Comey Memoranda of Communication with President Trump."

The available documents represent a final release of information responsive to your FOIA request.

For your information, Congress excluded three discrete categories of law enforcement and national
security records from the requirements of the FOIA.   See 5 U.S. C. § 552(c) (2006 & Supp. IV (2010).   This
response is limited to those records that are subject to the requirements of the FOIA.   This is a standard
notification that is given to all our requesters and should not be taken as an indication that excluded records
do, or do not, exist.

    ☐    In accordance with standard FBI practice and pursuant to FOIA exemption (b)(7)(E)/
Privacy Act exemption (j)(2) [5 U.S.C. § 552/552a (b)(7)(E)/(j)(2)], this response neither
confirms nor denies the existence of your subject's name on any watch lists.

    ☐    Additional records potentially responsive to your subject may exist.   Please inform us if
you would like the FBI to conduct a search of the indices to our Central Records System.

    ☐    Additional records responsive to your request were processed but are not currently
available on The Vault.   Please inform us if you would like to receive these records.

You may file an appeal by writing to the Director, Office of Information Policy (OIP), United States
Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, D.C. 20530-0001, or you
may submit an appeal through OIP's FOIA online portal by creating an account on the following web
site:  https://foiaonline.regulations.gov/foia/action/public/home.   Your appeal must be postmarked or
electronically transmitted within ninety (90) days from the date of this letter in order to be considered timely.
If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of
Information Act Appeal."   Please cite the FOIA Request Number assigned to your request so that it may be
easily identified.

You may seek dispute resolution services by contacting the Office of Government Information
Services (OGIS) at 877-684-6448, or by emailing ogis@nara.gov.   Alternatively, you may contact the FBI's
FOIA Public Liaison by emailing foipaquestions@fbi.gov.   If you submit your dispute resolution
correspondence by email, the subject heading should clearly state "Dispute Resolution Services."   Please
also cite the FOIPA Request Number assigned to your request so that it may be easily identified.

Enclosed for your information is a copy of the FBI Fact Sheet and Explanation of Exemptions.

Sincerely,

David M. Hardy
Section Chief,
Record/Information
 Dissemination Section
Records Management Division

Enclosure(s)

 # FBI FACT SHEET

- **The primary functions of the FBI are national security and law enforcement.**

- **The FBI does not keep a file on every citizen of the United States.**

- **The FBI was not established until 1908 and we have very few records prior to the 1920s.**

- **FBI files generally contain reports** of FBI investigations of a wide range of matters, including counterterrorism, counter-intelligence, cyber crime, public corruption, civil rights, organized crime, white collar crime, major thefts, violent crime, and applicants.

- **The FBI does not issue clearances or non-clearances for anyone other than its own personnel or persons having access to FBI facilities.** Background investigations for security clearances are conducted by many different Government agencies. Persons who received a clearance while in the military or employed with some other government agency should contact that entity. Most government agencies have websites which are accessible on the internet which have their contact information.

- **An identity history summary check or "rap sheet" is NOT the same as an "FBI file."** It is a listing of information taken from fingerprint cards and related documents submitted to the FBI in connection with arrests, federal employment, naturalization or military service. The subject of a "rap sheet" may obtain a copy by submitting a written request to FBI CJIS Division – Summary Request, 1000 Custer Hollow Road, Clarksburg, WV 26306. Along with a specific written request, the individual must submit a new full set of his/her fingerprints in order to locate the record, establish positive identification, and ensure that an individual's records are not disseminated to an unauthorized person. The fingerprint submission must include the subject's name, date and place of birth. There is a required fee of $18 for this service, which must be submitted by money order or certified check made payable to the Treasury of the United States. A credit card payment option is also available. Forms for this option and additional directions may be obtained by accessing the FBI Web site at www.fbi.gov/about-us/cjis/identity-history-summary-checks.

- **The National Name Check Program (NNCP)** conducts a search of the FBI's Universal Index (UNI) to identify any information contained in FBI records that may be associated with an individual and provides the results of that search to a requesting federal, state or local agency. Names are searched in a multitude of combinations and phonetic spellings to ensure all records are located. The NNCP also searches for both "main" and "cross reference" files. A main file is an entry that carries the name corresponding to the subject of a file, while a cross reference is merely a mention of an individual contained in a file. The results from a search of this magnitude can result in several "hits" and "idents" on an individual. In each instance where UNI has identified a name variation or reference, information must be reviewed to determine if it is applicable to the individual in question.

- **The Record/Information Dissemination Section (RIDS)** searches for records and provides copies of FBI files responsive to Freedom of Information or Privacy Act (FOIPA) requests for information. RIDS provides responsive documents to requesters seeking "reasonably described information." For a FOIPA search, the subject's name, event, activity, or business is searched to determine whether there is an associated investigative file. This is called a "main file search" and differs from the **NNCP** search.

**FOR GENERAL INFORMATION ABOUT THE FBI, VISIT OUR WEBSITE AT**
www.fbi.gov

7/18/16

## EXPLANATION OF EXEMPTIONS

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552

(b)(1)   (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified to such Executive order;

(b)(2)   related solely to the internal personnel rules and practices of an agency;

(b)(3)   specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

(b)(4)   trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(b)(5)   inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(b)(6)   personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal  privacy;

(b)(7)   records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ( A ) could reasonably be expected to interfere with enforcement proceedings, ( B ) would deprive a person of a right to a fair trial or an impartial adjudication, ( C ) could reasonably be expected to constitute an unwarranted invasion of personal privacy, ( D ) could reasonably be expected to disclose the identity of confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of record or information compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, ( E ) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or ( F ) could reasonably be expected to endanger the life or physical safety of any individual;

(b)(8)   contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(b)(9)   geological and geophysical information and data, including maps, concerning wells.

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552a

(d)(5)   information compiled in reasonable anticipation of a civil action proceeding;

(j)(2)   material reporting investigative efforts pertaining to the enforcement of criminal law including efforts to prevent, control, or reduce crime or apprehend criminals;

(k)(1)   information which is currently and properly classified pursuant to an Executive order in the interest of the national defense or foreign policy, for example, information involving intelligence sources or methods;

(k)(2)   investigatory material compiled for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit or privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(3)   material maintained in connection with providing protective services to the President of the United States or any other individual pursuant to the authority of Title 18, United States Code, Section 3056;

(k)(4)   required by statute to be maintained and used solely as statistical records;

(k)(5)   investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment or for access to classified information, the disclosure of which would reveal the identity of the person who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(6)   testing or examination material used to determine individual qualifications for appointment or promotion in Federal Government service he release of which would compromise the testing or examination process;

(k)(7)   material used to determine potential for promotion in the armed services, the disclosure of which would reveal the identity of the person who furnished the material pursuant to a promise that his/her identity would be held in confidence.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CABLE NEWS NETWORK, INC.,

      Plaintiff,

v.

FEDERAL BUREAU OF INVESTIGATION,

      Defendant.

Civil Action No. 1:17-cv-1167-JEB

**FIFTH DECLARATION OF DAVID M. HARDY**

# Exhibit B

CONFIDENTIAL//NOFORN

1/28/17

①

I had dinner with President Trump in the Green Room at the White House last night at 6:30 pm. We sat facing each other at a small oval table set for two and placed in the center of the room. There were two servers (who I had the chance to chat with a bit because I arrived about 10 minutes early; they were both retired Navy submariners and we had a fun discussion about height clearance in submarines). The servers were only in the room when they delivered food or retrieved plates.

The conversation, which was pleasant at all times, was chaotic, with topics touched, left, then returned to later, making it very difficult to recount in a linear fashion. Normally I can recall the pieces of a conversation and the order of discussion with high confidence. Here, given the nature of it, there is a distinct possibility that, while I have the substance right, the order was slightly different. It really was conversation-as-jigsaw-puzzle in a way, with pieces picked up, then discarded, then returned to.

The President spoke an overwhelming majority of the time. He never asked me an open-ended question or left it to me to choose a topic of conversation. There were almost no periods of silence during the 1 hour and 20 minutes, except once or twice when the President paused as the servers entered. I felt comfortable throughout, although never relaxed, given the focus conversation required.

At various times, he talked about the inauguration and crowd size, the campaign and his effective use of free media ("earned media"), the extraordinary luxury of the White House (which he favorably compared to Mar-a-lago), his many activities during the day and week, his young son's height, the viciousness of the campaign (where I interjected about Adams and Jefferson; he said he had been given a book about it, which was upstairs), how he had not been mocking a handicapped reporter, had not assaulted any of the women who claimed he did (reviewing in detail several of the allegations), and many other things. I will attempt to recount in some detail only those parts that related in some way to my work.

He touched on my future at various points. The first time he asked "so what do you want to do," explaining that lots of people wanted my job ("about 20 people"), that he thought very highly of me and had heard great things, that the people of the FBI really like me, but he would understand if I wanted to walk away given all I had been through, although he thought that would be bad for me personally because it would look like I had done something wrong, that he of course can make a change at FBI if he wants, but he wants to know what I think. There was no acknowledgement by him (or me) that we had already talked about this twice.

I responded by saying that he could fire me any time he wished, but that I wanted to stay and do a job I love and think I am doing well. I explained that I never expected to be back in government but had found this job hugely rewarding and wanted to serve out my term. I added that I was "reliable" in one way but not in the way political people sometimes use the term. I explained that he could count on me to always tell him the truth. I said I don't do sneaky things, I don't leak, I don't do

*Classified by: AD CD*
*Derived from: FBI NSICG*
*dated 20130301*
*Declassify on: 20421231*

CONFIDENTIAL//NOFORN

CONFIDENTIAL//NOFORN



weasel moves. But I was not on anybody's side politically and could not be counted on in that traditional political sense, which I said I thought was in the president's best interest. He asked whether the FBI leaks and I answered that of course in an organization of 36,000 we were going to have some of that, but I said I think the FBI leaks far less than people often say. I predicted he, like all Presidents, would discover the entire government leaks like crazy and explained that it often comes from the first or second hop out from those actually working on the sensitive thing.

He replied that he needed loyalty and expected loyalty. I did not reply, or even nod or change my facial expression, which he noted because we came back to it later.

The conversation then swerved into a long discussion of the email investigation (which we returned to at least once more). This was where I spoke the most and laid out for him my thinking (with frequent interruption) in a manner similar to my discussions with Senators Feinstein and Grassley during our one-on-ones. The one detail I added was about the AG directing me not to use the word "investigation."

He knew the sequence of events extremely well, breaking them down in his lexicon into Comey One, Comey Two, and Comey Three developments and he walked through how he saw each played out during the campaign, in great detail. He asked whether it was true "there was a revolt" after Comey One. I said that was nonsense and I had worked hard to see if folks had concerns. I added that I surely didn't need to tell him that the media sometimes gets stuff wrong. I explained that the investigators all agreed there was no case; he said he disagreed and thought there was a case. He asked me at several points how I had held up under all the abuse. I explained the freedom that comes from doing the right thing in the right way, surrounded by people who are helping make the decisions in the same way.

At this point he asked me (and asked again later) whether "your guy McCabe" has a problem with me, explaining that "I was pretty rough on him and his wife during the campaign." I explained that Andy was a true professional and had no problem at all. I then explained what FBI people were like, that whatever there personal views, they strip them when they step into their bureau roles and actually hold "political people" in slight contempt, without regard to party.

At about this point, he asked me to compare AG Holder and AG Lynch. I said I thought AG Holder was smarter and more sophisticated and smoother than AG Lynch, who I added is a good person. He said Holder and President Obama were quite close. I replied that they were and it illustrated, in my view, a mistake Presidents make over and over again: Because they reason that problems for a President often come from Justice, they try to bring Justice close, which paradoxically makes things worse because an independent DOJ and FBI are better for a President and the country. I listed off John Mitchell, Ed Meese, an Al Gonzales as examples of this mistake and he added Bobby Kennedy.

CONFIDENTIAL//NOFORN

CNN v. FBI, 17-cv-1167 (D.D.C.) - 002

CONFIDENTIAL//NOFORN

At about this point, he turned to what he called the "golden showers thing" and recounted much of what he had said previously on that topic. He repeated that it was a complete fabrication and "fake news." I explained again why I had thought it important that he know about it. I also explained that one of the reasons we told him was that the media, CNN in particular, was telling us they were about to run with it. He said it bothered him if his wife thought there was even a one percent chance it was true in any respect. He said he had spoken to people who had been on the Miss Universe trip with him and they had reminded him that he didn't stay over night in Russia for that. He said he arrived in the morning, did events, then showered and dressed for the pageant at the hotel (he didn't say the hotel name) and left for the pageant. Afterwards, he returned only to get his things because they departed for New York by plane that same night. He said he thought maybe he should ask me to investigate the whole thing to prove it was a lie. I did not ask any questions. I replied that it was up to him, but I wouldn't want to create a narrative that we were investigating him, because we are not and I worried such a thing would be misconstrued. I also said that it is very difficult to disprove a lie. He said "maybe you're right," but several times asked me to think about it and said he would also think about it.

We returned to the topic of my job and in response to his question I explained how I had ended up with the position and that I had been pleasantly surprised that President Obama thought of the role the way I did: He wanted competence and independence and didn't want the FBI involved in policy. He wanted to be able to sleep at night knowing the FBI was well run.

The President then spoke again about being glad I wanted to stay. He said Mattis said great things about me, as did Sessions. He explained he had asked a lot of people about me and heard great things. He then returned to loyalty, saying "I need loyalty." I replied that he would always get honesty from me. He paused and said that's what he wants, "honest loyalty." I replied "you will get that from me." (It is possible we understood that phrase differently, but I chose to understand it as consistent with what I had said throughout the conversation: I will serve the President with loyalty to the office, the country, and the truth. I decided it would not be productive to push the subject further.)

At about this point he asked again about "your guy McCabe" and whether he was "going to be okay." I again affirmed Andy's ability and professionalism and said the President would come to see and benefit from both.

He then asked who I though I should "deal with" and he suggested Reince Priebus. I explained that in the prior administration my WH contacts were with the COS, or the people in Mike Flynn's job and Tom Bossert's job. He said "Reince doesn't know we are having dinner," but he will tell him and that I should deal with Reince. He then went on to explain that he has serious reservations about Mike Flynn's judgment and illustrated with a story from that day in which the President apparently discovered during his toast to Teresa May that [    1    ] had called four days

b1

CONFIDENTIAL//NOFORN

CONFIDENTIAL//NOFORN



ago. Apparently, as the President was toasting PM May, he was explaining that she had been the first to call him after his inauguration and Flynn interrupted to say that [ 2 ] had called (first, apparently). It was then that the President learned of [ 3 ]   **b1**
call and he confronted Flynn about it (not clear whether that was in the moment or after the lunch with PM May). Flynn said the return call was scheduled for Saturday, which prompted a heated reply from the President that six days was not an appropriate period of time to return a call from the [ 4 ] of a country like   **b1**
[ 5 ] ("This isn't [ 6 ] we are talking about."). He said that if he called [ 7 ]
[ 7 ] and didn't get a return call for six days he would be very upset. In telling the story, the President pointed his fingers at his head and said "the guy has serious judgment issues." I did not comment at any point during this topic and there was no mention or acknowledgment of any FBI interest in or contact with General Flynn.

As we got up, he said we should have my family back for dinner. When I didn't reply, he added, "or a tour, whatever you think is appropriate." As we stepped from the Green Room, he said "Reince knows were are having dinner" (the opposite of what he said earlier) "deal with him; I will tell him." He then walked me into the East Room. I said I had been there before when President Obama held a big dinner for senior staff and appointees around Christmas. We then shook hands and parted.

JBC

*JBC  1/28/17*

CONFIDENTIAL//NOFORN

~~SECRET//NOFORN~~

I went to the White House today for a 4 pm "meet and greet" with COS Reince Priebus. As I walked in from West Exec, I saw and briefly chatted with Bill Priestap and Jen Boone, who were there to do a defensive briefing [ 8 ]

b1
b3

As I waited in the West Wing lobby, Mike Flynn stopped by and sat down. We chatted for about five minutes about his new job, the challenges in building a staff, and working with folks who had never been in government before, how he maintains fitness, etc. There was no mention by either of us of [ 9 ]
[ 9 ]

b1
b3

COS Priebus's assistant came and got me and took me to his office. He greeted me and we sat with his desk between us.   He explained that this was a chance to get acquainted, and he guided the conversation in a variety of directions.

Early in our conversation he brought of the immigration order and asked if I was a lawyer. He asked if I agreed that the order appear facially valid. I said I did, as I believed OLC had; the President has broad authority in the area. I added that because immigration was not an FBI issue, I had not followed the court discussion carefully and did not know what considerations there might be beyond the face of the order.

We touched on a variety of subjects, including "how the [ 10 ] ended up in the report." I explained that the analysts from all three agencies agreed it was relevant and that portions of the material were corroborated by other intelligence. They discussed whether [ 11 ] and decided it made most sense to [ 12 ] I said I agreed with that decision and thought it very important that it be included and briefed to a select audience. He pressed again and said that the material was [ 13 ] I explained that the primary source [ 14 ] much of it was consistent with and corroborative of other intelligence, and that the incoming president needed to know the rest of it was out there.

b1
b3
b7A

I explained to him that at our dinner the President had expressed interest in having me investigate the Golden Showers thing. I repeated what I had told the President about not wanting to create a narrative that we were investigating him.

He then asked about leaks of the fact of [ 15 ] and that it was briefed to the incoming president. I said I didn't know where it came from but I suspect it came from folks who have left government. He asked whether it could have come from the FBI. I said it was possible but extremely unlikely in view. We talked about leaks in general and I explained my view that they almost always come from one or two hops out and that every president is plagued by them. He asked if we had ever caught an FBI leaker. I said we had, but it was a rare thing because it almost always turned on our willingness to go after reporter records. He then recalled the Obama administration conflict with James Rosen of Fox. He also mentioned the leak of the read-outs of the Presidents calls with foreign leaders.

b1
b3
b7A

*Classified by : AD CD*
*Derived from : FBI NSICG dated ××××*
*Declassify on : 20421231*

~~SECRET//NOFORN~~

SECRET//NOFORN

He then asked me if this was a "private conversation." I replied that it was. He then said he wanted to ask me a question and I could decide whether it was appropriate to answer. He then asked, "Do you have a FISA order on Mike Flynn?" I paused for a few seconds and then said that I would answer here, but that this illustrated the kind of question that had to be asked and answered through established channels. I said the answer [16] I then explained that the normal channel was from DOJ leadership to the WH counsel about such things. [17] [17] I would normally make sure the AG and DAG were aware and they would likely inform the WH Counsel and he could decide whether to inform the COS. I explained that it was important that communications about any particular case go through that channel to protect us and to protect the WH from any accusations of improper influence.

b1
b3
b7E

He said he understood and then asked me what I would talk to Denis McDonough about. I said two kinds of things: policy, like Going Dark, and particular operational issues if we were facing a terror threat or there was an intelligence operation that was sensitive. He would call me to cut through the clutter and find out directly what he needed to know. Reince responded that that was helpful and he hoped I would call him to offer thoughts whenever I thought they would benefit from them, whether not it related to the FBI. He said they would welcome the feedback. I said I would.

He said he understood my dinner with the President had gone very well and that he was interested in my staying on. I repeated what I had told the President, including that we had agreed not to announce anything. Reince asked me how it worked and I explained that I had a ten-year term and, although the President could fire me anytime he liked, I would just continue my term. There was nothing to announce.

During the conversation, Reince also touched the email investigation, offering his view that the Clinton team had misplayed my final announcement and should have pushed it harder as good news. He also said, reflectively, that it wasn't the Russians' fault that she failed to campaign in Michigan, and it wasn't my fault that she set up her email the way she did. He then pressed me on why it wasn't chargeable "gross negligence," and I took him through the facts and the law. At some point I added that it also wasn't my fault that Huma Abedin forwarded emails to Anthony Weiner.

Reince then took me to the Oval Office to greet the President on my way out. The President was seated behind his desk, speaking to Sean Spicer. He introduced me to Mr. Spicer, who shook my hand and departed. Reince stayed, seated to my right as I sat in a chair facing the President.

The President then spoke about a variety of topics, touching on the email investigation (wondering aloud what it would have been like to run against Bernie

SECRET//NOFORN

Sanders if I had recommended charging Hillary Clinton). He asked (as he had at our dinner) whether my deputy had a problem with him, and recounting how hard he had been on the campaign trail, saying "the number 2 guy at the FBI took a million dollars from the Clintons." I again explained that Andy McCabe was a pro. He asked whether he had ever mentioned to me the campaign attacks. I said "never," and again explained he was a true pro and you would come to value him. I said if he had it to do over again I'm sure he would urge his wife not to run, but that the guy put everything aside and did his job well.

The President talked about the leak of the "read-outs" from his calls with Australia and Mexico, explaining that the leaks couldn't have come from the "other side," and he understood we were helping look into that. Reince interjected that "Kellogg" was looking at it and we were helping. I said I would follow up to find out what was going on.

The President brought up the "Golden Showers thing" and said it really bothered him if his wife had any doubt about it. He then explained, as he did at our dinner, that he hadn't stayed overnight in Russia during the Miss Universe trip. Twice during this part of the conversation, Reince tried to interject a comment about the ⸻ 18 ⸻ and "why it was even in there," but the President ignored him. The President said "the hookers thing" is nonsense but that Putin had told him "we have some of the most beautiful hookers in the world." (He did not say when Putin had told him this and I don't recall ⸻ 19 ⸻

b1
b3
b7A

He then pivoted to the Russians wanting an apology from Bill O'Reilly. I said I had seen that and O'Reilly's reply, which was to "call him in 2023." The President then said that O'Reilly's question about whether he respected Putin had been a hard one. ⸻ 20 ⸻ He said he does respect the leader of a major country and thought that was the best answer. He then said, "You think my answer was good, right?" I said the answer was fine, except the part about killers, because we aren't the kind of killers that Putin is. When I said this, the President paused noticeably. I don't know what to make of it, but he clearly noticed I had directly criticized him.

b1

The conversation then moved to other pleasantries and we wrapped up with a handshake.

JBC 2/8/2017

CNN v. FBI, 17-cv-1167 (D.D.C.) - 007

CONFIDENTIAL//NOFORN

I returned the president's call this morning at 8:26 am EDT. We spoke for about four minutes. He said he was following up to see if I did what he had asked last time -- getting out that he personally is not under investigation. I replied that I had passed the request to the Acting AG and had not heard back from him. He spoke for a bit about why it was so important: He is trying to do work for the country, visit with foreign leaders, and any cloud, even a little cloud gets in the way of that. They keep bringing up the Russia thing as an excuse for losing the election. I explained that Dana Boente was now the acting AG on this after Jeff Sessions recused himself. He said maybe he would have his people reach out to Dana. I said that that was the way to handle it -- he should have the White House Counsel call the Acting Attorney General and make the request. He said that was what he would do. He then added, "Because I have been very loyal to you, very loyal, we had that thing, you know."[2] I did not reply, or ask him what he meant by "that thing."[3] Instead I said again that the way to handle it was to have the White House Counsel call Dana Boente. He said that's what he would do.

He then switched topics and began to talk about Egypt and its leader, saying Obama didn't like the guy [        21        ] He mentioned the Coptic church bombings and how horrible they were. He said that three Americans had been killed by an Egyptian soldier and the Egyptian leader had raised it with him. I interrupted to say that I thought he meant [ 22 ] [ 22 ] and an incident in Jordan. He agreed and said [ 23 ] had told him he wanted to bring the soldier to justice quickly, but that the FBI was in some way asking them to delay. He said [ 24 ] [        24        ] I replied that I would dig into it but that I did not believe it to be true that the FBI was delaying a Jordanian prosecution. In fact, we were working very closely with the American families and had told them that we wanted the Jordanians to bring justice and if they did not we would try to bring the killer to the United States. He asked me to follow up and make sure that we were working well with the Jordanians and helping them quickly bring the killer to justice. I told him I would. He then said that I was doing a great job and wished me well. The call ended.

b1

JBE 4/11/17

---

[1] I don't know the President well enough to give a high-confidence read here from a phone call, but I perceived him to be slightly annoyed by my reply.

[2] His use of these words did not fit with the flow of the call, which at that point had moved away from any request of me, but I have recorded it here as it happened.

[3] I assumed when he said this that he was reaching back in his memory to our conversation about loyalty at our private dinner, which was sufficiently awkward to make it difficult for him to say I had promised to be loyal, which is where I thought he was headed in the comment.

Classified by: ADCD
Derived from: FBI NSICG
   dated 20130301
Declassify on: 20421231

CONFIDENTIAL//NOFORN

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CABLE NEWS NETWORK, INC.,<br><br>     Plaintiff,<br><br>v.<br><br>FEDERAL BUREAU OF INVESTIGATION,<br><br>     Defendant. | Civil Action No. 1:17-cv-01167-JEB |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS
<u>AS TO WHICH THERE IS NO GENUINE DISPUTE</u>**

Pursuant to LCvR 7(h), Defendant Federal Bureau of Investigation ("FBI") submits this

Statement of Material Facts as to Which There is No Genuine Dispute in connection with its

motion for summary judgment on remand.

**The Russian Interference Investigation**

1.     The law enforcement duties of the FBI include undertaking counterintelligence

and national security investigations, and detecting and investigating possible violations of

Federal criminal laws.  *See* 28 U.S.C. § 533; Decl. of David M. Hardy, Section Chief,

Record/Information Dissemination Section, Records Management Division, FBI ("First Hardy

Decl.") ¶ 65 (ECF No. 22-2); Fifth Decl. of David M. Hardy ("Fifth Hardy Decl.") ¶ 46 (Ex. 1

hereto).

2.     On March 20, 2017, then-FBI Director James B. Comey confirmed in public

testimony before Congress "that the FBI, as part of our counterintelligence mission, is

investigating the Russian government's efforts to interfere in the 2016 presidential election, and

that includes investigating the nature of any links between individuals associated with the Trump

campaign and the Russian government and whether there was any coordination between the

campaign and Russia's efforts."  Statement Before the House Permanent Select Committee on

Intelligence, available at https://www.fbi.gov/news/testimony/hpsci-hearing-titled-russian-active-

measures-investigation (last visited Dec. 14, 2018).  He added that "[a]s with any

counterintelligence investigation, this will also include an assessment of whether any crimes

were committed."  *Id.*

3.      Director Comey was terminated as FBI Director on May 9, 2017.  First Hardy

Decl. ¶ 108.

4.      On May 17, 2017, Deputy Attorney General Rod Rosenstein named former FBI

Director Robert S. Mueller III as Special Counsel to oversee the Russia investigation.  DOJ

Order No. 3915-2017, Appointment of Special Counsel to Investigate Russian Interference with

the 2016 Presidential Election and Related Matters (May 17, 2017).  Under the terms of his

appointment, Special Counsel Mueller is authorized to "conduct the investigation confirmed by

then-FBI Director James B. Comey in testimony before the House Permanent Select Committee

on Intelligence on March 20, 2017, including (i) any links and/or coordination between the

Russian government and individuals associated with the campaign of President Donald Trump;

and (ii) any matters that arose or may arise directly from the investigation; and (iii) any other

matters within the scope of 28 C.F.R. § 600.4(a)."  *Id.*  In addition, "[i]f the Special Counsel

believes it necessary and appropriate, the Special Counsel is authorized to prosecute federal

crimes arising from the investigation of these matters."  *Id.*  This investigation is ongoing.  Fifth

Hardy Decl. ¶ 49.

**The Comey Memos**

5.      On June 8, 2017, former Director Comey, then a private citizen, testified under oath in open session before the Senate Select Committee on Intelligence ("SSCI").  *See, e.g.,* Compl. (No. 17-1167), ¶ 22 (ECF No. 1).   In his Statement for the Record, released to the public on June 7, 2017, former Director Comey outlined how he had drafted contemporaneous memoranda after various meetings and conversations with President Trump in which he discussed matters pertaining to the Russia investigation, among other things. https://www.intelligence.senate.gov/sites/default/files/documents/os-jcomey-060817.pdf ("June 7 Statement").

6.      In his live testimony on June 8, 2017, former Director Comey again discussed his communications with President Trump regarding, among other things, the Russia investigation, referencing again his contemporaneous memos.  *See, e.g.,* Compl. (No. 17-1167), ¶ 22 (ECF No. 1).   With respect to his conversations with President Trump, former Director Comey stated that he had "not included every detail" in his testimony.   June 7 Statement, at 1.   He also stated that he "thought" he had written a memo for all conversations he had with President Trump or, if he had not, "for nearly all of them, especially the ones that were substantive."   Transcript of Comey Hearing, *available at* https://www.intelligence.senate.gov/hearings/open-hearing-former-fbi-director-james-comey# (last visited Dec. 14, 2018).

**Cable News Network's ("CNN's") Request**

7.      On May 16, 2017, CNN producer Greg Wallace submitted a FOIA request on behalf of CNN to the FBI for "copies of all records of notes taken by or communications sent from FBI Director James Comey regarding or documenting interactions (including interviews

and other conversations) with President Donald Trump."  Compl. (No. 17-1167), ¶¶ 12, 13 & Exh. A (ECF No. 1).

**The FBI's Search for Responsive Records**

8.     Personnel in the FBI's Records Management Division (now the Information Management Division) responsible for compiling and preserving FBI records, including the records of former Director Comey after his removal, were consulted about the existence and location of any "Comey Memos" responsive to CNN's request and to the other requests as issue in these consolidated cases.  First Hardy Decl. ¶ 62.  They consulted their collection of former Director Comey's records and identified what they believed to be the set of records constituting the Comey Memos.  *Id.*  They then provided counsel from the FBI's Office of General Counsel ("OGC") and Record/Information Dissemination Section personnel access to the collection of former Director Comey's materials and the set of records therein that they had identified as the Comey Memos.  *Id.*  Counsel in OGC's National Security and Cyber Law Branch who were already familiar with the relevant records confirmed that the records identified by RMD as the Comey Memos were, in fact, the full set of memos.  *Id.*  The FBI also consulted with the Special Counsel's Office and confirmed that the records located and processed represented the universe of Comey Memos that exist.  Second Hardy Decl. ¶ 4 (ECF No. 36-1).

**The FBI's Responses to CNN's Request and Procedural History**

9.     The FBI responded to CNN's request by letter dated June 16, 2017, stating that the material requested was being withheld in full pursuant to FOIA Exemption 7(A), 5 U.S.C. § 552(b)(7)(A).  First Hardy Decl. ¶ 13 & Ex. CNN-F.  The FBI further stated that "[t]he records responsive to your request are law enforcement records.  There is a pending or prospective law

enforcement proceeding relevant to these responsive records, and release of the information in these responsive records could reasonably be expected to interfere with enforcement proceedings." *Id.*, Ex. CNN-F.

10.     At that time, the FBI did not reveal the total number or volume of Comey Memos (responsive both to CNN's request and to the other requests at issue in the consolidated cases) in order to avoid interfering with a pending investigation.  Fifth Hardy Decl. ¶ 8 n.3.  Because it could not publicly disclose this information at the time, the FBI did not specify which Comey Memo or Memos were responsive to each plaintiff's request.  *Id.*

11.     In addition to Exemption 7(A), the FBI subsequently asserted other exemptions that applied to certain portions of information contained in the Comey Memos, specifically, Exemptions 1, 3, 6, 7(C) and 7(E).  *See* First Hardy Decl. ¶¶ 63, 73-106.

12.     On February 2, 2018, this Court granted the FBI's motion for partial summary judgment addressing the withholding of the Comey Memos and denied CNN's cross-motion. *CNN v. FBI*. 293 F. Supp. 3d at 77.  Because of the Court's conclusion that Exemption 7(A) was properly asserted to withhold the records in full and that no portion of them was reasonably segregable, it did not address the other exemptions asserted by the government to support withholding some or all of the Comey Memos.  *Id*. at 69.

13.     CNN appealed the Court's February 2, 2018, decision and ensuing judgment, as did some of the other plaintiffs in the consolidated cases.  *See* CNN Notice of Appeal, Feb. 5, 2018, ECF No. 52; CNN Notice of Appeal, Apr. 26, 2018, ECF No. 61.

14.     On April 19, 2018, while the appeals were pending, the Department of Justice provided the Comey Memos in redacted form to the Chairman of the Senate Select Committee

on Intelligence and the Chairmen of the House Committee on the Judiciary, House Committee

on Oversight and Government Reform, and House Permanent Select Committee on Intelligence.

Fifth Hardy Decl. ¶ 12.  Congress subsequently disclosed copies of the memos to the media, and

the media published them.  *Id.*

15.     On May 4, 2018, the FBI released its own redacted copies of the Comey Memos

by publishing them on the FBI's electronic reading room, The Vault, at

https://vault.fbi.gov/director-comey-memoranda-of-communications-with-president-trump/ (last

visited Dec. 14, 2018) (hereafter, "The Vault").  Fifth Hardy Decl. ¶ 13.  This release consisted

of seven memos totaling fifteen pages, with the redactions labelled with the pertinent FOIA

exemptions.  *See* The Vault.  Four of the seven memos were released in part; the other three

memos were released in full.  Fifth Hardy Decl. ¶ 17; *see also* The Vault.

16.     Because CNN's request sought memos documenting only those interactions

between Mr. Comey and President Trump beginning on January 20, 2017, one of the published

Comey Memos (the first one, consisting of two pages)) is not responsive to CNN's request.  Fifth

Hardy Decl. ¶ 18 & n.5.  Accordingly, there are six memos responsive to CNN's request, totaling

13 pages, three of which have been released in full.  *Id.* ¶¶ 18, 19.

17.     On April 24, 2018, the D.C. Circuit sua sponte ordered CNN to show cause why

its appeal had not been rendered moot by "the recent public disclosure of records at issue."

Order, No. 18-5041 (D.C. Cir. Apr. 24, 2018) (Doc. No. 1727918).  In response, CNN asked that

the case be remanded for further proceedings.  CNN's Resp. to Order Show Cause, No.18-5041

(D.C. Cir. May 17, 2018) (Doc. No. 1731461).

18.     On August 8, 2018, the D.C. Circuit granted CNN's request for remand.  Mandate & Order, No.18-5041 (D.C. Cir. Aug. 8, 2018) (Doc. No. 1744635).  The appeals court stated that "[f]urther proceedings in the district court are … necessary to determine whether there exist any additional memoranda that have not been publically disclosed, and whether [CNN] is entitled to the disclosure of any unreleased memoranda or redacted portions of released memoranda."  *Id.* at 2.

**Facts Relevant to the Claimed Exemptions**

19.     The Comey Memos contain information classified at the "Secret" or "Confidential" level that pertains to "intelligence activities (including covert action), intelligence sources or methods, or cryptology," and to "foreign relations or foreign activities of the United States, including confidential sources."  Fifth Hardy Decl. ¶¶ 25, 31-39.

20.     Confidentiality must be maintained with respect to the use or non-use of intelligence activities, sources, or methods, if the viability, productivity, and usefulness of the activity, source, and method are to be preserved.  Fifth Hardy Decl. ¶ 28.  Accordingly, intelligence activities, sources, and methods must be protected from disclosure in every situation in which a certain intelligence capability, technique, or interest – or its specific use – is unknown to the groups against which it is deployed, since those groups could take countermeasures to nullify its effectiveness.  *Id.* ¶ 29.  Intelligence activities, sources, and methods are valuable only so long as they remain unknown and unsuspected.  *Id.*  Once an intelligence activity, source, or method – or the fact of its use or non-use in a certain situation – is discovered, its continued successful use is seriously jeopardized.  *Id.*

21.     One vehicle for gathering information about the U.S. Government's capabilities is by reviewing officially-released information.  Fifth Hardy Decl. ¶ 30.  Terrorist organizations and other hostile or Foreign Intelligence groups have the capacity and ability to gather information from myriad sources, analyze it, and deduce means and methods from disparate details to defeat the U.S. Government's collection efforts.  *Id.*  Thus, even seemingly innocuous, indirect references to an intelligence activity, source, or method could have significant adverse effects when juxtaposed with other publicly-available data.  *Id.*

22.     The unauthorized disclosure of information concerning foreign relations or foreign activities of the United States can reasonably be expected to lead to diplomatic or economic retaliation against the United States; the loss of the cooperation and assistance of friendly nations; or the compromise of cooperative foreign sources, which may jeopardize their safety and curtail the flow of information from these sources.  Fifth Hardy Decl. ¶ 37.

23.     Disclosure of information concerning intelligence sources and methods is prohibited pursuant to the National Security Act of 1947, as amended, which provides that the Director of National Intelligence (DNI) "shall protect intelligence sources and methods from unauthorized disclosure."  50 U.S.C. § 3024(i)(1).  In order to fulfill its obligation of protecting intelligence sources and methods, the DNI is authorized to establish and implement guidelines for the Intelligence Community ("IC") for the classification of information under applicable laws, Executive Orders, or other Presidential Directives, and for access to and dissemination of intelligence.  *Id.*; Fifth Hardy Decl. ¶ 43.  The FBI is one of the member agencies comprising the IC, and as such must protect intelligence sources and methods.  Fifth Hardy Decl. ¶ 43.

24.     The Comey Memos contain information compiled through investigative efforts by the FBI in support of the Russia investigation.  Fifth Hardy Decl. ¶ 50.  The Comey Memos have themselves been compiled into the Russia investigation.  *CNN v. FBI*, 293 F.3d at 69-70.

25.     Disclosure of public details about when and against which targets the FBI has or has not used a particular law enforcement technique, such as surveillance authorized under the Foreign Intelligence Surveillance Act, reflect the circumstances under which the FBI will or will not seek authority to do so.  Fifth Hardy Decl. ¶ 52.  Over time, disclosure of such information would create a mosaic that criminals and other adversaries could use to predict when, where, and against whom surveillance may occur; detect it when it is occurring; and develop and utilize countermeasures to defeat or avoid it.  *Id.*

26.     Disclosure of the use of a particular intelligence method and information derived from it at an identifiable period of time in connection with the Russian investigation can reasonably be expected to reveal particular information or areas of interest in the investigation, as well as information that is available to the investigators.  Fifth Hardy Decl. ¶I 55.  Prematurely revealing this information risks revealing some non-public aspects of the focus of the investigation at a specific point in time, which would provide targets, potential targets, or others intent on interfering with the investigation with information that they could use to attempt to undermine the investigation by fabricating records or information to counter what the investigators already know or adulterating/destroying evidence that the investigators might not already know about or have, or taking other steps to thwart investigative efforts.  *Id.*

27.     The FBI considered the impact that disclosure of the redacted material could have on other sensitive information contained elsewhere in the United States Intelligence

Community's files.  Fifth Hardy Decl. ¶ 26.  Equal consideration was given to the impact that

other information – both in the public domain and likely known or suspected by present or

potential adversaries of the United States – would have upon the information protected here.  *Id.*

Consideration was further given to the context in which the classified information is found,

including not only the surrounding unclassified information, but also other information already

in the public domain, as well as information likely known or suspected by other hostile

intelligence entities.  *Id.* ¶ 27.

      28.    The information redacted in the Comey Memos does not match any information

that has been officially publicly disclosed by the Executive Branch nor does it match information

disclosed in the memorandum drafted by the Majority Staff of the House Permanent Select

Committee on Intelligence ("HPSCI"), which was declassified and released by the President

("the Nunes Memo"); the response memorandum released by HPSCI Minority Staff ("the Schiff

Memo") and a memorandum authored by Senators Grassley and Graham referring Steele to the

FBI for possible criminal violations ("the Grassley/Graham Memo").  Fifth Hardy Decl.

¶¶ 57-58.

Dated:  December 14, 2018

Respectfully submitted,

CHAD A. READLER
Principal Deputy Assistant Attorney General
Civil Division

MARCIA BERMAN
Assistant Director, Civil Division

*/s/Carol Federighi*
CAROL FEDERIGHI
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Phone: (202) 514-1903
Email: carol.federighi@usdoj.gov

*Counsel for Defendant*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CABLE NEWS NETWORK, INC., | |
|      Plaintiff, | Civil Action No. 1:17-cv-01167-JEB |
| v. | |
| FEDERAL BUREAU OF INVESTIGATION, | |
|      Defendant. | |

## [PROPOSED] ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON REMAND

Upon consideration of Defendant'' Motion for Summary Judgment on Remand, and response and reply thereto, and the entire record herein, and for good cause shown, it is hereby

**ORDERED** that, for the reasons set forth in Defendant's Motion:

1.     Defendant's Motion is hereby **GRANTED**; and

2.     Summary judgment is hereby **ENTERED** for Defendant.


So ordered on this _____ day of _____, 2019.


_____
James E. Boasberg
United States District Judge