**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CABLE NEWS NETWORK, INC.,** | |
| **Plaintiff,** | |
| v. | Civil Action No. 17-1167 (JEB) |
| **FEDERAL BUREAU OF INVESTIGATION,** | |
| **Defendant.** | |

## MEMORANDUM OPINION

Although the Special Counsel's investigation into Russian election interference may have come to an end, this long-running litigation over the Comey Memos marches on.  Since the existence of the Memos first came to light, Plaintiff Cable News Network has steadfastly sought copies of these documents, which were penned by then-Federal Bureau of Investigation Director James Comey to memorialize his meetings with President Trump.  Last year, this Court ruled that the ongoing nature of the Special Counsel's investigation barred the records from release under the Freedom of Information Act.  Much has changed since.  Most notably, Defendant FBI publicly released lightly redacted copies of the Memos, and the Special Counsel's investigation has concluded.  Still hoping to see what lies beneath the few remaining redaction boxes, CNN now renews its quest for disclosure.  It also asks the Court to release an *in camera* declaration submitted by the Bureau to justify its withholding in this litigation's last go-round.  The FBI resists both requests.  Finding that the Government has partially — but not completely — met its burden on the Memos, the Court will grant in part and deny in part both the FBI's Motion for Summary Judgment as well as Plaintiff's Cross-Motion.  Presented with little meaningful

opposition from Defendant to Plaintiff's Motion for Access to Judicial Records, moreover, the

Court will also grant CNN's request to see the unredacted declaration.

## I.    Background

Given the array of prior Opinions and the extensive press coverage on this topic, the

background of this case will be familiar to most not lost at sea for the past couple of years.  The

Court will thus offer only a brief synopsis of the facts that first led to this lawsuit, saving its ink

for events that have transpired since its last telling.  Readers curious for a more comprehensive

treatment are directed to this Court's earlier Opinions.  See Cable News Network, Inc. v. FBI

(CNN III), 298 F. Supp. 3d 124, 125–27 (D.D.C. 2018); Cable News Network, Inc. v. FBI (CNN

II), 293 F. Supp. 3d 59, 65–67, 69–70 (D.D.C. 2018); Cable News Network, Inc. v. FBI (CNN I),

271 F. Supp. 3d 108, 110 (D.D.C. 2017).

As Director of the FBI, Comey authored several confidential memoranda immediately

following his meetings with President Trump.  The purpose of such documentation, Comey later

reported, lay in his concern that the President "might lie about the nature of [their] meeting."

CNN II, 293 F. Supp. 3d at 66 (citation omitted).  After Trump fired Comey from his post, the

existence of these records did not stay secret.  Within a week, a New York Times story catapulted

the Memos to the forefront of public consciousness, galvanizing CNN and others to seek their

release.  Id. at 65–66.  As a means to get its hands on these written narratives, CNN employed a

well-known tool: the Freedom of Information Act, 5 U.S.C. § 552 *et seq*.  Unhappy with the

Government's rebuff of its request, Plaintiff filed suit here.

Unmoved, the FBI invoked a slew of FOIA exemptions, including 1, 3, 6, 7(C), and 7(E).

See CNN II, 293 F. Supp. 3d at 69.  Most notably, however, Defendant relied on the protection of

Exemption 7(A), which shields documents whose release "could reasonably be expected to

interfere with enforcement proceedings," 5 U.S.C. § 552(b)(7)(A) — namely, the then-nascent

Special Counsel's investigation into Russian interference in the 2016 presidential election. To

aid the Court in understanding why release could obstruct the investigation, the Government

submitted two declarations from FBI Special Agent David W. Archey *in camera*. See <u>CNN II</u>,

293 F. Supp. 3d at 66–67. It also provided additional explanation in a sealed, on-the-record

proceeding. <u>Id.</u> at 67. Digesting this material and thereafter agreeing that the pendency of the

investigation shielded the Memos from release, the Court granted Defendant's motion for

summary judgment. <u>Id.</u> at 77. "[T]he Comey Memos," the Court said, "at least for now, will

remain in the hands of the Special Counsel and not the public." <u>Id.</u> at 65. In making this

decision, the Court relied on Exemption 7(A) only, without passing on the merit of the FBI's

other claimed exemptions. <u>Id.</u> at 69.

       Understandably disappointed, CNN appealed. But before much could happen in that

legal proceeding, outside circumstances intervened. In response to a congressional request, the

Department of Justice agreed to turn over copies of the Comey Memos to the Hill — its

calculation altered, it appears, by the recent publication of Comey's memoir — but only after

redacting what it deemed to be classified information. See ECF No. 69, Attach. 3 (Def.

Statement of Facts), ¶ 14; ECF No. 70 (Pl. MSJ & Opp.) at 27 (Pl. Statement of Facts), ¶¶ 3–4.

The deletions were fairly minor, and these versions of the Memos soon found themselves

splashed across the front pages of multiple outlets. See Def. SOF, ¶ 14; Pl. SOF, ¶ 5. The FBI

then followed suit. Believing that its tight-handedness could no longer be justified, it published

the redacted versions of the Memos on its public site, which is dubbed the Vault. See Def. SOF,

¶ 15. In light of these developments and "subsequent statements by government officials that

release of the memoranda would no longer adversely impact any ongoing investigation," the

D.C. Circuit remanded the case to this Court for further proceedings without deciding the merits of Plaintiff's appeal. See Cable News Network, Inc. v. FBI, No. 18-5041, 2018 WL 3868760, at *1 (D.C. Cir. Aug. 8, 2018). With the ball now back in this Court, the facts on the ground stand thus: the vast majority of the Memos have been publicly released, but some minor redactions remain.

The FBI has again moved for summary judgment. It invokes multiple FOIA exemptions to justify keeping the redacted snippets of the Comey Memos from public view — namely, Exemptions 1, 3, and 7. See ECF No. 69, Attach. 1 (Def. MSJ) at 9, 17, 19. Believing the Government overzealous in its protectiveness, CNN, too, has moved for summary judgment, urging the Court to order release of the information underlying all 24 redactions remaining in the Memos. See Pl. MSJ & Opp. at 6, 17, 18, 20. As in the last iteration of this investigation, the Court ordered the FBI to produce in camera unredacted versions of the Memos to the Court. See Minute Order of Mar. 28, 2019. This has been done.

Plaintiff has also taken another step in its efforts to deliver information withheld by the Government to the public eye. It filed a second motion in this case, this time seeking access to the two in camera Archey Declarations from the last round of briefing and a transcript of the sealed, ex parte proceeding that the Court relied upon in its earlier Opinion. As the legal bases for this relief, it leans on both the First Amendment and common-law rights of access to judicial records. See ECF No. 72 (Pl. Access Mot.) at 1. On this count, the FBI has shown some flexibility. In response to CNN's Motion, Defendant released both Archey Declarations with redactions. See ECF No. 76 (Def. Access Opp.) at 2; see also ECF No. 74, Attach. 1, Exh. A (Redacted Third Archey Declaration) & Exh. B (Redacted First Archey Declaration). Plaintiff, however, is not yet satisfied and maintains its request for access to the unredacted documents.

<u>See</u> ECF No. 78 (Pl. Access Reply) at 1–2. In order to provide thorough consideration, here, too, the Court required the Government to provide unredacted copies of the declarations at issue *in camera*. <u>See</u> Minute Order of Mar. 28, 2019.

Despite this already protracted saga, the tale is not yet over. Demonstrating, again, the ability of real-world events to outpace judicial proceedings, the Special Counsel announced the end of his investigation after the latest round of briefing in this case had been completed. Because the Government's opposition to releasing some of the materials requested by CNN relied, in part, on the ongoing nature of that investigation, the Court ordered the FBI to file a notice indicating whether the investigation's conclusion altered the positions taken in its briefs. <u>See</u> Minute Order of Apr. 1, 2019. In response, the Government agreed to release one of the two Archey Declarations at issue in full and narrowed the redactions of the second. <u>See</u> ECF No. 79 (First Def. Response) at 2. A week later, the FBI filed another copy of this redacted declaration, removing again some of the claimed redactions and explaining its rationale for retaining the remainder. <u>See</u> ECF No. 81 (Def. Notice) at 1. Defendant also withdrew its reliance on one exemption — namely, Exemption 7(A), which protects information collected for ongoing law-enforcement proceedings. <u>See</u> First Def. Response at 1. The import of that last concession is narrow, however. The FBI's invocation applied to only one redaction in the Comey Memos, and Defendant maintained that two other exemptions continued to shield this information from public release. <u>Id.</u>

Just a few days after this response from the Government, the Special Counsel's Report was publicly released in redacted form. As this disclosure, too, could affect the FBI's calculation, the Court sought to learn "whether such release alters the Government's position in relation to any withheld portions of the Comey memos, the Archey Declaration, or the *ex parte*

proceeding." Minute Order of Apr. 18, 2019. Once again, this development resulted in a further softening of the Bureau's stance. More specifically, it dropped its objection to release of the transcript of the *ex parte* proceeding. See ECF No. 84 (Second Def. Response) at 2. The Court thus ordered the Government to turn over that transcript to Plaintiff. See Minute Order of May 7, 2019.

Winnowed down over this lengthy history, what remains disputed are the propriety of 24 redactions to the Comey Memos and a handful of redactions to one Archey Declaration. After setting out the legal standards that govern its analysis, the Court will turn to the merits of these two legal quarrels.

## II.    Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact is one that would change the outcome of the litigation. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). In the event of conflicting evidence on a material issue, the Court is to construe the conflicting evidence in the light most favorable to the non-moving party. See Sample v. Bureau of Prisons, 466 F.3d 1086, 1087 (D.C. Cir. 2006).

FOIA cases typically and appropriately are decided on motions for summary judgment. See Brayton v. Office of the U.S. Trade Representative, 641 F.3d 521, 527 (D.C. Cir. 2011); see also Defenders of Wildlife v. U.S. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009); Bigwood v. U.S. Agency for Int'l Dev., 484 F. Supp. 2d 68, 73 (D.D.C. 2007). In FOIA cases, the agency bears the ultimate burden of proof. See Dep't of Justice v. Tax Analysts, 492 U.S.

136, 142 n.3 (1989).  The Court may grant summary judgment based solely on information provided in an agency's affidavits or declarations when they "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."  Larson v. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009) (citation omitted).  "Uncontradicted, plausible affidavits showing reasonable specificity and a logical relation to the exemption are likely to prevail."  Ancient Coin Collectors Guild v. U.S. Dep't of State, 641 F.3d 504, 509 (D.C. Cir. 2011).  This standard applies most saliently in national-security cases.  See ACLU v. U.S. Dep't of Def., 628 F.3d 612, 624 (D.C. Cir. 2011).  That said, "[u]nlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'"  U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 755 (1989) (quoting 5 U.S.C. § 552(a)(4)(B)).

Plaintiff's separate request for access to judicial records under the common law — the only ground ultimately addressed in this Opinion — is governed by a two-part inquiry.  The Court will save a rehearsal of that legal framework for the relevant discussion below.

## III.    Analysis

It begins with Plaintiff's attempt to pry from the Government's clutches the remaining text in the Comey Memos that has not yet seen the light of day.  The Court will next consider CNN's request for access to the full Archey Declaration.

A.  Comey Memos

FOIA, Plaintiff says, entitles it to view the unredacted Memos.  Congress enacted this law "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny."  Dep't of the Air Force v. Rose, 425 U.S. 352, 361 (1976) (quotation marks and citation omitted).  In doing so, FOIA helps "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."  John Doe Agency v. John Doe Corp., 493 U.S. 146, 152 (1989) (citation omitted).  The statute provides that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . shall make the records promptly available to any person."  5 U.S.C. § 552(a)(3)(A).  Consistent with this statutory mandate, federal courts have jurisdiction to order the production of records that an agency improperly withholds.  See id. § 552(a)(4)(B); Reporters Comm., 489 U.S. at 754–55.

The Government need not, however, turn over requested information that falls into one of nine statutorily created exemptions from FOIA's broad directive.  See 5 U.S.C. § 552(b)(1)–(9).  These exemptions are to be "narrowly construed."  Rose, 425 U.S. at 361.  That is so because courts must "[a]t all times . . . bear in mind that FOIA mandates a 'strong presumption in favor of disclosure.'"  Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting U.S. Dep't of State v. Ray, 502 U.S. 164, 173 (1991)).

Plaintiff no longer challenges the adequacy of the Government's search, an issue the Court addressed in its prior Opinion, see CNN II, 293 F. Supp. 3d at 68–69, nor does it question Defendant's representation as to the number of pertinent Memos in existence.  See Pl. MSJ &

Opp. at 5.  What remains disputed, therefore, is solely the propriety of the FBI's 24 withholdings pursuant to the listed exemptions.

Because "the Government may withhold documents or portions thereof as long as [one] privilege applies," Cause of Action Inst. v. U.S. Dep't of Justice, 330 F. Supp. 3d 336, 351–52 (D.D.C. 2018), the Court "need not address the other exemptions invoked" for any particular withholding justified by a single exemption.  See Ctr. for Nat'l Sec. Studies v. U.S. Dept' of Justice, 331 F.3d 918, 925 (D.C. Cir. 2003).  The FBI here continues to rely on Exemptions 1 and 3, which, for ease of discussion, the Court addresses in reverse order.  The parties have labeled the redactions numerically and refer to blocks of redactions in their briefs grouped by subject matter.  The Court follows suit.

   1. *Exemption 3*

First up is Exemption 3, which the Bureau invokes to protect redactions 8 through 19. This exemption permits agencies to withhold information "specifically exempted from disclosure by [a] statute" that meets one of two requirements.  See 5 U.S.C. § 552(b)(3).  Namely, that statute must either "(A)(i) require[] that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (A)(ii) establish[] particular criteria for withholding or refer[] to particular types of matters to be withheld."  Id.  The applicability of Exemption 3 turns largely on the terms of the statute, as the "sole issue" necessary to invoke the exemption's protection is "the existence of a relevant statute and the inclusion of the withheld material within the statute's coverage."  Morley v. CIA, 508 F.3d 1108, 1126 (D.C. Cir. 2007) (citation omitted). Although the invocation of other FOIA exemptions depends on "the detailed factual contents of specified documents," Exemption 3's applicability is thus more categorical.  Id.

As its statutory basis for withholding here, the FBI rests on Section 102A(i)(1) of the

National Security Act of 1947, codified at 50 U.S.C. § 3024(i)(1).  It contends that this statute,

which provides that "[t]he Director of National Intelligence shall protect intelligence sources and

methods from unauthorized disclosure," id., "prohibit[s]" the disclosure of the redacted

information and thus "leaves no discretion" to the Bureau.  See ECF No. 69, Attach. 2 (Fifth

David M. Hardy Declaration), ¶¶ 41–42.

CNN does not dispute, "nor could [it]," that this Act "is a valid Exemption 3 statute."

DiBacco v. U.S. Army, 795 F.3d 178, 197 (D.C. Cir. 2015); see also Elec. Privacy Info. Ctr. v.

Dep't of Justice, 296 F. Supp. 3d 109, 121 (D.D.C. 2017) (noting that Director of National

Intelligence "has delegated enforcement of this National Security Act mandate to the heads of

the 17 agencies that constitute the 'Intelligence Community,'" including FBI); Pl. MSJ & Opp. at

17–18 (discussing Exemption 3 arguments).  The remaining question thus becomes whether the

redacted information falls within the statute's coverage — i.e., whether turning over the

information would result in the disclosure of "intelligence sources and methods."  50 U.S.C.

§ 3024(i)(1).

The D.C. Circuit has interpreted this provision of the Act broadly, holding that material is

properly withheld if it "relates to intelligence sources and methods," Larson, 565 F.3d at 865

(emphasis added) (citation omitted), or "can reasonably be expected to lead to unauthorized

disclosure of" such material.  See Halperin v. CIA, 629 F.2d 144, 147 (D.C. Cir. 1980) (citation

omitted).  Courts have recognized that the Act's protection of sources and methods is a "near-

blanket FOIA exemption."  Elec. Privacy Info. Ctr. v. Office of Dir. of Nat'l Intelligence, 281 F.

Supp. 3d 203, 213 (D.D.C. 2017) (citation omitted); accord Whalen v. U.S. Marine Corps, 407 F.

Supp. 2d 54, 59 n.5 (D.D.C. 2005) (quoting Minier v. CIA, 88 F.3d 796, 801 (9th Cir. 1996)).  It

includes the "power to withhold superficially innocuous information on the ground that it might enable an observer to discover the identity of an intelligence source [or method]." CIA v. Sims, 471 U.S. 159, 178 (1985). This is so because, in the intelligence context, "bits and pieces of data may aid in piecing together bits of other information even when the individual piece is not of obvious importance in itself." Id. (internal quotation marks omitted).

The Bureau's assessments in this realm must not be lightly brushed off. In enacting the National Security Act, "Congress gave [the intelligence agencies] broad power to control the disclosure of intelligence sources." Sims, 471 U.S. at 173. "[I]t is the responsibility of" these agencies, and "not that of the judiciary, to weigh the variety of complex and subtle factors" inherent in the intelligence context. Id. at 180. Because of this "'sweeping power,' courts are required to give 'great deference' to the [agency's] assertion that a particular disclosure could reveal intelligence sources or methods." Whitaker v. CIA, 64 F. Supp. 3d 55, 63–64 (D.D.C. 2014) (quoting Berman v. CIA, 501 F.3d 1136, 1140 (9th Cir. 2007)).

Having reviewed both the Government's rationale and the unredacted Memos, the Court concludes that the FBI has met its minimal burden. At issue here are several redactions whose disclosure — as described in the Bureau's publicly filed affidavit — would reveal whether the FBI used information from "confidential intelligence sources" and the "reliability of that information," as well as the Bureau's possible reliance on particular intelligence methods to gather other material. See Fifth Hardy Decl., ¶ 31 (characterizing redaction blocks 10–19). Other portions of the redactions concern "a statement about information known to the FBI concerning Lieutenant General Flynn as of a particular date" and "non-public details about to whom a defensive intelligence briefing was provided." Id. (characterizing redaction blocks 8–9).

If the redacted text were made public, the FBI says, it would reveal Defendant's intelligence practices "at a particular time and in relation to a particular set of circumstances." Id., ¶¶ 32; accord id., ¶ 33. This is knowledge that, the Bureau contends, "[a]dversaries could use . . . in conjunction with other information" to "reveal particular, singular details about the FBI's intelligence interests, priorities, activities, and methods." Id., ¶¶ 32–33. For this reason, the Bureau contends that the information properly falls within the statute's coverage. Id., ¶ 44; see also Def. MSJ at 17–18.

Combining the D.C. Circuit's broad interpretation of the statutory language and the deference owed to the FBI's determination, the Court has little trouble concluding that the redacted information "relates" to intelligence sources and methods. See Larson, 565 F.3d at 865. This is particularly so because, as mentioned above, the Bureau is empowered to "withhold superficially innocuous information on the ground" that it may offer a piece of a puzzle whose completion would reveal information about an intelligence source or method. See Sims, 471 U.S. at 178.

Understanding this, Plaintiff attempts a flanking maneuver. The Government, it says, has failed to establish that releasing the information at issue would cause any harm. See Pl. MSJ & Opp. at 17. CNN offers the following building blocks for this argument. It starts by pointing to its contention that Defendant came up short in its attempt to demonstrate the harm necessary to justify a different exemption — namely, Exemption 1's protection for properly classified information. Id. "[F]or all the same reasons," it then says, the Government has not met its burden under Exemption 3 because it has not made a sufficient "showing of harm to 'intelligence sources and methods.'" Id. This is especially true, CNN continues, in light of "the vast amount of information already available to the public." Id.

Here, Plaintiff hits a roadblock. Although a showing of harm to national security is necessary to invoke the protection of Exemption 1, Exemption 3 includes no comparable element. See Associated Press v. FBI, 265 F. Supp. 3d 82, 97 (D.D.C. 2017); Elgabrowny v. CIA, 2019 WL 1440345, at *14 (D.D.C. Mar. 31, 2019). Rather, the "sole issue" after finding a relevant statute is "the inclusion of the withheld material within the statute's coverage." Morley, 508 F.3d at 1126. And the "National Security Act does not require the [agency] to find that disclosure of the information would be expected to harm national security." Elgabrowny, 2019 WL 1440345, at *14; see also Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv., 608 F.2d 1381, 1390 (D.C. Cir. 1979) (stating that while "specific showing of potential harm to national security" is "necessary for Exemption 1," it "is irrelevant to the language of" another exempting statute). Nor does the Act's text reveal any other necessary showing of harm. See 50 U.S.C. § 3024(i)(1). In fact, the scope of information in the public sphere — which serves as the primary pillar of Plaintiff's argument — "bears no legal significance" in this context. See Elgabrowny, 2019 WL 1440345, at *14. All that is necessary is that "the withheld material relates to intelligence sources and methods." Larson, 565 F.3d at 865 (citation omitted).

Because the Government's invocation of Exemption 3 requires no showing of harm, this exemption "presents an easier hurdle for the agency" than Exemption 1. See Associated Press, 265 F. Supp. 3d at 97. The Court's conclusion that the Act is a qualifying statute whose plain language covers the Bureau's redactions thus settles the matter. The purported deficiency to which Plaintiff points has no bearing on the operative question here.

Perhaps anticipating this conclusion, CNN suggests in its Reply brief that the FBI has not shown that the redacted information could "reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods." ECF No. 77 (Pl. Reply) at 4. The Court

interprets this sentence as an intimation that the redacted information does not fall within the National Security Act's coverage, something CNN did not seem to challenge in its opening brief. But that implication is hard to confidently discern, as Plaintiff offers no elaboration beyond this single sentence. And if that is indeed its intended effect, it falls far short. For the reasons already stated, the FBI has met its burden: the Act's "broad[]" coverage, see Leopold v. CIA, 106 F. Supp. 3d 51, 57 (D.D.C. 2015), encompasses the redacted references to the use, reliability, and information gleaned from various intelligence sources. See Fifth Hardy Decl., ¶¶ 32–33. The Court does not have any reason to doubt the FBI's assessment that disclosing the information at issue could "reveal particular, singular details about the FBI's intelligence interests, priorities, activities, and methods." Id., ¶ 32. The Court will sustain Defendant's withholdings here.

2. *Exemption 1*

What remains are redactions 1 through 7 and 20 through 24, which the FBI posits are protected by Exemption 1. This exemption protects properly classified material. More precisely, it shields from disclosure matters that are "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and . . . are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). An agency invoking this exemption must make both a procedural and substantive showing — namely, that it "complies with classification procedures established by the relevant executive order and withholds only such material as conforms to the order's substantive criteria for classification." Mobley v. Dep't of Justice, 870 F. Supp. 2d 61, 66 (D.D.C. 2012) (citing King v. Dep't of Justice, 830 F.2d 210, 214 (D.C. Cir. 1987)); see also Lesar v. Dep't of Justice, 636 F.2d 472, 483 (D.C. Cir. 1980) ("To be classified properly, a document must be classified in

accordance with the procedural criteria of the governing Executive Order as well as its substantive terms.").

Like other FOIA exemptions, the invoking agency bears the burden of establishing the applicability of this one.  See Larson, 565 F.3d at 863.  As a general matter, it satisfies this task with an affidavit that "describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith."  ACLU, 628 F.3d at 619.  In the national-security context, the Court grants an especially high degree of deference to the Government's judgment.  "Because courts lack the expertise to second-guess . . . agency opinions in the typical national security FOIA case," they "must accord substantial weight to an agency's affidavit concerning the details of the classified status of the dispute record."  Id. (internal quotation marks omitted).  Courts thus find "it unwise to undertake searching judicial review," Ctr. for Nat'l Sec. Studies, 331 F.3d at 927, and instead defer to "an agency's justification for invoking a FOIA exemption" that "appears 'logical' or 'plausible.'"  Wolf v. CIA, 473 F.3d 370, 374–75 (D.C. Cir. 2007).

Deference, however, "is not equivalent to acquiescence."  Campbell v. U.S. Dep't of Justice, 164 F.3d 20, 30 (D.C. Cir. 1998).  A declaration passes muster "only if it is sufficient 'to afford . . . the district court an adequate foundation to review[] the soundness of the withholding.'"  Id. (quoting King, 830 F.2d at 218).  For this reason, "conclusory affidavits that merely recite statutory standards, or are overly vague or sweeping will not, standing alone, carry the government's burden."  Larson, 565 F.3d at 864.  Along similar lines, the Government's failure to establish "a logical connection between the disclosure of" the subject information "and a risk to the national security" — a necessary element under Exemption 1, as explained below —

dooms its attempt to invoke this protection. See Rosenberg v. U.S. Dep't of Def., 342 F. Supp. 3d 62, 86 (D.D.C. 2018); see also ACLU, 628 F.3d at 624 (stating that certain withholdings are "exempt from disclosure under exemption 1[] only if the [agency] can establish that public disclosure of the withheld information will harm national security"). Put another way, the agency must set forth a plausible rationale; it "cannot meet its burden of justifying non-disclosure simply by invoking the phrase 'national security.'" Coldiron v. U.S. Dep't of Justice, 310 F. Supp. 2d 44, 53 (D.D.C. 2004) (citation omitted).

To justify its redactions of the Comey Memos, the FBI submitted the declaration of David M. Hardy, Section Chief of the Bureau's Records/Information Dissemination Section of the Information Management Division. See Fifth Hardy Decl., ¶ 1. In his declaration, Hardy invokes Executive Order 13526, 75 Fed. Reg. 707 (Dec. 29, 2009), as the basis for Defendant's use of Exemption 1. Id., ¶¶ 2, 19–39. This Order establishes procedures and standards to govern the federal government's classification of records. It requires both substantive and procedural steps. On the substantive side — the only disputed step here — the Executive Order demands that the information pass two separate standards. First, its disclosure must "reasonably be expected to cause identifiable or describable damage to the national security." EO 13526, § 1.4. Second, the information must "pertain[] to one of" several possible categories, only one of which is at issue here: Section 1.4(d), which shields "foreign relations or foreign activities of the United States, including confidential sources." Id. This provision, the Bureau maintains, covers the remaining redactions. See Fifth Hardy Decl., ¶ 19.

CNN's challenge is straightforward. Defendant, it says, has not sustained its burden of demonstrating a logical connection between the withheld information and any adverse effect on national security. See Pl. MSJ & Opp. at 7. Plaintiff does not appear to dispute that the

information properly qualifies as "pertain[ing]" to "foreign relations or foreign activities of the United States." EO 13526, § 1.4(d). Like the parties, the Court will proceed through the redactions in blocks, assessing the national-security connection.

a. Redactions 1–7

The first batch of redactions concerns Comey's recounting of a conversation with President Trump concerning former National Security Advisor Michael Flynn. As Comey recounts, Trump

> then went on to explain that he has serious reservations about Mike Flynn's judgment and illustrated with a story from that day in which the President apparently discovered during his toast to Teresa [*sic*] May that [Redaction 1] had called four days ago. Apparently, as the President was toasting PM May, he was explaining that she had been the first to call him after his inauguration and Flynn interrupted to say that [Redaction 2] had called (first, apparently). It was then that the President learned of [Redaction 3] call and he confronted Flynn about it (not clear whether that was in the moment or after the lunch with PM May). Flynn said the return call was scheduled for Saturday, which prompted a heated reply from the President that six days was not an appropriate period of time to return a call from the [Redaction 4] of a country like [Redaction 5] ("This isn't [Redaction 6] we are talking about."). He said that if he called [Redaction 7] and didn't get a return call for six days he would be very upset.

ECF No. 69, Attach 2, Exh. B (Comey Memos) at 3–4.

The redacted information, the FBI says, contains "[r]eferences to foreign countries or foreign leaders that reflect the relative importance attached by the President to contacts from one over another." Fifth Hardy Decl., ¶ 19. The Bureau contends that its disclosure "could reasonably be expected to . . . cause damage to the national security." Id., ¶ 38. The rationale underlying this conclusion, however, is somewhat curt. The Hardy Declaration merely asserts that "[i]n general," the release of any information "concerning foreign relations" can lead to

diplomatic tensions and perhaps diminished cooperation from foreign nations.  <u>Id.</u>, ¶ 37; <u>see also</u> <u>id.</u>, ¶ 38 (stating similarly).

It is here that CNN starts its fight.  That rationale may very well suffice, it says, when the withheld information contains <u>negative</u> information about foreign countries or dignitaries.  But in this case, the released information makes clear that redactions 1 through 5 and 7 reference only <u>positive</u> interactions with the United States' foreign partners.  <u>See</u> Pl. MSJ & Opp. at 8–9.  The release of this information, CNN contends, cannot possibly cause "damage to the national security" as required by the pertinent Executive Order.  <u>See</u> EO 13526, § 1.4; <u>see also</u> Pl. MSJ & Opp. at 9.  Given that the Executive Order leaves little ambiguity about the effect on national security required — damage is indeed necessary — Plaintiff is off to a strong start.

In its Reply brief, the FBI offers three responses.  First, it says that CNN "is not qualified to determine what will or will not affect [foreign] relations."  ECF No. 75 (Def. Opp. & Reply) at 6.  This misses the point.  Plaintiff's qualifications and preferred rationale are irrelevant; it is Defendant who has the burden of demonstrating a connection between the withheld information and harm to national security.  If it does not sustain its burden of demonstrating a "logical or plausible" connection to a damaged national-security interest, the fault lies with the Bureau.  <u>See</u> <u>Rosenberg</u>, 342 F. Supp. 3d at 86 (requiring Government to show "a logical connection between the disclosure of" the subject information "and a risk to the national security").

Second, the FBI posits that "even if release of such positive information does not harm the United States' relations with <u>that</u> particular country, it is logical and plausible that it could hurt our relations with <u>other</u> countries."  Def. Opp. & Reply at 6.  This isolated sentence does little to advance the ball.  As an initial matter, there is only a hint of this rationale in the sworn declaration that typically serves as the basis for the Court's review.  <u>See</u> <u>ACLU</u>, 628 F.3d at 619.

Hardy characterizes the redactions as reflecting the "relative importance" assigned to foreign leaders by the President. See Fifth Hardy Decl., ¶ 38. As the public version of this Memo makes clear, however, redactions 1 through 5 and 7 contain only factual or positive statements; they alone reveal nothing about the relative importance assigned to foreign leaders. Disclosing these few redactions, further, would not risk revealing the remaining one — i.e., redaction 6.

If the Bureau intends to argue more in its Reply brief, it fares no better. A mere assertion that harm is "logical" or "plausible" is exactly the type of "conclusory" statement that falls short of the FBI's minimal burden. See Larson, 565 F.3d at 864. Defendant must offer a rationale that is logical or plausible; it cannot simply state that it is logical or plausible that harm will ensue. And here, the Bureau has provided no line of reasoning linking the disclosure of these redactions to any harm to the United States' relations with a foreign country or leader and a consequent harm to national security.

Grasping at a final straw, the FBI redirects its fire at the Court, saying that its job is not to "second guess" the Agency's opinion. See Def. Opp. & Reply at 7. Since the Bureau's "classification authority has determined that release of these statements would impact our relations with other countries," it says, that should be the end of the matter. Id. This is a bridge too far. What Defendant seems to be asking for here is more than deference; it wants acquiescence. Such an approach would relegate the Court to the role of the Bureau's loyal sidekick, offering only affirmation of its decisions. That, plainly, is not how judicial review works. "No matter how much a court defers to an agency, its 'review is not vacuous.'" Coldiron, 310 F. Supp. 2d at 53 (quoting Ctr. for Nat'l Sec. Studies, 331 F.3d at 939 (Tatel, J., dissenting)); see also Campbell, 164 F.3d at 30 (holding that deference "is not equivalent to acquiescence"). Although the Court will not second-guess a plausible rationale articulating a

line between withheld information and harm to foreign relations, it is the Bureau's job to provide that line of reasoning. Without submitting a rationale that "afford[s]" the Court "an adequate foundation to review[] the soundness of the withholding," the Government cannot prevail. See Campbell, 164 F.3d at 30 (citation omitted). It has not met this minimal burden here.

Two notes are necessary before moving to the next category of redactions. First, the Court does not impose a categorical rule that a statement must be disparaging to fall under the Executive Order's protection under § 1.4(d). Far from it. It only concludes, consistent with other courts in this district and controlling law, that the FBI must set forth a logical connection between disclosure and damage to national security. In this factual circumstance, the Bureau has not articulated the links to forge such a chain.

Second, the deficiency evident in Defendant's declaration does not extend to redaction 6. Given the statement and context, the Court has no trouble following the link offered by the FBI between disclosure and harm to national security. Although Plaintiff points out that "President Trump has insulted any number of foreign countries and leaders using far sharper language," Pl. MSJ & Opp. at 9, that does not diminish the logical likelihood that an additional statement could cause additional harm. The plausible connection is evident. The Court, therefore, will uphold the Bureau's withholding of this redaction, but not the others in this group.

b. Redaction 20

Skipping redactions 8 through 19 — which the Court has already held are properly protected by Exemption 3 — the next stop is redaction 20. In this part of his Memo, Comey states that Trump

> then pivoted to the Russians wanting an apology from Bill O'Reilly. I said I had seen that and O'Reilly's reply, which was to "call him in 2023." The President then said that O'Reilly's question about whether he respected Putin had been a hard one. [Redaction 20].

20

He said he does respect the leader of a major country and thought
that was the best answer.

Comey Memos at 7.

According to the FBI, the redacted sentence contains "a reference about the President's observation about responding to a question he was asked about Russian President Putin." Fifth Hardy Decl., ¶ 38. "In the context of other surrounding information," Hardy asserts, the "disclosure of the redacted information could reasonably be expected to impart or adversely impact relations with the referenced countries, and thus, cause harm to national security." Id.; see also id., ¶ 37 (explaining link between foreign relations and national security). Unlike some of the earlier redacted information, which is classified at the "Confidential" level, this information garnered the higher "Secret" classification. Id., ¶ 38. The FBI determined, therefore, that its disclosure could be expected to cause "serious damage" — as opposed to merely "damage" — to national security. Id.

CNN offers a single rebuttal. It says that "President Trump has already offered what is effectively every possible opinion one could have about Putin." Pl. MSJ & Opp. at 15. This "broad array" of statements "renders implausible any argument that releasing this one additional" observation could harm national security. Id.

The Court does not see things the same way. As an initial matter, the FBI has offered a "logical connection" linking disclosure to a consequent harm to national security. It requires little explanation to establish that most confidential observations about a foreign leader — other than those that are patently laudatory, which may require additional justification — could plausibly harm relations with that leader's country and thus adversely affect national security. See Rosenberg, 342 F. Supp. 3d at 86; see also Wolf, 473 F.3d at 374–75 (requiring "logical or plausible" explanation). Plaintiff's precise beef, it seems, is not with the links in this logical

chain — *i.e.*, if President Trump had uttered no other public statements, nothing in CNN's brief would undermine the FBI's rationale for disclosure here. Rather, it contends that any harm to foreign relations is muted by statements already in the public record. This rationale suffers from two primary deficiencies.

First, even granting CNN's premise that the President may have uttered "effectively every possibly opinion one could have," its conclusion does not necessarily follow. See Pl. MSJ & Opp. at 15. Contrary to Plaintiff's argument, it is by no means "implausible" that a further observation stated by a President could have an additional impact on relations with the subject country. Other courts in this district have endorsed the intuitive proposition that official disclosure of information already in the public realm can nevertheless affect national security. See Edmonds v. FBI, 272 F. Supp. 2d 35, 49 (D.D.C. 2003) ("[I]n the area of national security, it is accepted that an agency can determine that disclosure of information already in the public realm 'reasonably could be expected to cause damage to the national security.'") (quoting Washington Post v. U.S. Dep't of Def., 766 F. Supp. 1, 10 (D.D.C. 1991)). Said otherwise, the mere fact that a similar statement may have already been publicly uttered "does not eliminate the possibility that further disclosures can cause harm." Fitzgibbon v. CIA, 911 F.2d 755, 766 (D.C. Cir. 1990). In addition, there is a large gulf — particularly in the eyes of a foreign country — between what a public figure may say to the press (or others) in public and what she might reveal in private to the Director of the FBI.

Second, once the Government has established the logical connection necessary to invoke the exemption, the calculus about the degree of harm is not CNN's — or this Court's, for that matter — to perform. As long as the Bureau has provided a plausible rationale, tailored to this factual circumstance, "the court should not second-guess an agency's 'facially reasonable

concerns' regarding the harm disclosure may cause to national security." <u>Coldiron</u>, 310 F. Supp.

2d at 54 (quoting <u>Frugone v. CIA</u>, 169 F.3d 772, 775 (D.C. Cir. 1999). Decisions regarding the

magnitude of impact from the disclosure of confidential observations on the complex world of

international diplomacy are properly within the intelligence agencies' wheelhouse. <u>See</u> <u>Frugone</u>,

169 F.3d at 775. The judiciary, and CNN, are in an "extremely poor position to" question such

"predictive judgments." <u>Larson</u>, 565 F.3d at 865 (citation omitted). And here, the FBI

determined that release would cause "serious damage" to national security and thus classified the

information at the "Secret" level. <u>See</u> Fifth Hardy Decl., ¶ 38. To the degree Plaintiff challenges

the "extent" that disclosure would "harm[] national security," Pl. MSJ & Opp. at 15, that

argument finds no success here in light of Defendant's plausible calculation.

The Court will, accordingly, permit the FBI to keep secret the text that lies beneath

redaction 20.

c. Redactions 21–24

Finally, the last of the redactions occur in a description of a discussion between the two

men concerning foreign leaders. Comey states that Trump

> then switched topics and began to talk about Egypt and its leader,
> saying Obama didn't like the guy [Redaction 21]. He mentioned the
> Coptic church bombings and how horrible they were. He said that
> three Americans had been killed by an Egyptian soldier and the
> Egyptian leader had raised it with him. I interrupted to say that I
> thought he meant [Redaction 22] and an incident in Jordan. He
> agreed and said [Redaction 23] had told him he wanted to bring the
> soldier to justice quickly, but that the FBI was in some way asking
> them to delay. He said [Redaction 24]. I replied that I would dig
> into it but that I did not believe it to be true that the FBI was delaying
> a Jordanian prosecution.

Comey Memos at 8.

The redactions, the FBI contends, contain "information reflecting the President's impressions of specific foreign leaders." Fifth Hardy Decl., ¶ 38. For much the same reasons as redaction 20, discussed above, the Bureau thus believes that release of these impressions could harm national security. Id. Unlike that earlier redaction, however, the FBI applied the lower "Confidential" classification to this material. Id.

As to redactions 22 and 23, the Government has not toed the line. The Court fails to see, quite simply, how the redacted information contains anything about Trump's "impressions of specific foreign leaders." Id. Redaction 22 concerns a factual correction about a particular event, and redaction 23 contains information about what another foreign leader purportedly said to the President. Perhaps this information warrants protection in its own right, but if it does, it is not on the basis offered by the FBI. And because the Bureau has offered no other concrete explanation for its withholding, once this proffered rationale collapses, it is left with only abstract and conclusory statements about national security untethered to the specific information withheld. That is plainly not enough to carry its burden. The Government must offer the Court "an adequate foundation to review[] the soundness of the withholding." Campbell, 164 F.3d at 30 (quoting King, 820 F.2d at 218). Conclusory and sweeping generalizations will not suffice. See Larson, 565 F.3d at 864. The Government cannot justify its actions "simply by invoking the phrase 'national security.'" Coldiron, 310 F. Supp. 2d at 53 (citation omitted).

As for redactions 21 and 24, however, the story is different. The FBI's justification for the possible harm to national security that could result from sharing impressions of foreign leaders applies to this information. The Court finds no fault in this rationale for withholding. CNN's only response is to advocate for the categorical rule the Court rejected earlier. It contends that if the comments are positive, then they cannot possibly damage national security; if

they are negative, they are by now too old to have any real impact.  See Pl. MSJ & Opp. at 16. The Court is unpersuaded by this position.  The complex world of international diplomacy is a poor fit for such categorical statements, and Plaintiff's judgment about the degree of harm that might ensue from release matters little.  Having reviewed the redactions *in camera*, the Court is satisfied that the FBI has met its burden here.  Redactions 21 and 24 need not be released.

*     *     *

The final tally is now in: the FBI has properly justified its invocation of Exemption 3 for redactions 8 through 19 and Exemption 1 for redactions 6, 20, 21, and 24.  These may continue to be withheld.  The others — namely, redactions 1 through 5, 7, 22, and 23 — must be released, as the FBI has only asserted the protection of Exemption 1 here, which it failed to substantiate.

B.  Archey Declaration

With this tour of the Comey Memos complete, the Court moves to the last stop on its journey.  In the previous iteration of this litigation, the FBI provided material in two *in camera* declarations and one sealed *ex parte* proffer to justify its decision to keep the Memos secret.  In response to Plaintiff's Motion and this Court's probing, the Bureau has now publicly released both declarations — one in full and a second with redactions — and a transcript of the sealed proceeding.  CNN is not satisfied.  It wants unfettered access to all the FBI's submissions to this Court.  What remains at issue, therefore, are approximately five redactions in a single declaration.

Plaintiff mounts its attack on two fronts.  Both the First Amendment and common-law rights of access — two distinct but overlapping doctrines — entitle the public, CNN contends, to know what lies beneath the black boxes.  In other words, CNN is not relying on FOIA or its status as a requester here; it acts simply as a member of the public.  The Court begins with the

common law.  As this route gets Plaintiff to its desired destination, the Court need not wade into the parties' constitutional arguments.

"In the courts of this country — including the federal courts — the common law bestows upon the public a right of access to public records and documents."  Wash. Legal Found. v. U.S. Sentencing Comm'n, 89 F.3d 897, 902 (D.C. Cir. 1996) (internal quotation marks omitted).  This doctrine of transparency, which includes the right to access "judicial records," Nixon v. Warner Comm's, Inc., 435 U.S. 589, 597 (1978), is grounded in the public's "interest in keeping a watchful eye on the workings of public agencies."  SEC v. Am. Int'l Grp., 712 F.3d 1, 3 (D.C. Cir. 2013) (internal quotation marks omitted).  "[E]nsuring the integrity of judicial proceedings" serves as another pillar of this mission.  See Metlife, Inc. v. Fin. Stability Oversight Council, 865 F.3d 661, 665 (D.C. Cir. 2017) (citation omitted).  Given these underpinnings, the public's entitlement to judicial records "is fundamental to a democratic state."  Id. (citation omitted).

### 1. *Preemption*

Before turning to the applicability of this right, however, the Court appreciates that two antecedent obstacles lie in Plaintiff's path.  First, the Government contends that the redacted information contains "non-public information about intelligence methods" that the FBI is "obligated to protect" under the National Security Act.  See ECF No. 81, Attach. 1 (Sixth David M. Hardy Declaration), ¶ 6.  Although not stated in such explicit terms, what the FBI appears to argue is that this statute's strictures obviate the need to consider the applicability of the public's right to records; simply put, the Act supersedes this common-law right.  Second, along similar lines, the Government invokes — although somewhat equivocally — the protection of FOIA Exemption 7(E).  Id.  The Court addresses the operation and applicability of each statute in turn.

a.  National Security Act

Start with the National Security Act.  This statute — which the Court discussed at length in the preceding section — provides that the "Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure."  50 U.S.C. § 3024(i)(1).  While "it is true that the [common-law] inquiry must yield to a statute 'when Congress has spoken directly to the issue at hand,'" Metlife, 865 F.3d at 669 (quoting Ctr. for Nat'l Sec. Studies, 331 F.3d at 937), the Court concludes that the NSA is "not such a statute."  Id.

The D.C. Circuit recently addressed a similar question in Metlife.  There, Metlife — the party seeking to prevent disclosure — argued that the Dodd-Frank Act's mandate that "[t]he Council, the Office of Financial Research, and the other member agencies" keep certain materials confidential superseded the common-law right of access.  Id. at 669.  The circuit disagreed.  It held that the statute's plain text required only that the agencies keep material confidential, but "imposes no such obligation on — and does not even mention — the courts" and thus did not eclipse the common-law right to judicial records.  Id.  In doing so, the circuit squarely rejected the argument that "when a statute requires an agency to preserve the confidentiality of administrative materials, the statute supersedes the [common-law] test and requires that agency materials be sealed during litigation."  Id. at 673.  And although other aspects of the statute "reinforce[d]" the circuit's conclusion, the absence of a textual application appeared sufficient to preclude Dodd-Frank from abrogating the common-law right of access to judicial records.  Id. at 669.

So, too, here.  In a singular directive, the National Security Act mandates that the "Director of National Intelligence" keep intelligence sources confidential but does not mention the courts.  See 50 U.S.C. § 3024(i)(1).  This directive looks a lot like the one at issue in Metlife.

As in that case, moreover, the FBI has complied with the Act's directive that intelligence agencies not disclose the information. The "'typical' question of whether a <u>court</u> should unseal those records," however, is a question that remains "governed by [the common law]." <u>Metlife</u>, 865 F.3d at 674 (emphasis added) (citing <u>In re Sealed Case</u>, 237 F. Supp. 657, 666 (D.C. Cir. 2001)). That said, as in <u>Metlife</u>, Congress's view that information within the statute's coverage warrants protection must "weigh heavily" in the Court's common-law-access inquiry. <u>Id.</u> at 675. The key takeaway, however, is that the NSA is something to be considered <u>in</u> that analysis; it is not a way <u>around</u> the inquiry.

### b. FOIA

Next up is the Government's argument that an exemption from FOIA protects the redactions from release. More specifically, the FBI contends that "some of these same redactions could, if lifted, expose information that the FBI would typically redact under Exemption []7(E)." Sixth Hardy Decl., ¶ 6. Here, again, the Court must consider whether a statute — this time, FOIA — preempts the common-law right of access.

The Court does not write on a blank slate. In <u>Metlife</u>, the D.C. Circuit recently weighed in on the interaction of these two legal schemes. There, it reasoned that "[i]f FOIA . . . preempted the common-law right of access to judicial records," then "there would be little left of that right in litigation involving the federal government." 865 F.3d at 672; <u>but see</u> <u>Ctr. for Nat'l Sec. Studies</u>, 331 F.2d at 936–37 (concluding that "balanced scheme of disclosure and exemption" that Congress provided in FOIA "preempts any preexisting common law right"). The circuit thus held that the access right survived in that suit. <u>See</u> <u>Metlife</u>, 865 F.3d at 674. This conclusion initially appears to preclude the Government's reliance on FOIA to protect the information sought.

There may be reason to think, however, that Metlife's holding is less than categorical.  Id. at 672–73 & n.14 (relying on factual circumstances).  This is especially so when a plaintiff employs the common-law right in a FOIA suit to seek information that FOIA itself denies.  But even if Metlife does leave some room for FOIA to supersede the common-law right in certain contexts, such displacement would only occur if a FOIA exemption did, in fact, apply to the records sought.  And here, for the reasons articulated below, the Government has not successfully met that burden.  The Court, therefore, need not wade into preemption's murky waters, as an assumption in the FBI's favor still leaves the Bureau short of the finish line.

In a traditional FOIA suit, the agency bears the burden of justifying its withholdings, see Reporters Comm., 489 U.S. at 755, and the Court sees no reason why that should be any different in this scenario.  To protect information from disclosure, the agency must, at a minimum, "describe the justifications for nondisclosure with reasonably specific detail, [and] demonstrate that the information withheld logically falls within the claimed exemption." Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice, 746 F.3d 1082, 1088 (D.C. Cir. 2014) (citation omitted); see also Morley, 508 F.3d at 1115 (holding that "conclusory and generalized allegations of exemptions are unacceptable") (internal quotation marks omitted).

This it has not done.  The FBI falters right off the bat, since it is not clear to the Court the redactions for which it seeks to invoke Exemption 7(E) or, in fact, whether it truly attempts to invoke it at all.  It says only that "some of these redactions could, if lifted, expose information that the FBI would typically redact under Exemption []7(E)."  Sixth Hardy Decl., ¶ 6 (emphases added).  The Government's statement is hopelessly equivocal.  To explain its potential withholding, moreover, the Bureau says only that the information pertains to the "law

enforcement technique of utilizing confidential human sources." Id.  This sauce needs more flavor.  To succeed, the Government "must at least provide some explanation of what procedures are involved and how they would be disclosed."  CREW, 746 F.3d at 1102.  When an agency's declaration "lacks the reasonably specific detail required to carry its burden" and "fails to give the reviewing a reasonable basis to evaluate the claim of privilege," as is the case here, the Court will not sustain its desire for secrecy.  Id. at 1099–1100 (internal quotation marks omitted).  Even if a properly invoked FOIA exemption would wipe out any common-law right to the information, the Bureau cannot thus rely on that protection here.

### 2. *Common-Law Right of Access to Judicial Records*

With that lengthy detour complete, the Court can now turn to Plaintiff's contention that it is owed the unredacted declaration under the common-law right of access to judicial records.  A party seeking to invoke this right must clear two hurdles.  First, it must demonstrate that the information to which it seeks access does, in fact, qualify as a "judicial record."  In re Fort Totten Metrorail Cases, 960 F. Supp. 2d 2, 6 (D.D.C. 2013) (citing Wash. Legal Found., 89 F.3d at 902).  The applicability of this category is judged according to "the role [the document] plays in the adjudicatory process."  United States v. El-Sayegh, 131 F.3d 158, 163 (D.C. Cir. 1997).  Something "intended to influence" a court's pending decision — a party's brief, for example — is almost certainly a judicial record, see Metlife, 865 F.3d at 668, while a document about which the court "made no decisions" and did not "otherwise rel[y]" does not qualify.  See Am. Int'l Grp., 712 F.3d at 3–4.  A withdrawn plea agreement the court never ruled on, for example, lies in the latter category.  Id. at 3 (citing El-Sayegh, 131 F.3d at 162).

A court's conclusion that a document constitutes a judicial record triggers a "strong presumption in favor of public access."  EEOC v. Nat'l Children's Ctr., Inc., 98 F.3d 1406, 1409

(D.C. Cir. 1996) (citation omitted).  But making it over this first hump does not, alone, entitle

Plaintiff to view the records it seeks, as the common-law "right is not absolute."  Am. Int'l Grp.,

712 F.3d at 3.  Rather, at the second step of the Court's inquiry, it must determine whether "the

government's interest in secrecy outweighs the public's interest in disclosure."  Id.  To apply this

broad query to a particular factual circumstance, the D.C. Circuit has crafted a multi-pronged

test, dubbed the Hubbard factors, which "fully account for the various public and private

interests at stake."  Metlife, 865 F.3d at 665–66 (citing United States v. Hubbard, 650 F.2d 293,

317–22 (D.C. Cir. 1980)).  These factors are:

> (1) the need for public access to the documents at issue; (2) the
> extent of previous public access to the documents; (3) the fact that
> someone has objected to disclosure, and the identity of that person;
> (4) the strength of any property and privacy interests asserted; (5)
> the possibility of prejudice to those opposing disclosure; and (6) the
> purposes for which the documents were introduced during the
> judicial proceedings.

Nat'l Children's Ctr., 98 F.3d at 1409 (citing Hubbard, 650 F.2d at 317–22).  A finding in favor

of the Government "might act to overcome th[e] presumption" in favor of access.  Id.

### a.  Judicial Record

Turning to the records at hand, Plaintiff clears the first hurdle without breaking a sweat.

The Archey Declaration is clearly a judicial record.  In the last go-round, the Government sought

leave to file this declaration in camera to bolster is motion for summary judgment.  See CNN II,

293 F. Supp. 3d at 66; see also ECF No. 23 (Def. Request for Leave).  Because the FBI was

"limited in the amount of information it can provide publicly" to justify its withholdings, it

provided in camera information about the "harms that could reasonably be expected to flow from

disclosure."  Def. Request for Leave, ¶¶ 3–4.  After reviewing these declarations, the Court

granted the Government summary judgment.  There can be no doubt, therefore, that the

declaration was "intended to influence" the Court, see Metlife, 865 F.3d at 667, and thus played

a central "role . . . in the adjudicatory process," rendering it a judicial record. See El-Sayegh,

131 F.3d at 163. The FBI does not appear to contend otherwise.

> b.  Hubbard Factors

This conclusion creates a presumption in favor of disclosure. See Wash. Legal Found.,

89 F.3d at 902. The question upon which the propriety of the FBI's withholding then turns is

whether the six Hubbard factors sufficiently tip the scales back in the Government's favor. See

Nat'l Children's Ctr., 98 F.3d at 1409. The Court will march through each prong in turn.

First is "the need for public access to the documents at issue." Id. This one favors

Plaintiff. Although the Court sees little public value in the specific information that remains

redacted, there is enormous public interest in the Comey Memos and documents related to their

disclosure. The FBI does not argue to the contrary; in fact, it does not even mention this factor.

The need for public access, therefore, counsels disclosure.

The Court next weighs "the extent of previous public access to the documents." Id.

There is little, in the end, helpful here. On the one hand, the FBI has already released the vast

majority of the declaration. This previous public access seems to cut in favor of release. See

Hubbard, 650 F.2d at 424 ("Previous access is a factor which may weigh in favor of subsequent

access."); see also In re Fort Totten Metrorail Cases, 960 F. Supp. 2d at 8 (similar). Then again,

the reason the FBI would like to keep the remaining redactions secret is, presumably, because the

specific information is somehow distinct from what is in the public record. Defendant, however,

offers no explanation or argument here. The Court thus concludes that this factor, too, tips in

favor of access.

Third, the Court considers "the fact that someone has objected to disclosure, and the identity of that person." Nat'l Children's Ctr., 98 F.3d at 1409. On this prong, the Government makes a bit more progress. The FBI has objected to disclosure. See Sixth Hardy Decl., ¶ 6. Given that it is an agency tasked with national security, the Court takes this objection seriously. That said, "litigants to this proceeding have a lesser claim to privacy than third parties." Hyatt v. Lee, 251 F. Supp. 3d 181, 185 (D.D.C. 2017) (citation omitted). The strength of any potential objection related to national security, moreover, is taken into account in the next two prongs, obviating the need to place much weight on it here. While the Court thus takes the FBI's objection into account, it "do[es] not have the same strength as a third-party objection." Id.

The fourth and fifth prongs go hand in hand. They are "the strength of any property and privacy interests asserted" and "the possibility of prejudice to those opposing disclosure." Nat'l Children's Ctr., 98 F.3d at 1409. This is a bit of a mixed bag for the parties. The National Security Act's protection for "intelligence sources and methods" — which the FBI says applies to the redactions here, see Sixth Hardy Decl., ¶ 6 — favors withholding. Such a "congressional judgment about the importance of maintaining . . . confidentiality" creates a privacy interest in favor of keeping the records from public view, which the Court must "weigh heavily." Metlife, 865 F.3d at 675. But beyond a brief nod to this Act in Hardy's declaration, see Sixth Hardy Decl., ¶ 6, the Government does nothing to address the strength of the interests at play. To be sure, it repeatedly invoked the then-ongoing nature of the Special Counsel's investigation in its earlier briefing as a reason to keep the documents from public light. See Def. Access Opp. at 5–6, 10. That investigation, however, has now come to an end. And with it, so has the strength of the Bureau's argument.

Defendant's brief and subsequent filings articulate no other basis for the Court to conclude that these two prongs favor withholding. Nor is it self-evident from the Court's review of the withheld information why secrecy is important here. Perhaps the redactions constitute "superficially innocuous" material that, in conjunction with other available data, may "enable an observer to discover the identity of an intelligence source [or method]." Sims, 471 U.S. at 178. The FBI, however, has provided no such rationale, and the Court is not in the position to make such a determination without the Government's help. On the current record, therefore, these two prongs also provide little support for Defendant's position.

The sixth and final factor is "the purposes for which the documents were introduced during the judicial proceedings." Nat'l Children's Ctr., 98 F.3d at 1409. Under this prong, "[t]he public's entitlement to judicial records is commensurate with the documents' importance to the judicial proceeding in question." Matter of Leopold to Unseal Certain Elec. Surveillance Applications & Orders, 300 F. Supp. 3d 61, 96 (D.D.C. 2018). This is the "single most important" Hubbard factor. See Hubbard, 650 F.2d at 321. Although the FBI spills most of its ink on this prong, CNN still comes out ahead in the end.

The Government introduced the *in camera* declaration to persuade the Court to rule against CNN, which sought to inform the public about documents that were central to an investigation in the public eye. This Court relied on those declarations and noted their existence in its prior Opinion. See CNN II, 293 F. Supp. 3d at 66–67. This sequence of events elevates the public's interest in disclosure. See Nat'l Children's Ctr., 98 F.3d at 1409; cf. Hubbard, 650 F.2d at 427 (noting fact that documents were not "expressly relied upon by the trial judge in his decision" as reason for withholding). At first blush, therefore, the purposes for which the documents were introduced appear to cut heavily in Plaintiff's favor.

Not so fast, says the FBI. If the redacted information were released, Defendant counters, it would "impair the very . . . rights [defendants] seek to vindicate" — namely, the exemptions to FOIA. See Def. Access Opp. at 10 (quoting Hubbard, 650 F.2d at 321). Rather, the FBI continues, it is FOIA itself that should provide the appropriate framework here and submitting *in camera* declarations is routine in such cases. Id. at 10–11. That may be so. But see Metlife, 865 F.3d at 672 (concluding that FOIA does not displace common-law right). The Court, however, has already found that the Government has fallen short of meeting its burden for invoking any FOIA exemption here. And if the FBI is not, in fact, entitled to the "right" it seeks to "vindicate," then nothing in this prong counsels withholding the redacted information. The Court's initial take is also its final: the sixth Hubbard factor stands on Plaintiff's side of the aisle.

All in all, Defendant's showing under the Hubbard factors does not overcome the presumption in favor of disclosure. No factor overwhelmingly favors the Government; some, on the other hand, counsel strongly for disclosure, including the "single most important" one. See Hubbard, 650 F.2d at 321. On this record, Plaintiff must prevail.

IV.    **Conclusion**

For these reasons, the Court will grant in part and deny in part Defendant's Motion for Summary Judgment and will grant in part and deny in part Plaintiff's Cross-Motion for Summary Judgment. It will also grant Plaintiff's Motion for Access to Judicial Records. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  June 7, 2019